UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CITY OF NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | Civ. A. No. 10-6826 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **ECF CASE** |
| PRIVATEBANCORP, INC., LARRY D. RICHMAN, DENNIS L. KLAESER, KEVIN M. KILLIPS, RALPH B. MANDELL, KEVIN VAN SOLKEMA, DONALD L. BEAL, WILLIAM A. CASTELLANO, ROBERT F. COLEMAN, PATRICK F. DALY, WILLIAM A. GOLDSTEIN, JAMES M. GUYETTE, RICHARD C. JENSEN, PHILIP M. KAYMAN, CHERYL MAYBERRY MCKISSACK, WILLIAM J. PODL, EDWARD W. RABIN, COLLIN E. ROCHE, WILLIAM R. RYBAK, ALEJANDRO SILVA, JAMES C. TYREE, JOHN B. WILLIAMS, NORMAN R. BOBINS, KEEFE, BRUYETTE & WOODS, INC., ROBERT W. BAIRD & CO. INCORPORATED, WILLIAM BLAIR & COMPANY, L.L.C., SUNTRUST ROBINSON HUMPHREY, INC., J.P. MORGAN SECURITIES INC., ERNST & YOUNG LLP, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff City of New Orleans Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes: (a) review and analysis of regulatory filings made by PrivateBancorp, Inc. ("PrivateBancorp" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by PrivateBancorp; and (c) review and analysis of other publicly available information concerning PrivateBancorp.

## SUMMARY OF ACTION

1.      This is a federal securities class action brought on behalf of purchasers of PrivateBancorp's publicly traded common stock between November 2, 2007 and October 23, 2009, inclusive (the "Class Period"), and investors who purchased or otherwise acquired PrivateBancorp's common stock pursuant and/or traceable to registered public offerings conducted on or about June 4, 2008 (the "2008 Offering") and on or about May 11, 2009 (the "2009 Offering"). The claims alleged herein are asserted against PrivateBancorp, certain of its senior executives and directors, the underwriters of PrivateBancorp's 2008 and 2009 Offerings, and its independent auditor. The Company' alleged misconduct, as detailed herein, caused Plaintiff and the Class to incur substantial losses on their investments in PrivateBancorp common stock during the Class Period. Plaintiff now seeks remedies for those losses under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      PrivateBancorp is a Chicago-based, financial services company that concentrates on commercial banking and private banking for high-net worth individuals and families. Since

November 2007, PrivateBancorp has operated with a singular focus: to aggressively grow the Company's franchise into "the bank of choice for middle market commercial and commercial real estate companies, as well as business owners, executives, entrepreneurs and families." In furtherance of this goal, on November 2, 2007, PrivateBancorp's Board of Directors (the "PrivateBancorp Board") – led by former Chief Executive Officer ("CEO") and current Chairman Ralph B. Mandell – announced its approval of a Strategic Growth and Transformation Plan (the "Growth Plan") intended to expand the Company's business through increased lending and new business development. Two key components of the Growth Plan were (1) the recruitment and retention of experienced middle market commercial bankers, and (2) a new incentive program to reward high-performing PrivateBancorp employees for driving up the price of Company stock.

3.     In executing the Growth Plan, PrivateBancorp aggressively poached the talent of its competitors to attract new commercial business to the Company. PrivateBancorp's primary source for recruitment was LaSalle Bank, N.A. ("LaSalle"), which in 2007 was in the process of being acquired by Bank of America Corp. In the two years that followed the announcement of the Growth Plan, the Company nearly doubled the ranks of its bankers, with over 160 LaSalle recruits joining PrivateBancorp. According to Norman Bobins, former LaSalle Chairman and current PrivateBancorp Board member, in making its wholesale talent raid, PrivateBancorp "bet the ranch." Indeed, PrivateBancorp showered its new hires with big salaries, large signing bonuses, and substantial incentive awards tied to the performance of PrivateBancorp stock. By motivating its workforce with substantial performance based incentives, PrivateBancorp cultivated a corporate culture that placed the achievement of financial targets above responsible lending.

4.     Under the Growth Plan, the Company's loan portfolio more than doubled in less than two years, with PrivateBancorp's interest-earning assets rapidly growing from $4.5 billion in 2007 to more than $12 billion in 2009. The Company touted this apparent success in the execution of the Growth Plan, which resulted in the artificial inflation of the price of PrivateBancorp shares during the Class Period.

5.     In truth, the growth and financial results reported by PrivateBancorp during the Class Period were materially false and misleading because the Company concealed from investors that PrivateBancorp was routinely sacrificing loan quality for quantity in order to achieve certain financial targets to trigger incentive awards for its key employees. Although PrivateBancorp represented to investors that the core principle of the Growth Plan involved prudent and quality lending with rigorous risk management, PrivateBancorp's thirst for growth caused the Company to take on hundreds of millions of dollars in high-risk, low quality loans, which the Company failed to disclose, even when substantial losses on those loans began to materialize. As such, PrivateBancorp's Class Period statements materially misled investors about, *inter alia*, the success of the Growth Plan; the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions and reserves; the amount of write-offs necessary to address the Company's growing credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

6.     Rather than disclose these concerns, PrivateBancorp sought to shore up its capital position by issuing materially false and misleading offering materials that enabled the Company to raise hundreds of millions of dollars from investors in registered public offerings of PrivateBancorp common stock. Significantly, on or about June 11, 2008, PrivateBancorp

concluded the 2008 Offering, selling approximately 4 million shares of newly issued common stock at $34 per share, and 522,963 shares of the Company's Series A convertible preferred stock at $32.64 per share. The 2008 Offering resulted in net proceeds to the Company of $147.6 million.

7.    On January 26, 2009, the truth about PrivateBancorp began to be revealed when PrivateBancorp shocked investors by announcing a net loss of $62 million for the fourth quarter 2008 and a net loss of $91.5 million for the year ended December 31, 2008, compared to a net loss of $15.1 million for the fourth quarter 2007 and net income of $11.8 million for the year ended December 31, 2007. PrivateBancorp's reported losses of nearly $2 per share vastly exceeded analysts' estimated losses of $0.14 per share, and were due largely to PrivateBancorp's sudden write-off of $108.8 million worth of nonperforming loans. In response to the January 26 disclosure, PrivateBancorp stock fell approximately 22%, dropping from $19.70 per share to $15.32.

8.    To mitigate the market's response to the January 26 announcement and reassure investors, PrivateBancorp asserted that the Company had engaged in a "proactive" review to address "credit-quality concerns" in PrivateBancorp's "legacy loans," and that the losses incurred were not related to the Growth Plan. PrivateBancorp thereby concealed that the Company also held hundreds of millions of dollars in nonperforming or high-risk commercial and industrial loans originated under the Growth Plan, which allowed the Company's stock to rebound. Seizing on the opportunity to benefit from the recovery of its stock, on May 11, 2009, PrivateBancorp conducted a public offering of 11.87 million shares of Company stock at $19.25 per share (the "2009 Offering"), raising. $217 million.

9.      Prior to the start of trading, on October 26, 2009, PrivateBancorp shocked investors by announcing a third quarter loss of $31.2 million, or $0.68 per share, when the market had expected a per-share profit for the quarter.  Despite having written-off in excess of $100 million in bad loans in January 2009, the Company revealed that it held almost $400 million in nonperforming loans as of the third quarter 2009, compared to just $106.5 million of nonperforming loans in the third quarter of 2008.  This was a substantial increase from the second and first quarters of 2009 for which PrivateBancorp reported $212.8 million and $191.6 million in nonperforming loans, respectively.  Unable to hide the truth any longer, PrivateBancorp disclosed that its elevated levels of nonperforming loans were originated under the Growth Plan.  As a result, PrivateBancorp increased its provisions for bad loans to $90 million, compared to just $30 million in the third quarter of 2008.  In response to the Company's October 26 disclosure, PrivateBancorp stock fell over 37%, dropping from $19.00 per share to $11.98.

10.      In the wake of the losses PrivateBancorp disclosed in January and October 2009, the Company replaced its Chief Financial Officer and Chief Operating Officer.  Notwithstanding the revelations about PrivateBancorp's true financial condition, and the fact that incentive targets under the Growth Plan were not achieved, on February 2, 2010, the Company announced that it would reward its management team by modifying the Company's compensation plan in order to provide bonuses for 130 senior executives and key employees.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o); and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

12.     This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged violations of the federal securities laws or the effects of these violations have occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Additionally, PrivateBancorp maintains its principal executive offices within this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### Plaintiff

15.     Plaintiff City of New Orleans Employees' Retirement System as set forth in the accompanying Certification, incorporated by reference herein, purchased PrivateBancorp common stock during the Class Period and on the 2008 Offering, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.  Plaintiff is a defined-benefit pension fund established for the benefit of city employees of the city of New Orleans.

### PrivateBancorp Defendant

16.     PrivateBancorp, Inc. is a Chicago-based financial services company that is incorporated in Delaware.  PrivateBancorp delivers customized business and personal financial

services to middle-market companies, as well as business owners, executives, entrepreneurs and families. As of March 31, 2010, the Company had 34 offices in 10 states and $12.8 billion in assets.

### Officer Defendants

17.     Larry D. Richman is President and CEO of PrivateBancorp, and The PrivateBank-Chicago, a wholly owned subsidiary of PrivateBancorp. Richman assumed his leadership role at the Company in November 2007. Defendant Richman signed the Shelf Registration Statement (defined below). Defendant Richman's total compensation for 2007, 2008, and 2009 was reportedly $6,387,709, $1,461,666, and $883,991, respectively.

18.     Ralph B. Mandell is Chairman and a co-founder of PrivateBancorp. Mr. Mandell has been on the PrivateBancorp Board since 1989 and is a director of all of the Company's subsidiary banks. Mr. Mandell was Chairman, President and CEO of PrivateBancorp until his succession by Defendant Richman in November 2007. Defendant Mandell signed the Shelf Registration Statement (defined below). Defendant Mandell's total compensation for 2007, 2008, and 2009 was reportedly $2,369,256, $3,012,897, and $1,422,114, respectively.

19.     Dennis L. Klaeser was CFO of PrivateBancorp and The PrivateBank-Chicago from April 2003 through his departure from the Company in February 2009. Defendant Klaeser signed the Shelf Registration Statement (defined below). Defendant Klaeser's total compensation for 2007, 2008, and 2009 was reportedly $1,460,692, $334,970, and $600,106, respectively

20.     Kevin M. Killips succeeded Defendant Klaesar as the Chief Financial Officer of PrivateBancorp, and has served in that capacity since March 2009. Defendant Killips' total compensation for 2009 was reportedly $1,397,791.

21.     Kevin Van Solkema is Chief Credit Officer at PrivateBancorp and has served in that capacity since March 2008.

22.     Defendants Richman, Mandell, Klaeser, Killips, and Solkema are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with PrivateBancorp, possessed the power and authority to control the contents of PrivateBancorp's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**Director Defendants**

23.     Donald L. Beal was a director of PrivateBancorp from 1991 through December 2009.  Defendant Beal signed the Shelf Registration Statement (defined below).

24.     William A. Castellano was a director of PrivateBancorp from 1991 through February 2010.  Defendant Castellano signed the Shelf Registration Statement (defined below).

25.     Robert F. Coleman has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board.   Defendant Coleman signed the Shelf Registration Statement (defined below).

26.     Patrick F. Daly was a director of PrivateBancorp from July 2004 through January 2010.  Defendant Daly signed the Shelf Registration Statement (defined below).

27.     William A. Goldstein was a director of PrivateBancorp from April 2003 through December 2009.  Defendant Goldstein signed the Shelf Registration Statement (defined below).

28.     James M. Guyette has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board.   Defendant Guyette signed the Shelf Registration Statement (defined below).

29.     Richard C. Jensen was a director of PrivateBancorp from January 2000 through July 2008.  Defendant Jensen signed the Shelf Registration Statement (defined below).

30.     Philip M. Kayman was a director of PrivateBancorp from 1990 through May 2010.  Defendant Kayman signed the Shelf Registration Statement (defined below).

31.     Cheryl Mayberry McKissack has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.   Defendant McKissack signed the Shelf Registration Statement (defined below).

32.     William J. Podl was a director of PrivateBancorp from August 1999 through May 2009.  Defendant Podl signed the Shelf Registration Statement (defined below).

33.     Edward W. Rabin, Jr. has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.   Defendant Rabin signed the Shelf Registration Statement (defined below).

34.     Collin E. Roche has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Roche signed the Shelf Registration Statement (defined below).

35.    William R. Rybak has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.   Defendant Rybak signed the Shelf Registration Statement (defined below).

36.    Alejandro Silva has been a director of PrivateBancorp since August 2005 and continues to serve on the PrivateBancorp Board.  Defendant Silva signed the Shelf Registration Statement (defined below).

37.    James C. Tyree has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Tyree signed the Shelf Registration Statement (defined below).

38.    John B. Williams was a director of PrivateBancorp from April 2004 through July 2008.  Defendant Williams signed the Shelf Registration Statement (defined below).

39.    Norman R. Bobins has been a director of PrivateBancorp since July 2008 and continues to serve on the PrivateBancorp Board.  The claims against herein against Mr. Bobins are restricted to those concerning the 2009 Offering.

40.    Defendants Beal, Castellano, Coleman, Daly, Goldstein, Guyette, Jensen, Kayman, McKissack, Podl, Rabin, Roche, Rybak, Silva, Tyree, Williams, and Bobins are at times referred to herein as the "Director Defendants."

## Underwriter Defendants

41.    Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette") was an underwriter of the 2008 and 2009 Offerings as specified herein.  As an underwriter of the 2008 and 2009 Offerings, Keefe Bruyette was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2008 and 2009 Offering Materials.

42. Robert W. Baird & Co. Incorporated ("Robert Baird") was an underwriter of the 2008 and 2009 Offerings as specified herein. As an underwriter of the 2008 and 2009 Offerings, Robert Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2008 and 2009 Offering Materials.

43. William Blair & Company, L.L.C. ("William Blair") was an underwriter of the 2008 and 2009 Offerings as specified herein. As an underwriter of the 2008 and 2009 Offerings, William Blair was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2008 and 2009 Offering Materials.

44. SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter of the 2008 and 2009 Offerings as specified herein. As an underwriter of the 2008 and 2009 Offerings, SunTrust was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2008 and 2009 Offering Materials.

45. J.P. Morgan Securities Inc. ("JP Morgan") was an underwriter of the 2009 Offering as specified herein. As an underwriter of the 2009 Offering, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2009 Offering Materials.

**Auditor Defendant**

46. Defendant Ernst & Young LLP ("Ernst & Young"), at all relevant times, served as an Independent Registered Public Accounting Firm for PrivateBancorp. Ernst & Young audited PrivateBancorp's financial statements for the years ended December 31, 2007, December 31, 2008 and December 31, 2009. The Company's December 31, 2008 financial statement was approved by Ernst & Young and included in PrivateBancorp's Annual Report for the year ended December 31, 2008, which was filed on Form 10-K with the SEC, and incorporated by reference

into the 2009 Offering, as detailed below. Ernst & Young consented to the incorporation by reference of its report of PrivateBancorp's 2008 Annual Report on Form 10-K and to the incorporation by reference of that report in the Shelf Registration Statement at issue herein. Ernst & Young is referred to herein as the "Auditor Defendant."

## SUBSTANTIVE ALLEGATIONS

47.     On November 2, 2007, the start of the Class Period, PrivateBancorp issued a press release entitled, "Larry Richman Joins PrivateBancorp, Inc. as Chief Executive Officer," in which the Company unveiled its Growth Plan to investors, including PrivateBancorp's aggressive recruitment strategy and its new performance-based incentive program. The press release stated, in relevant part, as follows:

> The hiring of Mr. Richman follows PrivateBancorp's recent success in recruiting a number of key middle market commercial bankers from LaSalle Bank, N.A., as part of a Strategic Growth and Transformation Plan (the "Plan") that has been adopted by its Board of Directors. Over the past two weeks, PrivateBancorp hired 27 commercial banking executives including Karen Case, Bruce Hague and Bruce Lubin, each of whom were previously leaders of different business lines at LaSalle Bank … Given these new hires, the total number of Managing Directors at PrivateBancorp has increased to 195 from 168 as of September 30, 2007.

> PrivateBancorp plans to hire additional Managing Directors over the next three quarters consistent with the Plan. The Board of Directors has appointed a special committee of independent outside directors, which has overseen all aspects of the development of the Plan. The Plan is based on the continuation of the Company's business model with a goal of substantially increasing its commercial banking market share.

> The key component of the Plan is the recruitment and retention of experienced middle market commercial bankers and the synergistic integration of those bankers into PrivateBancorp's existing platform. As a key component of the Plan, the Board of Directors has established a Transformation Equity Award Program for making inducement awards as a means to attract talent and to promote the achievement of exceptional performance benchmarks. Two-thirds of these awards have performance-vesting provisions that create an incentive for management to achieve significant stock price appreciation or earnings per share growth hurdles ("Performance Awards"). The remaining one-third of the equity awards are stock options, which will vest over a five-year period.

48.     Under the Growth Plan, PrivateBancorp's managing directors were highly motivated to deliver strong earnings growth and sharp stock price appreciation as two-thirds of PrivateBancorp's incentive awards were tied to performance – half of which vested upon the achievement of pre-determined Earnings Per Share growth rate targets, and the other half of which vested upon the achievement of pre-determined stock price appreciation targets.   The vesting requirements for PrivateBancorp's incentive awards were as follows:

> Approximately half of the Performance Awards vest upon achievement of a 20% compounded annual growth rate in PrivateBancorp's stock price over a five-year period ending December 31, 2012.  The remaining Performance Awards vest upon achievement of earnings per share growth hurdles: 50%, 75% and 100% will vest if the sum of GAAP earnings per share is equivalent to compounded annual growth rates in earnings per share of 15%, 17.5% and 20%, respectively, over a five-year time period ending December 31, 2012. The baselines for the performance hurdles are the ten day average closing stock price prior to the date of the grant, $27.91, and the latest twelve months earnings per share as of September 30, 2007, $1.65.

49.     In connection with the Growth Plan, the Company further announced that it would incur "substantial income statement charges" in the fourth quarter 2007, primarily as a result of the payment of generous sign-on bonuses, salaries, and stock awards to PrivateBancorp's new recruits.  Significantly, the Company reported that sign-on bonuses would exceed $15 million; new hires would receive awards valued at approximately $26 million; and an additional $14 million in awards would be issued to certain existing senior management.  As a result, "[f]or 2008, the Company anticipates a significant reduction in GAAP earnings primarily as a result of amortization expenses associated with the Transformation Equity Award Program, increased salary expenses and increased loan loss provision expense as a result of anticipated loan growth. Longer term, the Company believes the Strategic Growth and Transformation Plan will be accretive to earnings per share."  Notwithstanding these costs on PrivateBancorp's near-term earnings, the Company encouraged investors that "[a]s a result of the Strategic Growth and

Transformation Plan, the Company expects that its client base will substantially expand and that it will achieve significant balance sheet growth."

50.     PrivateBancorp's announcement was well received by the investment community, and the fact that "the former LaSalle employees who have joined PrivateBancorp accepted compensation in the form of performance equity awards that will not be paid in full unless aggressive targets are met" was initially regarded by analysts at Robert Baird, among other analysts, as a positive motivational factor for PrivateBancorp to deliver strong results to its shareholders.

51.     In a separate press release issued on November 2, PrivateBancorp further informed investors that in order to fund the Growth Plan it intended to issue shares of common stock in a private placement offering to certain Qualified Institutional Buyers and "accredited" investors pursuant to Regulation D of Rule 506 under the Securities Act.

52.     On November 27, 2007, PrivateBancorp held a conference call to discuss the Company's previously announced $200 million private placement offering, in which Defendants Mandell, Richman, and Klaeser participated.   On the call, these Defendants explained to investors the need for the private placement and provided a preliminary report on the early progress of the Growth Plan, in relevant part, as follows:

> PrivateBancorp is raising the capital to support its growth initiatives. This private placement of equity gives us the capital we need to support the continued expansion of our client relationships and substantially grow our loan portfolio pursuant to our strategic growth and transformation plan, which we announced November 2, 2007.
>
> *   *   *
>
> Related to the raise of capital, we continue to make progress in executing our strategic growth and transformation plans. Since the end of the third quarter 2007, we have hired 34 new managing directors. We will continue to recruit talented bankers in all our markets and are building on our strong foundation to

substantially grow our client base and increase our middle market commercial banking capabilities.

53.     Analysts on the call were skeptical of the aggressive growth projected by PrivateBancorp.  Indeed, an analyst with Stifel Nicolaus remarked that"[g]iven the size of your earning assets now at about a little over $4 billion, that's an awful lot of growth.  It seems to me that one of the implications here is you expect a major amount of balance sheet growth just next year by the end of next year."  According to the analyst, "if you need $200 million of, if you will, incremental equity, you are telling us that these people are going to add, within a relatively short period of time, just several quarters, $1.5 billion, $2 billion of earning assets. Is that correct?"  Defendant Klaeser answered the question affirmatively.  However, what Defendant Klaeser failed to reveal was that PrivateBancorp would achieve these targets through imprudent high-risk lending that sacrificed loan quality for quantity, placing the Company's loan portfolio at serious risk of impairment.

54.     During the call, Defendant Richman also assured investors that "there is a tremendous market reception for what we plan and what we're building, which is the pre-eminent middle market commercial real estate private and wealth management bank in our chosen markets … And so I'm very, very optimistic that we will effectively utilize this capital productively and profitably in order to continue to grow and increase the value to our shareholders."  The size of the private placement offering and the players involved provided support to the bank's aggressive strategy to become a dominant player in Chicago's middle-market commercial lending and private banking sectors.  The $200 million private placement closed on December 11, 2007.

55.     From December 2007 through January 2008, PrivateBancorp reported continued progress in implementing its Growth Plan.  Specifically, the Company announced a series of new

hires, mainly recruits from LaSalle, and that equity awards were being made to a number of the Company's newly minted managing directors.

56.     On January 28, 2008, PrivateBancorp issued a press release entitled, "PrivateBancorp Reports Fourth Quarter Earnings and Substantial Growth Resulting from Implementation of its Strategic Growth Plan." The press release stated, in relevant part:

> CHICAGO, Jan. 28 /PRNewswire-FirstCall/ -- PrivateBancorp, Inc. (Nasdaq: PVTB) today reported a net loss for the fourth quarter 2007 of $15.1 million, or $0.68 per diluted share, compared to net income of $9.1 million, or $0.42 per diluted share, for the fourth quarter 2006. The net loss for the quarter was substantially due to costs associated with the implementation of the Company's previously announced Strategic Growth Plan. As planned, the Company incurred substantial costs related to the recruitment of a significant number of experienced middle-market commercial bankers. Reflecting early success with its Strategic Growth Plan, the Company achieved record loan growth of 12 percent during the quarter. The Company considerably increased its provision for loan losses to reflect this growth and to account for credit quality deterioration in the existing loan portfolio. Net income for the year ended December 31, 2007 was $11.8 million, or $0.53 per diluted share, compared to $37.8 million, or $1.76 per diluted share for the prior year period, a decrease of 69 percent.
>
> "As anticipated, reported quarterly financial results were down considerably as we aggressively implemented our Strategic Growth Plan. We announced the Plan in early November 2007, which sets forth our goal of recruiting experienced middle-market commercial bankers in order to substantially expand our client base and achieve significant balance sheet growth," commented Ralph B. Mandell, Chairman of PrivateBancorp, Inc., "We have made significant progress towards implementing this Plan, including the hiring of Larry Richman as our new President and CEO as well as a substantial number of senior commercial bankers and other new employees. In fact, we increased the number of Managing Directors at the Company by 33 percent in the fourth quarter alone. The 12 percent loan growth experienced in the fourth quarter further validates the market opportunity," continued Mr. Mandell.

57.     The Company's "early success" in executing the Growth Plan was attributed, in large part, to the hiring of 56 new managing directors, which yielded a $451.7 million increase in the Company's loan portfolio. Although the Company incurred significant costs during the fourth quarter, including $13.7 million in sign-on bonuses, $2.5 million in recruitment fees, and approximately $45 million in equity awards, those costs were described as necessary to ensure

the attraction of new clients and the successful execution of the Growth Plan. According to

Defendant Richman, "we are optimistic that our new commercial clients will be a key funding

source in quarters to come. Each new client relationship we nurture brings new lending, deposit

gathering and wealth management opportunities."

58.     The January 28 press release also addressed the status of PrivateBancorp's loan

portfolio, including the need for the Company to increase its loan loss provisions due to

substantial loan growth and its need to take $3.4 million in write-offs. The press release stated,

in relevant part, as follows:

> Non-performing assets to total assets were 0.96 percent at December 31, 2007,
> compared to 0.23 percent at December 31, 2006 and 0.80 percent at September
> 30, 2007. Of $48.3 million in total non-performing assets at the end of 2007, 27
> percent are located in the Chicago market, 36 percent are located in the St. Louis
> market, 14 percent are in Michigan and 23 percent are located in Georgia. Of total
> non-performing assets, 34 percent are commercial real estate, 36 percent are
> construction, 20 percent are commercial and industrial, and the remaining 10
> percent are classified as residential real estate and personal.

> As a result of substantial loan growth and an increase in non-performing assets
> during the fourth quarter 2007, the provision for loan losses was $10.2 million,
> compared to $707,000 in the fourth quarter 2006 and $2.4 million in the third
> quarter 2007.

> Net charge offs totaled $3.4 million, or 0.35 percent of average loans, in the
> fourth quarter 2007, versus net charge offs of $49,000, or 0.01 percent of average
> loans, in the prior year fourth quarter, and net charge-offs of $1.6 million, or 0.17
> percent of average loans, in the third quarter 2007. Net charge offs to average
> loans for the year-to-date period were 0.17 percent compared to 0.03 percent in
> the prior year period. The allowance for loan losses as a percentage of total loans
> was 1.17 percent at December 31, 2007, versus 1.13 percent at September 30,
> 2007 and 1.09 percent at December 31, 2006.

59.     On January 28, PrivateBancorp also held an Earnings Conference Call, in which

Defendants Mandell, Richman, and Klaeser participated. During the call, these Defendants

continued to tout the early success of the Growth Plan, including the Company's record 12%

loan growth. They also shrugged off PrivateBancorp's fourth quarter loss, and concealed from

investors that the riskiness of the Company's lending practices warranted significantly greater increases in PrivateBancorp's loan loss provisions.

60.     During the call, these Defendants also minimized the write-offs that the Company reported for the quarter.  In response to a question posed concerning the range of write-offs expected in 2008, Defendant Klaesar stated, in relevant part, that "clearly the charge-off rate that we had in the fourth quarter was higher than what we would think would be normal.  When we look for the full-year 2008, we would expect our full-year charge-off rate to be in the low to mid teen range. So that would suggest a rate level meaningfully less than the charge-offs we had in the fourth quarter."  Defendant Klaesar also reassured investors that "we are always diligent and do comprehensive loan review and I would say we did a very comprehensive loan review in the fourth quarter … We have a pretty good feel for the pipeline of charge-offs and our loan ratings and we believe that the charge-off rate should come down from that level."  These statements were materially false and misleading given Defendants' knowledge or reckless disregard of PrivateBancorp's lending practices under the Growth Plan.

61.     On February 29, 2008, PrivateBancorp filed its Annual Report with the SEC on Form 10-K for the 2007 fiscal year, reaffirming the Company's previously announced financial results.  The Company's Form 10-K was signed by Defendants Richman, Klaeser, Mandell, Beal, Castellano, Coleman, Daly, Goldstein, Guyette, Jensen, Kayman, McKissack, Podl, Rabin, Roche, Rybak, Silva, Tyree, and Williams.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Richman and Klaesar, which stated, in relevant part, as follows:

1.      I have reviewed this annual report on Form 10-K of PrivateBancorp, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

19

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

  a.      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

  b.      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

                              *     *     *

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

  a.      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

62. In addition to reaffirming PrivateBancorp's previously announced financial results, the Form 10-K addressed the Company's supposedly disciplined lending policies, which are reviewed and approved by the PrivateBancorp Board, including PrivateBancorp's purportedly high standards for extending credit to its borrowers. Significantly, the Form 10-K also represented that the Company engages in a "careful" process of continuous portfolio monitoring for credit quality issues. As detailed in the Form 10-k:

We provide a full range of commercial, real estate and personal lending products and services to our clients. We have adopted loan policies that contain general lending guidelines consistent with regulatory requirements and are subject to review and revision by the Board of Directors of each of the banks as well as our Board of Directors. We extend credit consistent with these comprehensive loan policies.

The goal of our lending program is to meet the credit needs of our diverse client base while using sound credit principles to protect our asset quality. Our business and credit strategy is relationship-driven and we strive to provide a reliable source of credit, a variety of lending alternatives, and sound financial advice to our clients. When extending credit, our decisions are based upon our client's ability to repay the loan from non-speculative sources. The quality and integrity of the borrower is crucial in the loan approval process. We monitor the performance of our loan portfolio through regular contact with our clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists.

63. These statements were materially false and misleading because they concealed from investors that since November 2007 PrivateBancorp was increasingly sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees. As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high

risk of delinquency. These statements also concealed the magnitude of the mounting loan deterioration impairing PrivateBancorp's residential development portfolio. Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its growing credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

64. From January 2008 through April 2008, the Company reported continued success in implementing the Growth Plan with a series of new hires, largely LaSalle recruits, and additional equity awards issued to newly-minted managing directors.

65. On April 28, 2008, PrivateBancorp issued a press release entitled "PrivateBancorp Reports First Quarter 2008 Results," in which it announced a net loss for the first quarter 2008 of $8.9 million, or $0.34 per diluted share, compared to net income of $9.0 million, or $0.41 per diluted share, for the first quarter 2007. According to the Company, the net loss was primarily attributed to "expected increases in expenses" associated with the implementation of the Growth Plan. PrivateBancorp, nevertheless, reassured investors that the Growth Plan was on track by reporting an 18% growth in revenue and a substantial increase in the Company's client base, which would lead to additional business. The press release stated, in relevant part, as follows:

> CHICAGO, April 28 /PRNewswire-FirstCall/ -- PrivateBancorp, Inc. (Nasdaq: PVTB) today reported a net loss for the first quarter 2008 of $8.9 million, or $0.34 per diluted share, compared to net income of $9.0 million, or $0.41 per diluted share, for the first quarter 2007. The net loss was primarily attributed to expected increases in expenses associated with implementation of our previously announced Strategic Growth Plan. During the quarter, the Company experienced substantial increases in revenue, client deposits and loans, and added a significant number of new clients.

"The Strategic Growth Plan conceived last year has made PrivateBancorp a larger, more diversified company and puts us on course to become the premier middle-market commercial, commercial real estate, private banking and wealth management bank in all of our chosen markets. During the quarter, we added 46 talented, experienced bankers across our network of offices, bringing the total number of managing directors added since we first announced the Plan to 95," said Ralph B. Mandell, Chairman of the Board. "I am proud of the team we have assembled and its exceptional capabilities to serve the business needs of our clients."

"As anticipated, first quarter earnings were negatively affected by costs associated with our Strategic Growth Plan and higher loan loss provision expenses. However, the growth in the first full quarter of the execution of the Plan exceeded our own expectations. The substantial increase in our client base, as evidenced by exceptionally strong loan and deposit growth and our strong pipeline of business, is a testament to our strong business development culture," said Larry D. Richman, President and CEO.

66.     PrivateBancorp further reassured investors by reporting that its total assets increased 21% to $6.0 billion from $5.0 billion at December 31, 2007; its total deposits increased 33% to $5.0 billion from $3.8 billion at December 31, 2007; and its total loans increased 23% to $5.1 from $4.2 billion at December 31, 2007.

67.     In the April 28 press release, PrivateBancorp and the Officer Defendants concealed the Company's mounting exposure to high-risk, low quality loans originated under the Growth Plan, and attributed the vast majority of the Company's nonperforming loans to legacy loans in the residential development sector.   These Defendants also failed to disclose the Company's need to set aside funds to account for the growing credit quality concerns with respect to its commercial and industrial lending business.   As reported in the press release:

During the first quarter 2008, the provision for loan losses increased to $17.1 million, compared to $1.4 million in the first quarter 2007 and $10.2 million in the fourth quarter 2007 due to the substantial loan growth incurred and an increase in non-performing assets, coupled with current market conditions and loans charged off during the quarter.

Non-performing assets to total assets were 1.10% at March 31, 2008, compared to 0.97% at December 31, 2007. Of $65.9 million in total non-performing assets at March 31, 2008, 33% are located in the Georgia market, 27% are located in the

Chicago market, 24% are located in the St. Louis market, and 16% are in Michigan. Of total non-performing assets, 59% are construction, 23% are commercial real estate, 8% are commercial, and the remaining 10% are classified as residential real estate and personal. Of the $65.9 million in non-performing assets at March 31, 2008, $42.7 million or 65% relate to residential development loans.

Net charge-offs totaled $4.1 million in the first quarter 2008, or an annualized rate of 0.35% of average total loans, versus net charge-offs of $582,000, or an annualized rate of 0.07% of average total loans, in the prior year first quarter, and net charge-offs of $3.4 million, or an annualized rate of 0.35% of average total loans, in the fourth quarter 2007. The allowance for loan losses as a percentage of total loans was increased to 1.21% at March 31, 2008, compared to 1.17% at December 31, 2007.

68. On April 28, PrivateBancorp also held an Earnings Conference Call, in which Defendants Richman, Mandell and Klaeser participated. During the call, these Defendants reiterated the false and misleading statements made in the Company's press release, and continued to attribute PrivateBancorp's nonperforming loans to legacy loans in the residential development sector. They also materially overstated the growth of PrivateBancorp's client franchise. Specifically, an analyst with Oppenheimer asked if PrivateBancorp could provide the percentage of growth where "PrivateBancorp would be the primary bank and really control the relationship versus more of a participation type of relationship, where you just don't have access to the principles and those that run the business?" In response, Defendant Klaeser stated that "[w]e don't have that specific statistic but in general we are the primary bank or we have an opportunity to be the primary bank in all of the loans that we are doing." This statement was false and misleading because it concealed that the Company often served in a syndicate along with other banks on transactions in which PrivateBancorp was not acting as the principal, and therefore, would not realize additional business from those transactions. Notwithstanding this fact, the Defendants on the call represented that PrivateBancorp anticipated that its loan growth would be at least as strong in the second quarter of 2008 as it was in the first quarter.

69. On May 6, 2008, PrivateBancorp filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Richman and Klaeser and reaffirmed the Company's financial results previously announced on April 28. The Company's Form 10-Q also contained Sarbanes-Oxley-required certifications, signed by Defendants Richman and Klaeser. According to the Form 10-Q, PrivateBancorp's "provision for loan losses reflects management's assessment of the inherent losses in the loan portfolio … [which is] reassessed monthly to determine the appropriate level of the reserve."

70. These statements were materially false and misleading when made because they concealed from investors that since November 2007 PrivateBancorp was increasingly sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees. As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency. These statements also concealed the magnitude of the mounting loan deterioration impairing PrivateBancorp's residential development portfolio. Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its growing credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

71. Instead of disclosing the Company's mounting credit-quality concerns, PrivateBancorp and the Officer Defendants sought to shore up PrivateBancorp's capital position by issuing materially false and misleading offering materials that enabled the Company to raise

well over hundred million dollars from the investing public in a registered public offering of PrivateBancorp common stock. Specifically, on or about June 11, 2008, PrivateBancorp completed a $147.6 million registered public offering consisting of 4 million shares of the Company's common stock at $34 per share and 522.963 shares of the Company's Series A convertible preferred stock at $32.64 per share. The 2008 Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3 on May 9, 2008 (the "Shelf Registration Statement"). Form S-3 permits an issuer to register numerous securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed Prospectus, Prospectus Supplement, and/or Pricing Supplement that refers investors to the underlying Form S-3.

72. The Shelf Registration Statement included a Prospectus and a Prospectus Supplement, dated May 9, 2008, that became part of the Shelf Registration Statement pursuant to which the 2008 Offering was conducted. The Shelf Registration Statement and the relevant Prospectus and Prospectus Supplement are referred to collectively as the "2008 Offering Materials."

73. The 2008 Offering Materials incorporate by reference numerous other public filings of the issuer, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, including those filed both prior to and after the filing of the Shelf Registration Statement. The 2008 Offering Materials specifically incorporated by reference PrivateBancorp's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, the proxy statement in connection with PrivateBancorp's 2008 annual meeting of stockholders filed with the SEC on April 4, 2008, the Company's Quarterly Report on Form 10-

Q for the quarter ended March 31, 2008, and PrivateBancorp's Current Reports on Form 8-K filed on January 28, 2008, February 29, 2008, January 25, 2008, March 19, 2008, April 28, 2008, and May 1, 2008.

74.     Pursuant to the Prospectus Supplement filed with the SEC on June 6, 2008, the underwriters of the 2008 Offering – Defendants Keefe Bruyette, Robert Baird, William Blair, and SunTrust – sold and distributed shares in the 2008 Offering to the investing public.   The extent of these Underwriter Defendants' participation in the 2008 Offering was as follows:

| Underwriters | Number of Shares |
| --- | --- |
| Keefe Bruyette | 1,920,000 |
| Robert Baird | 1,160,000 |
| William Blair | 640,000 |
| SunTrust | 280,000 |

75.     The 2008 Offering Materials contained untrue statements of material fact and material omissions, regarding, among other things, PrivateBancorp's credit-quality concerns, its exposure to hundreds of millions of dollars in high-risk, low quality loans, and the adequacy of its loan loss provisions and write-offs.   The 2008 Offering Materials also failed to disclose that PrivateBancorp's reported financial results were inflated as a result.   Accordingly, those Defendants that participated in the 2008 Offering failed in their obligation to ensure the accuracy of the 2008 Offering Materials.   The net proceeds from the 2008 Offering were reinvested into the ongoing execution of the Growth Plan.

76.     On July 29, 2008, PrivateBancorp issued a press release entitled "PrivateBancorp Reports Second Quarter 2008 Results," in which it announced "a net loss for the second quarter 2008 of $13.3 million, or $0.48 per diluted share, compared to net income of $8.8 million, or

$0.40 per diluted share, for the second quarter 2007. The net loss for the six months ended June 30, 2008, was $22.2 million or $0.82 per diluted share, compared with net income of $17.8 million, or $0.81 per diluted share for the prior-year period." PrivateBancorp attributed its second quarter loss primarily to expenses associated with the Growth Plan and an increase in provisioning for loan losses. The Company, however, concealed its credit quality concerns by reassuring investors that it "recorded increases in revenue, client deposits and loans, and the number of new clients." Indeed, PrivateBancorp reported that revenue grew 17% over the first quarter 2008 to $53.5 million from $45.9 million.

77.     According to Defendant Richman, "[t]he second quarter results once again show success in the ongoing implementation of our Strategic Growth Plan and the reported loss reflects the continued investments we're making to position our Company for long-term success." Defendant Richman further reassured investors that "[i]n the current credit environment, we have taken deliberate steps to ensure the quality of our loan portfolio as well as the rigor of our risk management practices." The July 29 press release stated, in relevant part, as follows:

> Total assets increased 50 percent to $7.5 billion at June 30, 2008, from $5.0 billion at December 31, 2007. Total loans increased 54 percent to $6.4 billion at June 30, 2008, from $4.2 billion at December 31, 2007. Commercial loans, including commercial and industrial and owner-occupied commercial real estate loans, continue to be the fastest-growing segment of the loan portfolio and increased to $2.7 billion or 42 percent of the Company's total loans from $1.3 billion or 32 percent of total loans at the end of 2007. During the quarter, commercial real estate loans, including multi-family commercial real estate, grew to $2.2 billion from $1.6 billion at December 31, 2007. However, commercial real estate loans decreased to 34 percent of the Company's total loans at the end of the second quarter, compared to 38 percent of total loans at December 31, 2007.
>
> Total deposits increased 64 percent to $6.2 billion at June 30, 2008, from $3.8 billion at December 31, 2007, with $1.0 billion attributable to an increase in client deposits, defined as total deposits less brokered deposits. Client deposits were $4.3 billion, or 69 percent, of total deposits at the end of the second quarter. The remaining increase in total deposits came from a combination of an increase in

CDARs(TM) deposits of $380.4 million and an increase in traditional brokered deposits of $966.6 million.

\*    \*    \*

As previously indicated, with new clients, loan volume tends to lead client deposit volume associated with these new relationships.

78.    In the July 29 press release, PrivateBancorp concealed its credit quality concerns from investors by attributing the increase in its loan loss provisions to strong loan growth, and restricting concern for its nonperforming assets to legacy loans in the residential development sector, which the Company also downplayed. The press release stated, in relevant part, as follows:

During the second quarter 2008, the provision for loan losses increased to $23.0 million from $17.1 million in the first quarter and $3.0 million in the second quarter 2007. The increase is attributable to the substantial loan growth the Company continues to experience, as well as an increase in non-performing assets, current market conditions and loans charged off during the quarter.

Non-performing assets to total assets were 0.98 percent at June 30, 2008, compared to 1.10 percent at March 31, 2008. The Company had $73.1 million in total non-performing assets at June 30, 2008, compared to $65.9 million at March 31, 2008. In the second quarter, 33 percent of the non-performing assets were in the Chicago market, 27 percent in the Georgia market, 24 percent in the Michigan market and 16 percent in the St. Louis market. Of total non-performing assets, $57.3 million are non-accruing loans, $1.2 million are loans over 90 days past due but still accruing and $14.6 million are Other Real Estate Owned. Of the $73.1 million in non-performing assets at June 30, 2008, $49.1 million or 67 percent were related to the residential development sector.

\*    \*    \*

Net charge-offs totaled $6.0 million in the second quarter 2008, or an annualized rate of 0.42 percent of average total loans, compared with net charge-offs of $4.1 million, or an annualized rate of 0.35 percent of average total loans, in the first quarter 2008, and $571,000, or an annualized rate of 0.06 percent of average total loans, in the prior-year second quarter. Year-to-date, charge-offs were primarily attributable to the residential development sector.

The allowance for loan losses as a percentage of total loans was 1.23 percent at June 30, 2008, compared to 1.21 percent at March 31, 2008. The amount of the allowance for loan losses is determined based on a variety of factors, including

assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, and loan growth.

79. On July 29, PrivateBancorp also held an Earnings Conference call in which Defendants Richman, Mandell, Klaeser, and Solkema participated. These Defendants continued to tout the success of the Growth Plan and conceal PrivateBancorp's mounting credit quality concerns. Significantly, Defendant Richman applauded the Company's risk management team, noting that "[t]he risk-management team has implemented common lending practices and policies to strengthen our credit review and underwriting standards. The changes we've made and will continue to make allow us to be highly responsive to our clients while more aggressively managing our risk." Defendant Richman further stated, in relevant part that:

> Our weakened credit trends remain disproportionately attributable to the residential development sector. When we look at our current level of nonperforming loans, the numbers are higher than we'd like, but they certainly are manageable. The residential development sector is experiencing considerable softness, with slow selling of both homes and lots. The market conditions in this segment of our portfolio are expected to remain weak.

> In order to manage our exposure, we review our entire residential development portfolio each month. This allows us to validate our risk ratings and analyze current borrower and guarantor information.

> This leads me to a brief discussion of what we're doing to enhance and improve our risk-management practices overall. As I mentioned at the outset, Kevin Van Solkema is in the room here today. Kevin came onboard earlier this year, and in a very short time has done a great job to enhance our risk-management procedures, given the growth and diversification of our business. Under Kevin's leadership and with the strong additions to his team, we have restructured our risk-management function to centralize policy and processes to align organizationally to better support the growth of our loan portfolio.

> The risk-management team has implemented common lending practices and policies to strengthen our credit review and underwriting standards. The changes we've made and will continue to make allow us to be highly responsive to our clients while more aggressively managing our risk.

80. Apart from PrivateBancorp's legacy loans, analysts on the call wanted insight into the status of the loans originated under the Growth Plan, including whether and to what extent they were nonperforming or played a role in the Company's reported write-offs for the quarter. An analyst with William Blair asked whether any of PrivateBancorp's nonperforming loans and net charge-offs were "tied to loans originated since November, when you guys established the strategic growth plan?" In response, Defendant Solkema firmly stated that "[t]he answer is no. We have had very careful client selection of our new business that we brought in since November 1st. We have seen almost no delinquency whatsoever, and certainly no nonperformers or charge-offs."

81. Defendant Solkema was also quick to isolate PrivateBancorp's credit quality problems to residential development loans, disclaiming any implication that similar concerns had spread to other sectors. Indeed, Defendant Solkema stated, in relevant part, that "[t]he deterioration that we're seeing, though, is very limited to the for-sale residential development space. We're not seeing any deterioration occur on the commercial real estate front. And as Dennis indicated, that's a pretty manageable portfolio for us here in Chicago, and across the Company for that matter. And that's where you're seeing the deterioration rest." In addition to concealing PrivateBancorp's exposure to loans originated under the Growth Plan, these statements, among others, failed to reveal the magnitude of the credit quality problems facing the Company's residential development loans.

82. During the call, an analyst with Oppenheimer also asked whether "[a]ny of the loan growth the last couple quarters come from participation loans or shared national credits, where PrivateBancorp is not the lead?" In response, Defendant Richman continued to overstate PrivateBancorp's client franchise, stating that "[t]he majority of the business we do is where

we're either the sole bank, the lead bank or the co-lead bank. There are a few selected cases where we are a participant. But in those cases that we've chosen to be a participant, it's only where we have a direct active relationship with management and an opportunity to continue to enhance our position over time."

83.     On August 11, 2008, PrivateBancorp filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Richman and Klaeser and reaffirmed the Company's financial results previously announced on July 29. The Company's Form 10-Q also contained Sarbanes-Oxley-required certifications, signed by Defendants Richman and Klaeser.  According to the Form 10-Q, PrivateBancorp "continues to make asset quality monitoring a key priority … Loan quality is monitored by management and reviewed by the Board of Directors."

84.     These statements were materially false and misleading when made because they concealed from investors that since November 2007 PrivateBancorp was sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees.  As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency.  These statements also concealed the magnitude of loan deterioration impairing PrivateBancorp's residential development portfolio.  Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its credit-quality

concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

85.    On October 27, 2008, PrivateBancorp issued a press release entitled "PrivateBancorp Reports Third Quarter 2008 Results," in which it reported "a net loss for the third quarter 2008 of $7.3 million, or $0.23 per diluted share, compared to net income of $9.2 million, or $0.42 per diluted share, for the third quarter 2007.  The net loss for the nine months ended September 30, 2008, was $29.5 million, or $1.04 per diluted share, compared to net income of $27.0 million, or $1.23 per diluted share for the prior-year period."  The Company also reported that revenue grew 23% over the second quarter from $53.5 million to $65.8 million.  In announcing these results, PrivateBancorp and the Officer Defendants continued to conceal the full extent of PrivateBancorp's deteriorating loan portfolio from investors by, among other things, touting the Company's "significant increases in revenue, client deposits and loans, and [that] the number of new client relationships grew during the third quarter."  According to Defendant Richman, "[d]espite these unprecedented times in our industry … We remain confident in our ability to continue delivering on our Strategic Growth Plan despite market conditions."  The press release stated, in relevant part, as follows:

Total assets increased 81 percent to $9.0 billion at September 30, 2008, from $5.0 billion at December 31, 2007. Total loans increased 78 percent to $7.4 billion at September 30, 2008, from $4.2 billion at December 31, 2007. Commercial loans, including commercial and industrial and owner-occupied commercial real estate loans, continue to be the fastest-growing segment of the loan portfolio and increased to $3.5 billion, or 46 percent of the Company's total loans, from $1.3 billion, or 32 percent of total loans, at the end of 2007. Commercial real estate loans decreased to 33 percent of the Company's total loans at the end of the third quarter, compared to 38 percent of total loans at December 31, 2007. Management believes that on a percentage basis, the portfolio is diversified, which has resulted in a more preferred loan mix relative to the end of 2007.

Total deposits increased 98 percent to $7.4 billion at September 30, 2008, from $3.8 billion at December 31, 2007, with $1.8 billion attributable to an increase in client deposits, which includes $304.4 million in reciprocal CDARS(TM)

deposits. The CDARS deposit program is a deposit services arrangement that achieves FDIC deposit insurance for jumbo deposit relationships. Client deposits were $5.0 billion, or 67 percent, of total deposits at the end of the third quarter. During the quarter, the Company facilitated its deposit growth by aggressively pursuing deposits from existing and new clients, increasing institutional and municipal deposits, expanding its business DDA account balances through its enhanced treasury management services, and continuing implementation of the CDARS deposit program.

86.     PrivateBancorp also reported a moderate increase in its loan loss provisions driven primarily by an uptick in nonperforming residential development loans. The Company, however, disclaimed any meaningful deterioration in credit quality in any other major loan sectors, including commercial and industrial lending under the Growth Plan. Moreover, PrivateBancorp concealed the magnitude of loan deterioration impairing PrivateBancorp's residential development portfolio. The press release stated, in relevant part, as follows:

> During the third quarter 2008, the provision for loan losses increased to $30.2 million from $23.0 million in the second quarter 2008 and $2.4 million in the third quarter 2007. The increase is attributable to an increase in non-performing loans and loans charged off during the quarter, the substantial loan growth the Company continues to experience and deteriorating market conditions. Non-performing assets to total assets were 1.18 percent at September 30, 2008, compared to 0.98 percent at June 30, 2008, and 0.97 percent at December 31, 2007. The Company had $106.5 million in total non-performing assets at September 30, 2008, compared to $73.1 million at June 30, 2008 and $48.3 million at December 31, 2007. This increase is primarily driven from deterioration in residential development loan exposures in various markets. The Company has not seen meaningful deterioration in credit quality in other major loan types. Each non-performing loan generally is secured and carries personal guaranties.

> Of the total $106.5 million in non-performing assets at September 30, 2008, $88.1 million are non-accruing loans, and $18.5 million are Other Real Estate Owned (OREO). The Company had no loans over 90 days past due and accruing. OREO properties are carried at fair value on the Company's balance sheet. Of total non-performing assets, approximately $80.0 million or 75 percent were related to the residential development sector.

> Delinquencies (loans 30-89 days past due and still accruing) were $50.0 million, or 0.67 percent of total loans at September 30, 2008, compared to $30.1 million, or 0.47 percent of total loans at June 30, 2008, and $102.6 million, or 2.46 percent of total loans at December 31, 2007.

87. PrivateBancorp also continued to downplay the write-offs reported for the quarter, which were again attributed to isolated issues in the residential development sector. The press release stated, in relevant part, as follows:

> Net charge-offs totaled $7.0 million in the third quarter 2008, or an annualized rate of 0.40 percent of average total loans, compared to $6.0 million in the second quarter 2008, or an annualized rate of 0.42 percent of average total loans, and $1.6 million or an annualized rate of 0.17 percent of average total loans, in the prior-year third quarter. Year-to-date, charge-offs were primarily attributable to declining collateral valuations in the residential development sector.

> The allowance for loan losses as a percentage of total loans was 1.37 percent at September 30, 2008, compared to 1.23 percent at June 30, 2008 and 1.17 percent at December 31, 2007. In response to the challenging asset quality environment, the Company has taken several steps to effectively and proactively manage its risk exposure including enhancing its risk management infrastructure, moving to monthly executive management review of all residential development loans in all markets, and maintaining appropriate risk-rating assignments. The Company continues to anticipate challenges related to asset quality until the housing environment begins to stabilize.

88. On October 27, PrivateBancorp held an Earnings Conference Call in which Defendants Richman, Klaeser, Mandell and Solkema participated. On the call, during which the anniversary of the Growth Plan was recognized, these Defendants praised PrivateBancorp for achieving the following milestones since the third quarter of 2007: increasing its assets by 100%; increasing its market cap by 84%; hiring approximately 140 managing directors; generating approximately $3.7 billion in new loans, or 99% growth; increasing deposits more than 100% to $7.4 billion from $3.6 billion; and improving fee income by 80% to $11.5 million from $6.4 million. Defendant Richman also lauded the Company's "disciplined" risk management operations, in relevant part, as follows:

> An important area that we have been and will continue to be focused on is risk management and credit quality. Like many banks in the marketplace today, we saw an increase in our non-performing assets during the third quarter as well as an uptick in our net charge-offs. The increase in non-performing assets is largely due to the deterioration of -- in residential development loans in our various markets.

Though we have seen weakening in this area, we have not seen meaningful deterioration in credit quality in any other major market type.

The residential development sector is experiencing considerable softness and has not yet begun to show improvements. Market conditions in this sector of our portfolio are expected to remain weak. We are being diligent about managing our exposure in this sector. We hold monthly executive review meetings of all residential development loans. We are actively managing our portfolio. We're trying to identify potential problems and work with our clients towards resolution. We're very committed to this approach and are taking the necessary proactive steps to guarantee that we remain focused on this industry issue.

89.     On November 10, 2008, PrivateBancorp filed its Quarterly Report with the SEC on Form 10-Q for the 2008 fiscal third quarter. The Company's Form 10-Q was signed by Defendant Richman and Barbara E. Briick and reaffirmed the Company's financial results previously announced on July 29. The Company's Form 10-Q also contained Sarbanes-Oxley-required certifications, signed by Defendants Richman and Klaeser. According to the Form 10-Q, PrivateBancorp "continues to make asset quality monitoring a key priority ... Loan quality is monitored by management and reviewed by the Board of Directors."

90.     These statements were materially false and misleading because they concealed from investors that since November 2007 PrivateBancorp was sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees. As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency. These statements also concealed the magnitude of loan deterioration impairing PrivateBancorp's residential development portfolio. Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its credit-quality

concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

## The Truth Begins to Be Revealed

91.     On January 8, 2009, the truth about the Company began to be revealed when *The Wall Street Journal* reported on the growing delinquencies in the commercial real estate mortgage sector.  According to the article, out of the top 15 commercial mortgage-backed securities originators, LaSalle held the second highest 60-day-or-more delinquency rate at 1.63%.  News of LaSalle's imprudent lending practices raised immediate concerns among Company investors that the numerous bankers aggressively recruited by PrivateBancorp over the past two years as part of the Growth Plan, including roughly 140 managing directors and PrivateBancorp's CEO Richman, had brought with them LaSalle's culture of irresponsible, high-risk lending.  On the disclosure of this news, PrivateBancorp's stock dropped from $28.14 per share on the previous day's closing to $25.62 per share, or approximately 9%.

92.     Shortly thereafter, on January 26, 2009, PrivateBancorp shocked investors by issuing a press release entitled "PrivateBancorp Reports Fourth Quarter and Year-End 2008 Results," in which the Company reported "a net loss for the fourth quarter 2008 of $62.0 million, or $1.96 per diluted share, compared to a net loss of $15.1 million, or $0.68 per diluted share, for the fourth quarter 2007.  The net loss for the fiscal year ended December 31, 2008, was $91.5 million, or $3.11 per diluted share, compared to net income of $11.8 million, or $0.53 per diluted share, for the 2007 fiscal year."  The Company's fourth quarter loss was due, in large part, to "net charge-offs of $108.8 million in the fourth quarter after a proactive loan review to address credit quality concerns, particularly in the residential development sector."  The press release stated, in relevant part, as follows:

37

As a result of the rapid deterioration in economic conditions, in the fourth quarter the Company undertook a comprehensive review of all residential development loans and all underperforming assets. The intent of the review was to identify inherent losses where cash flow and guarantor support indicated likely non-performance and where losses from deteriorating asset values were evident. The Company believes the review was prudent in light of market conditions, particularly in the residential sector in Georgia and Michigan. The actions proactively addressed the deterioration in the loan portfolio and the Company believes the result is reduced balance sheet risk.

The fourth quarter loan loss provision was $119.3 million and resulted from $108.8 million net charge-offs (an annualized rate of 5.49 percent of average total loans) and $10.5 million in additional loan-loss provision primarily related to growth in the loan portfolio. Of the fourth quarter net charge-offs, $86.2 million, or 79.2 percent, were related to the residential development portfolio. Total charge-offs for the year were $125.8 million, or a net charge-off ratio of 2.00 percent, compared to $6.1 million, or a net charge-off ratio of 0.17 percent, for the year ended December 31, 2007.

\*       \*       \*

Non-performing assets to total assets were 1.55 percent at December 31, 2008, compared to 1.18 percent at September 30, 2008, and 0.97 percent at December 31, 2007. The Company had $155.7 million in total non-performing assets at December 31, 2008, compared to $106.5 million at September 30, 2008, and $48.3 million at December 31, 2007. Non-accruing loans totaled $131.9 million and other real estate owned (OREO) was $23.8 million. Approximately $105.7 million, or 68 percent of the non-performing assets, were related to the residential development sector.

93.     On this news, PrivateBancorp stock fell approximately 22%, from $19.70 per share to $15.32 per share.

94.     On January 26, PrivateBancorp also held an Earnings Conference Call in which Defendants Richman, Klaeser, Mandell, and Solkema participated. Analysts on the call were skeptical about the nature and timing of PrivateBancorp's substantial write-off. According to an analyst with Sandler O'Neill, "the problems in Michigan and in Atlanta aren't anything knew. You know, it's been pretty much broadcast what the problems were there. So I'm wondering, were the nonperformers do you think understated in the third quarter, or did it really deteriorate that much more in one quarter?" In response, Defendant Solkema rebuffed any implication that

the $108.8 million write-off was not timely taken, reiterating that PrivateBancorp took "proactive" steps to address its nonperforming loans in order to flush them through the balance sheet. Contrary to Defendant Solkema's assertion, however, the unexpected size and delayed timing of the January 26 write-off suggest that prior statements made by PrivateBancorp and the Officer Defendants regarding the Company's ability to manage and actively monitor its loan portfolio were materially false and misleading when made.

95. While the January 26 announcement revealed some of the problems affecting the Company's troubled loan portfolio, PrivateBancorp and the Officer Defendants continued to conceal the full extent of the Company's credit quality problems from investors. Significantly, PrivateBancorp represented that "[n]one of the losses reported were from loans originated as part of the Strategic Growth Plan." In addition, PrivateBancorp made false assurances that led investors to believe that the actions taken by PrivateBancorp had fully addressed the Company's credit quality problems. The January 26 press release stated, in relevant part, as follows:

> None of the losses reported were from loans originated since the commencement of the Strategic Growth Plan in the fourth quarter 2007. These loans continue to perform as expected with no significant payment past dues.

> In addition, the Company strengthened its allowance for loan losses in recognition of the weakened credit climate expected to remain through at least 2009. The allowance for loan losses as a percentage of total loans was 1.40 percent at December 31, 2008, compared to 1.37 percent at September 30, 2008 and 1.17 percent at December 31, 2007. The allowance for loan losses as a percent of non-performing loans decreased to 85 percent in the fourth quarter 2008 from 116 percent in the third quarter 2008 and 125 percent in the fourth quarter 2007.

96. PrivateBancorp's January 26 press release also misled investors by touting the success of the Growth Plan, including, *inter alia*, that the Company generated a 9% increase in revenue over the third quarter; that client deposits grew $1.0 billion or 20% from the third quarter 2008; and that loans increased by $595.7 million or 8% over the third quarter. According to the press release:

Total assets increased over 100 percent to $10.0 billion at December 31, 2008, from $5.0 billion at December 31, 2007. Total loans increased 92 percent to $8.0 billion at December 31, 2008, from $4.2 billion at December 31, 2007. Commercial loans increased to $4.0 billion, or 50 percent of the Company's total loans, from $1.3 billion, or 32 percent of total loans, at the end of 2007. Commercial loans include commercial and industrial and owner-occupied commercial real estate loans and continue to be the fastest-growing segment of the loan portfolio. Commercial real estate loans decreased to 30 percent of the Company's total loans at the end of the fourth quarter, compared to 38 percent of total loans at December 31, 2007. Management believes further diversifying the portfolio has resulted in a more preferred loan mix relative to the end of 2007.

Total deposits increased 113 percent to $8.0 billion at December 31, 2008, from $3.8 billion at December 31, 2007. Approximately $2.8 billion of the increase in total deposits was attributable to an increase in client deposits, and includes $679.0 million in client CDARS® deposits. Brokered deposits (excluding client CDARS) were 25 percent of total deposits in the fourth quarter 2008, 33 percent of total deposits in the previous quarter and 14 percent of total deposits as of December 31, 2007. Client deposits were $6.0 billion, or 75 percent, of total deposits at the end of the fourth quarter. During the quarter, the Company facilitated its deposit growth by aggressively pursuing deposits from existing and new clients, expanding its business DDA account balances through its enhanced treasury management services, and continuing implementation of the CDARS deposit program.

97.     In addition to the statements made in the Company's press release, during the January 26 conference call, Defendant Richman misled investors by reiterating that the significant write-offs reported for the quarter were due to deterioration in the residential development loan sector, not commercial lending – the Company's core business under the Growth Plan. Defendant Richman also misrepresented to investors that the write-offs would adequately address the credit quality concerns facing PrivateBancorp, in relevant part, as follows:

We undertook a comprehensive loan portfolio review in the fourth quarter, which Kevin will discuss more in a minute. As a result of this review and the significant deterioration in our residential development loan portfolio, we determined the best course of action was to charge off a large portion of this portfolio. We recorded a $108.8 million in net charges, primarily related to the residential development portfolio.

We believe the charge-offs, while obviously large, allow us to put these problems -- these problem loans behind us. More importantly, this will not have a lasting effect on the success of the strategic growth plan.

\* \* \*

The loss in the fourth quarter is very disappointing. But when it comes to our core business as defined as the strategic growth plan, we have made significant progress toward our objectives. Throughout the course of the year we have increased our new clients, loans, deposits, fee income, and revenue, and continued to manage our expenses. We have begun to create positive operating leverage as we envisioned in our plan. Our results show that if we keep our focus on developing high-quality client relationships, our Company can grow even in the most challenging times and is poised for tremendous success when the economy rebounds.

By continuing our pattern of selective relationship development, the Company's loan portfolio increased in the fourth quarter by more than $700 million, or $596 million after the $108.8 million in net charges. This pace is slower than we have seen since the launch of the strategic growth plan but reflects our more conservative risk appetite in the current economic environment.

And what does it mean by selective relationship development? We are working with clients we know, and in many cases we have been with them before through other difficult economic cycles. The loans we have added in 2008 were put through rigorous stress testing, and we're underwriting with this challenged economic environment in mind.

With this discipline we have added nearly $4 billion in new loans this year, almost doubling the size of our loan portfolio from the end of 2007. Importantly, commercial and industrial loans -- including owner occupied commercial real estate -- now make up half of our loan portfolio compared to 32% at the end of last year. We believe this is a much more favorable loan mix.

At this time we have seen no meaningful deterioration in the quality of our C&I portfolio, although we realize that there are inherent risks as recessionary pressures move through other industry groups. We are prepared to manage these risks.

98.    During the call, Defendant Solkema also lauded the Company's so-called "proactive" review of credit quality issues, touting the thoroughness of the review and its anticipated success in positioning the Company going into 2009.   In addition, Defendant Solkema reassured investors that none of the troubled loans were originated as part of the

Growth Plan, and that beyond the residential development sector, no other concentration of loans raised concerns worth highlighting. Defendant Solkema stated, in relevant part, as follows:

> As a management team, we were determined to actively address the weakness in the portfolio versus waiting for the problems to come to us. We chose to act now and reduce surprises in future quarters.

> The results of this intensive project led to our decision to take charge-offs of approximately $108.8 million against the loan portfolio, which represents an annualized charge-off rate of 5.49%. We're confident in the thoroughness of the work, and we believe that our decisions position us well going into 2009.

> Now I would like to review some of the more specific outcomes from this work as it affected our residential exposure and other loan sectors. Of the total $108.8 million in charge-offs for fourth quarter, approximately $86 million was attributable to the residential development portfolio...

> During the comprehensive review, we also identified charge-offs in other areas of the portfolio. In commercial real estate we charged off $11.1 million; commercial and industrial loans, $4.4 million; and personal loans, $3.3 million. None of the loans that we charged off were originated as part of the strategic growth plan launched in November 2007.

99.     These statements were materially false and misleading because they concealed from investors that PrivateBancorp was sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees. As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency. Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

100.    On January 26, the Company also announced that it had received preliminary approval of a $244 million investment from the U.S. Treasury Department as part of the Capital Purchase Program under the Emergency Economic Stabilization Act of 2008.

101.    On February 9, 2009, PrivateBancorp issued a press release announcing the abrupt departure of the Company's CFO.  The press release stated, in relevant part, that "Kevin M. Killips is named Chief Financial Officer, effective March 6, 2009, replacing Dennis L. Klaeser, who is leaving the Company at the end of March to pursue other opportunities."  Mark Holmes was named interim CFO until Killips assumed his role in March 2009.

102.    On March 2, 2009, PrivateBancorp filed its Annual Report with the SEC on Form 10-K for the 2008 fiscal year, reaffirming previously announced results.  The Company's Form 10-K was signed by Defendants Richman, Mandell, Beal, Bobins, Castellano, Coleman, Daly, Goldstein, Guyette, Kayman, McKissack, Podl, Rabin, Roche, Rybak, Silva, Tyree, as well as by interim CFO Mark Holmes and Barbara Briick.  The Company's Form 10-K contained Sarbanes-Oxley required certifications, signed by Defendant Richman and interim CFO Holmes. According to the Form 10-K, "[w]hen extending credit, our decisions are based upon our client's ability to repay the loan, as well as the value of any collateral securing the loan. The quality and integrity of the borrower is crucial in the loan approval process.  We monitor the performance of our loan portfolio through regular contact with our clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists."

103.    On April 27, 2009, PrivateBancorp issued a press release entitled "PrivateBancorp Reports First Quarter 2009 Results," in which the Company reported "income of $4.8 million, or $0.14 per diluted share, for the first quarter ended March 31, first quarter 2008" and that "[n]et revenue grew 23 percent over the fourth quarter to $88.3 million."  According to CEO Richman,

"[w]e are pleased with our first quarter results, especially given the continued economic pressures … For the second quarter in a row, we saw strong client acquisition and increased client deposit growth, a clear signal that we are building those strong, deep client relationships. We are fully aware that 2009 will continue to present economic challenges, particularly related to credit quality, and we will continue to manage our business prudently."   The press release stated, in relevant part, as follows:

> Total assets increased to $10.4 billion at March 31, 2009, from $6.0 billion at March 31, 2008, and $10.0 billion at December 31, 2008. Total loans increased $446.8 million to $8.5 billion at March December 31, 2008. Commercial loans increased to 52 percent of the Company's total loans at the end of the first quarter 2009 from 36 percent of total loans at March 31, 2008, and 49 percent decreased to 28 percent of total loans at the end of the first quarter 2009, compared to 39 percent of total loans at the end of the first quarter 2008, and 30 percent of the Company's total loans.

> Total deposits were $7.8 billion at March 31, 2009, compared to $5.0 billion at March 31, 2008, and $8.0 billion at December 31, 2008. Client deposits increased to $6.9 billion at March 31, 2009, Client deposits at March 31, 2009, includes $865.7 million in client CDARS(R) deposits. Brokered deposits (excluding client CDARS) decreased to 11 percent of total deposits in the first quarter percent of total deposits at the end of the fourth quarter 2008

104.    The press release also addressed the status of the Company's loan portfolio, including the Company's nonperforming loans and loan loss provisions, in relevant part, as follows:

> The first quarter 2009 provision for loan losses was $17.8 million, compared to $17.1 million in the first quarter 2008. The provision for loan losses in the fourth quarter 2008 was $119.3 million, when the Company recorded $108.8 million in net charge-offs and $10.5 million in additional provision for loan losses primarily related to growth in the loan portfolio.

> The allowance for loan losses as a percentage of total loans was 1.50 percent at March 31, 2009, compared with 1.21 percent at March 31, 2008, and 1.40 percent at December 31, 2008. Charge-offs were $7.0 million, offset by recoveries of $3.6 million.

> The Company had $191.6 million in total non-performing assets at March 31, 2009, compared to $65.9 million at March 31, 2008, and $155.7 million at

December 31, 2008, reflecting a weakening credit environment. Non-performing assets to total assets were 1.85 percent at March 31, 2009, compared to 1.10 percent at March 31, 2008, and 1.55 percent at December 31, 2008.

During the first quarter, a portion of the Company's clients were significantly impacted by the challenging economic environment. Higher non-performing assets were driven largely by weakness in the commercial real estate sector in most of the Company's markets. Problem loans and stress in the portfolio led to an increase in the allowance for loan losses.

105.    On April 27, PrivateBancorp also held an Earnings Conference Call in which Defendants Richman, Killips, and Solkema participated.   During the call, these Defendants praised the Company for achieving its first quarterly profit since announcing the Growth Plan, disclaimed that any of PrivateBancorp's nonperforming loans originated under the Growth Plan, and reaffirmed that the substantial write-offs taken in January were adequate to address the Company's credit quality concerns.   Defendant Solkema stated, in relevant part, as follows:

First, there are residential development loans remaining in the nonperforming loan category from our year-end portfolio review. I will speak in a moment regarding the performance of this portfolio sector, but in summary, the results of the actions taken at year-end are proving to be accurate and adequate.

Regarding nonperforming loans arising this quarter, they are largely driven by weakness in the commercial real estate loan sector. Of the increase in nonperforming, no concentration by geography or property type is evident. The new nonperforming loans include transactions extended directly for commercial real estate property investment to investors in commercial real estate and some owner-occupied real estate. All of the loans entering nonperforming this quarter were originated prior to November 2007 and the commencement of the statistic growth plan.

*    *    *

Once again this quarter it is important to note none of the loans charged off or classified as nonperforming were originated as part of the strategic growth plan portfolio.

106.    These statements were materially false and misleading when made because they concealed from investors that PrivateBancorp was sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees.   As a

result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency. Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

107. In the ensuing months, PrivateBancorp and the Officer Defendants continued to conceal the truth about the hundreds of millions of dollars in problematic commercial and industrial loans originated by PrivateBancorp under the Growth Plan. PrivateBancorp's false assurances that it had previously addressed the deterioration of its loan portfolio, and its misrepresentations that "[n]one" of the nonperforming loans originated through the Growth Plan, caused PrivateBancorp stock to recover from its January 2009 slump.

108. Seizing on the opportunity to benefit from the artificial inflation of its stock price, on or about May 19, 2009, PrivateBancorp completed a $217 million registered public offering of 11.87 million shares of the Company's common stock at $19.25 per share. The 2009 Offering was conducted pursuant to the Shelf Registration Statement, as well as the Prospectus and Prospectus Supplement, dated May 14, 2009, that became part of the Shelf Registration Statement pursuant to which the offering was conducted. The Shelf Registration Statement and the relevant Prospectus and Prospectus Supplement are referred to collectively as the "2009 Offering Materials."

109.    The 2009 Offering Materials incorporate by reference numerous other public filings of the issuer, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K, including those filed both prior to and after the filing of the Shelf Registration Statement.    The 2009 Offering Materials specifically incorporated by reference PrivateBancorp's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009, PrivateBancorp's Current Reports on Form 8-K filed on January 26, 2009, February 3, 2009, February 9, 2009, February 26, 2009, March 5, 2009, March 23, 2009, April 27, 2009, and May 12, 2009, and the description of PrivateBancorp's common stock contained in the Registration Statement on Form 8-A, as amended, dated April 27, 1999.

110.    In PrivateBancorp's Form 10-K for the year ended December 31, 2008, Defendant Ernst & Young expressed an unqualified opinion of its audit of the Company's "internal control over financial reporting" and stated that "PrivateBancorp, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008." Defendant Ernst & Young consented to the incorporation by reference of its audit opinion concerning PrivateBancorp's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting in the Shelf Registration Statement. Furthermore, PrivateBancorp incorporated by reference in the 2009 Offering Materials the financial statements set forth in the Form 10-K for the year ended December 31, 2008, and the effectiveness of the Company's internal control over financial reporting, which was audited by Defendant Ernst & Young.

111.    The underwriters of the 2009 Offering – Defendants JP Morgan, Robert Baird, William Blair, Keefe Bruyette, and SunTrust – sold and distributed the shares in the 2009

Offering to the investing public. The extent of these Underwriter Defendants' participation in the 2009 Offering was as follows:

| Underwriters | Number of Shares |
|---|---|
| JP Morgan | 6,960,000 |
| Robert Baird | 1,160,000 |
| William Blair | 1,160,000 |
| Keefe, Bruyette | 1,160,000 |
| SunTrust | 1,160,000 |

112.    The 2009 Offering Materials contained untrue statements of material fact and material omissions, regarding, among other things, PrivateBancorp's exposure to hundreds of millions of dollars in high-risk, low quality loans, and failed to disclose that PrivateBancorp's reported financial results were inflated as a result. Those Defendants that participated in the 2009 Offering failed in their respective obligations to ensure the accuracy of the 2009 Offering Materials. The Company raised an additional $217 million as a result of the 2009 Offering.

113.    On July 27, 2009, PrivateBancorp issued a press release entitled "PrivateBancorp Reports Second Quarter 2009 Results," in which the Company reported "net income of $2.5 million, or $0.06 per diluted share, for the second quarter ended June 30, 2009, compared with a net loss of $13.7 million, or $0.49 per diluted share, for the second quarter 2008. For the six months ended June 30, 2009, net income was $7.3 million, or $0.20 per diluted share, compared to a net loss of $22.9 million, or $0.84 per diluted share, for the prior year period." The Company also reported that revenue grew 9% over the first quarter to $95.8 million from $88.3 million. According to Defendant Richman, "[t]he Strategic Growth Plan continues to generate positive results for our business … We continue to add new, quality clients, leading to growing

deposits, improving margins and stronger net interest income this quarter. We also continue to

bolster our strong capital base and strengthen our credit reserves to solidify our balance sheet."

The July 27 press release stated, in relevant part, as follows:

> Total assets increased to $11.0 billion at June 30, 2009, from $7.5 billion at June 30, 2008, and $10.4 billion at March 31, 2009. Total loans increased to $8.7 billion at June 30, 2009, from $and $8.5 billion at March 31, 2009. Commercial loans increased to 53 percent of the Company's total loans at the end of the second quarter 2009 from 42 percent of total loans at June 30, 2008, loans at March 31, 2009. Commercial real estate loans were 28 percent of total loans at the end of the second quarter 2009, a decrease compared to 34 percent of total loans at the end of the unchanged in comparison to the end of the first quarter 2009.

> Total deposits were $8.3 billion at June 30, 2009, compared to $6.2 billion at June 30, 2008, and $7.8 billion at March 31, 2009. Client deposits increased to $7.4 billion at June 30, 2009, from 2008, and $6.9 billion at March 31, 2009. Client deposits at June 30, 2009, includes $1.0 billion in client CDARS(R) deposits. Brokered deposits (excluding client CDARS) were 11 percent of quarter 2009 a decrease from 28 percent of total deposits as of June 30, 2008, and unchanged from the first quarter 2009.

114.    The July 27 press release also addressed the status of PrivateBancorp's loan

portfolio, including the Company's reported increase in nonperforming loans and loan loss

provisions.  The press release stated, in relevant part, as follows:

> The second quarter 2009 provision for loan losses was $21.5 million, compared to $23.0 million in the second quarter 2008 and $17.8 million in the first quarter 2009.

> The allowance for loan losses as a percentage of total loans was strengthened to 1.60 percent at June 30, 2009, compared with 1.23 percent at June 30, 2008, and 1.50 percent at March 31, 2009. Charge-offs were $12.6 million for the quarter ended June 30, 2009, offset by recoveries of $4.1 million, and $7.0 million for the quarter ended March 31, 2009, offset by recoveries of $3.6 million.

> The Company had $212.8 million in total non-performing assets at June 30, 2009, compared to $73.1 million at June 30, 2008, and $191.6 million at March 31, 2009, reflecting a weakening credit environment. Non-performing assets to total assets were 1.94 percent at June 30, 2009, compared to 0.98 percent at June 30, 2008, and 1.85 percent at March 31, 2009.

> The increase in provision expense and elevated levels of nonperforming loans primarily reflects ongoing deterioration experienced in the Commercial Real

Estate portfolio as well as continued stress in general business conditions. The increased level of loan loss coverage reflects growth in nonperforming assets and recognition of underlying collateral values.

115.     On July 27, PrivateBancorp conducted an Earnings Conference Call in which Defendants Richman, Killips, and Solkema participated.   During the call, these Defendants continued to conceal from investors that the loans originated as part of the Growth Plan were facing serious credit quality concerns, and misled investors by representing that the write-offs taken earlier in the year were adequately sized to address the deterioration in the Company's loan portfolio.  Significantly, Defendant Solkema stated, in relevant part, as follows:

First, there are the residential development loans remaining in the nonperforming loan category from the our year-end portfolio review. In our review of our year-end portfolio actions, the charge-offs taken then are proving to be appropriately sized and adequate. We are able to liquidate the subject properties at values very close to our carrying values within significant additional losses.

Regarding the nonperforming loans arising this quarter, they are once again like last quarter, largely driven by weakness in the real estate loans sector. The new nonperforming loans include transactions extended directly for commercial real estate property investment and to investors in real estate projects. New nonperforming loans are primarily development related loans that are negatively impacted by the economy, not driven by poor underwriting. As project and guarantor cash flow support weakens and collateral values decline, we identified loans considered to be nonperforming and where warranted established specific reserves recognizing the inherent losses.

\*     \*     \*

Once again this quarter, it is important to note, none of the loans charged off or classified as nonperforming were originated as part of the strategic growth plan portfolio. The higher provision expense is a result of continued deterioration and weakness in the broader economy and the related stress on our customers and our continued proactive efforts to address problem loans.

We strengthened the loan loss reserve coverage to 1.6% from 1.5% at March 31. We're comfortable with this level of coverage given the adequacy of our loan loss factors used in our model and the comprehensive review of all underperforming and nonperforming loans we completed once again at the end of the quarter. In addition, when one considers the increase in the allowance for loan losses against the elevated level of nonperforming loans and our historical loss severity, the increase in the allowance is proportional to the nonperforming increase.

116.    These statements were materially false and misleading when made because they concealed from investors that PrivateBancorp was sacrificing loan quality for quantity in order to achieve certain financial targets that would trigger incentive payments for key employees.  As a result, PrivateBancorp and the Officer Defendants knew or were reckless in not knowing that the loans originated as part of the Growth Plan were at high risk of delinquency.   Accordingly, PrivateBancorp and the Officer Defendants' statements touting the success of the Growth Plan materially misled investors about, *inter alia*, the strength of PrivateBancorp's loan portfolio; PrivateBancorp's exposure to delinquent and/or nonperforming loans; the adequacy of PrivateBancorp's loan loss provisions; the amount of write-offs necessary for PrivateBancorp to address its credit-quality concerns; and PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

117.    In July 2009, PrivateBancorp announced that in furtherance of the Growth Plan it had acquired Founders Bank, increasing the Company's Chicago-area footprint from eight to eighteen branches, and assuming Founders Bank's $828 million in deposits and $906 million in assets.

118.    Prior to the start of trading, on October 26, 2010, PrivateBancorp shocked investors by issuing a press release entitled "PrivateBancorp Reports Third Quarter 2009 Results," in which the Company reported "a net loss of $31.2 million, or $0.68 per diluted share, for the third quarter ended September 30, 2009, compared with a net loss of $7.8 million, or $0.25 per diluted share, for the third quarter 2008. For the nine months ended September 30, 2009, the net loss was $23.9 million, or $0.62 per diluted share, compared to a net loss of $30.7 million, or $1.07 per diluted share, for the prior year period."   The press release stated, in relevant part, as follows:

During the quarter, credit quality continued the negative trend from prior periods reflecting the challenging economy. Defaulted loans increased, causing a significant rise in the Company's non-performing loans. The Company had $396.6 million in total non-performing assets at September 30, 2009, compared to $106.5 million at September 30, 2008, and $212.8 million at June 30, 2009. The third quarter increase in non-performing assets included $37 million from Shared National Credits. Non-performing assets to total assets were 3.28 percent at September 30, 2009 (non-performing assets to total assets excluding covered assets were 3.43 percent), compared to 1.18 percent at September 30, 2008, and 1.94 percent at June 30, 2009.

As a result of the credit quality deterioration in the quarter, the Company took additional steps to review loan exposures in targeted areas of its credit portfolio, concentrating primarily on the commercial real estate sector and loans originated prior to November 2007. The targeted review of loans assessed loan performance, underlying project characteristics and the strength of sponsor support, and it provided the Company greater insight into existing and emerging credit issues to proactively mitigate credit risk in future quarters.

Based on the credit quality deterioration in the quarter and in light of the results of the credit portfolio review, the Company increased the allowance for loan losses. The third quarter 2009 provision for loan losses was $90.0 million, compared to $30.2 million in the third quarter 2008 and $21.5 million in the second quarter 2009. The allowance for loan losses as a percentage of total loans increased to 2.14 percent at September 30, 2009, compared with 1.37 percent at September 30, 2008, and 1.60 percent at June 30, 2009. Chargeoffs were $40.1 million for the quarter ended September 30, 2009, offset by recoveries of $2.8 million, and $12.6 million for the quarter ended June 30, 2009, offset by recoveries of $4.1 million.

The increase in provision expense and elevated levels of non-performing loans reflects ongoing deterioration primarily in the Company's commercial real estate portfolio but also across select industry sectors. The increased level of loan loss coverage reflects growth in non-performing assets and recognition of lower underlying collateral values. During the quarter, deterioration of the commercial real estate portfolio followed trends in the sector, including elevated commercial vacancy rates, sponsor bankruptcies and downward pressure on real estate values. The weak state of the economy continues to put pressure on other business sectors represented in our portfolio, but not to the degree seen in commercial real estate.

The Company expects increasing levels of non-performing assets for the next several quarters. The trends in the credit portfolio will remain weak due to the under-performing commercial real estate sector and the generally soft economic environment. Specifically, fourth quarter growth in non-performing assets is expected to be meaningful, though at a rate less than the increase between the end of the second and third quarters.

119.    According to the press release, net revenue grew to $101.2 million in the third quarter 2009, including $11.5 million attributable to the Founders Bank acquisition, from $65.2 million in the third quarter 2008, and $95.8 million in the second quarter 2009.  The press release reported, in relevant part, as follows:

> Total assets increased to $12.1 billion at September 30, 2009, from $9.0 billion at September 30, 2008, and $11.0 billion at June 30, 2009. Assets attributable to Founders totaled $836.5 million at September 30, 2009. Total loans increased to $9.0 billion at September 30, 2009, from $7.4 billion at September 30, 2008, and $8.7 billion at June 30, 2009. The $300 million in loan growth during the quarter reflected the Company's selective approach to credit generation and prevailing market conditions. Commercial loans were 51 percent of the Company's total loans at the end of the third quarter 2009, compared with 46 percent of total loans at September 30, 2008, and 53 percent of total loans at June 30, 2009. Commercial real estate loans were 29 percent of total loans at the end of the third quarter 2009, compared to 33 percent of total loans at the end of the third quarter 2008 and up from 28 percent at the end of the second quarter 2009.
>
> Total deposits were $9.6 billion at September 30, 2009, compared to $7.4 billion at September 30, 2008, and $8.3 billion at June 30, 2009. Deposits attributable to Founders totaled $793.9 million at September 30, 2009. Client deposits increased to $8.9 billion at September 30, 2009, from $5.0 billion at September 30, 2008, and $7.4 billion at June 30, 2009. Client deposits at September 30, 2009, include $981.7 million in client CDARS® deposits. Brokered deposits (excluding client CDARS) were 7 percent of total deposits in the third quarter 2009, a decrease from 33 percent of total deposits as of September 30, 2008, and down from 11 percent in the second quarter 2009. The significant decrease in brokered deposits year-over-year reflects success in executing an important element of the Strategic Growth Plan, namely relying on less-expensive client deposits to fund loan growth.

120.    On October 26, PrivateBancorp held an Earnings Conference Call, in which Defendants Richman, Killips, and Solkema participated.  During the call, the truth about the commercial loans originated by PrivateBancorp as part of the Growth Plan was finally revealed to investors.  Significantly, Defendant Solkema stated, in relevant part, as follows:

> Our operating results reflect a significant deterioration in our commercial real estate portfolio and the addition of a handful of commercial loans that became non-performing in the quarter. The weakness in the general economy and, in particular, with commercial real estate with higher vacancy rates, very limited sales activity, a little financing activity altogether have impacted our portfolio

quality to a meaningful level. We have moved some commercial borrowers to non-performing as a result of declining revenue and strained cash flow.

We also have two shared national credits that moved to non-performing. We are seeing limited liquidity at both the borrower and guarantor level. In sum, we are observing an escalation of negative trends in borrower events over and above what we had previously observed.

With that said, non-performing loans increased to $360 million, up from $183 million at June 30, or 3.99% of total loans. The concentration of non-performing loans, including those new to this quarter, are commercial real estate and commercial construction loans. In addition, we had $33 million of commercial loans which moved to non-performing loan status during the quarter.

Our allowance for loan losses increased this quarter to 2.14% from 1.60% at the end of the second quarter and up meaningfully from 1.37% a year ago. Our third quarter provision for loan losses was $90 million, up from $21.5 million in the second quarter, reflecting our judgment of maintaining a loan loss reserve level appropriate to our loan portfolio position and broader market conditions.

Loans charged off were $40.1 million, offset by recoveries of $2.8 million, resulting in net charge-offs of $37.3 million in the quarter. Charge-offs have escalated and reflect real estate collateral values which have fallen appreciably, especially land values.

121.    During the conference call, the Company further revealed that of the $1.6 billion that it reported in shared national credits – loans in which three or more regulated financial institutions participate in a lending relationship – PrivateBancorp served as the primary in only about 20% of those relationships, far less than analysts had anticipated based on the Company's prior representations.   In other words, PrivateBancorp would not likely realize additional business from the vast majority of its shared national credit relationships.  According to analysts at SunTrust, "[w]e would have thought that the bank would have played the lead role in a larger percentage of these credits."

122.    On the disclosure of this news, analysts questioned the aggressiveness of the Growth Plan, under which approximately 40% of PrivateBancorp's nonperforming loans had originated.  One analyst wrote that "[t]he emergence of credit deterioration at PrivateBancorp in

loans originated during the 'Strategy Growth Plan' (since Nov. '07) will no doubt result in the questioning of the company's decision to grow aggressively over the past two years."  At the same time that PrivateBancorp announced its quarterly loss, the Company disclosed that it had replaced its Chief Operating Officer.  In response to the October 26 disclosures, PrivateBancorp stock fell over 37%, dropping from $19.00 per share to $11.98.

123.    Notwithstanding PrivateBancorp's disappointing financial results, on February 2, 2010, PrivateBancorp rewarded its management by modifying the Company's compensation plan to provide bonuses for 130 senior executives and key employees despite missed financial targets.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

124.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not "forward looking statements" when made.  To the extent there were any forward-looking statements, there was no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, PrivateBancorp and the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PrivateBancorp who knew that those statements were false when made.  Moreover, to the extent that PrivateBancorp and the Officer Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that PrivateBancorp

and the Officer Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures false and misleading.

## PRESUMPTION OF RELIANCE

125.    At all relevant times, the market for PrivateBancorp's publicly traded securities was an efficient market for the following reasons, among others:

(a)    PrivateBancorp common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, PrivateBancorp filed periodic public reports with the SEC;

(c)    PrivateBancorp regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    PrivateBancorp was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

126.    As a result, the market for PrivateBancorp's publicly traded common stock promptly digested current information regarding PrivateBancorp from all publicly-available sources and reflected such information in PrivateBancorp's stock prices. Under these circumstances, all purchasers of PrivateBancorp's common stock during the Class Period

suffered similar injury through their purchase of PrivateBancorp's common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

127.    During the Class Period, as detailed herein, PrivateBancorp and the Officer Defendants made false and misleading statements and engaged in a course of conduct that artificially inflated the price of PrivateBancorp common stock and operated as a fraud or deceit on Plaintiff and the Class by misrepresenting the Company's business and prospects.  Later, when PrivateBancorp and the Officer Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of PrivateBancorp common stock plunged.  As a result of their purchases of PrivateBancorp common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased PrivateBancorp's common stock between November 2, 2007 and October 23, 2009, inclusive, and who were damaged thereby, and on behalf of all persons who purchased or otherwise acquired PrivateBancorp's common stock pursuant and/or traceable to the 2008 and 2009 Offerings.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PrivateBancorp's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this

time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of PrivateBancorp shares were traded publicly during the Class Period on NASDAQ and as of August 4, 2010, PrivateBancorp had 71,395,369 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by PrivateBancorp and/or its transfer agent and from the Underwriter Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

131. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

132. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by PrivateBancorp and the Officer Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PrivateBancorp;

(c) Whether the 2008 and 2009 Offering Materials issued by PrivateBancorp contained untrue statements of material facts or omitted to state material information; and

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

133.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

134.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

135.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**Violations Of Section 11 Of The Securities Act Against PrivateBancorp, the Officer Defendants (Excluding Defendant Solkema) the Director Defendants, the Underwriter Defendants and the Auditor Defendant**

136.    This Count, relating to the allegations set forth in ¶¶ 71-75 and ¶¶ 108-112 *supra*, is asserted against PrivateBancorp, the Officer Defendants (excluding Defendant Solkema), the Director Defendants, the Underwriter Defendants, and the Auditor Defendant for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who

purchased or otherwise acquired the common stock sold pursuant and/or traceable to the 2008 and/or 2009 Offerings.

137.   This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

138.   With respect to the 2008 Offering, this Count is asserted against PrivateBancorp, the Officer Defendants (excluding Defendants Solkema and Killips), the Director Defendants (excluding Defendant Bobins), Underwriter Defendants Keefe Bruyette, Robert Baird, William Blair, and SunTrust.  With respect to the 2009 Offering, this Count is asserted against PrivateBancorp, the Officer Defendants (excluding Defendant Solkema), the Director Defendants, Underwriter Defendants JP Morgan, Keefe Bruyette, Robert Baird, William Blair, and SunTrust, and the Auditor Defendant.

139.   Liability under this Count is predicated on the Defendants' respective participation in the 2008 and 2009 Offerings, which was conducted pursuant to the 2008 and 2009 Offering Materials.  The 2008 and 2009 Offering Materials contained untrue statements and omissions of material fact concerning *inter alia* the success of the Growth Plan, the quality of PrivateBancorp's loan portfolio, and the Company's ability to maintain internal controls and adequately manage risk.

140.   By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the securities sold pursuant and/or traceable to the 2008 and/or 2009 Offering Materials.

## COUNT II

### For Violations Of Section 12 Of The Securities
### Act Against PrivateBancorp And The Underwriter Defendants

141.    This Count, relating to the allegations set forth in ¶¶ 71-75 and ¶¶ 108-112 *supra*,

is asserted against PrivateBancorp and the Underwriter Defendants for violations of Section

12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who

purchased or otherwise acquired PrivateBancorp securities pursuant and/or traceable to the 2008

and/or 2009 Offerings.

142.    This Count does not sound in fraud.   Any allegations of fraud or fraudulent

conduct and/or motive are specifically excluded from this Count.   For purposes of asserting this

claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or

fraudulent intent, which are not elements of a Section 12 claim.

143.    With respect to the 2008 Offering, this Count is asserted against PrivateBancorp

and Underwriter Defendants Keefe Bruyette, Robert Baird, William Blair, and SunTrust.  With

respect to the 2009 Offering, this Count is asserted against PrivateBancorp and Underwriter

Defendants JP Morgan, Keefe Bruyette, Robert Baird, William Blair, and SunTrust.

144.    PrivateBancorp and the Underwriter Defendants were sellers, offerors, and/or

solicitors of sales of the securities issued in the 2008 and 2009 Offerings pursuant to the 2008

and 2009 Offering Materials.   The 2008 and 2009 Offering Materials, including Prospectuses,

Prospectus Supplements and pricing supplements incorporated therein, contained untrue

statements of material fact and omitted other facts necessary to make the statements not

misleading, and failed to disclose material facts, as set forth in the charts provided herein.  These

statements include *inter alia* representations concerning the success of the Growth Plan, the

quality of PrivateBancorp's loan portfolio, and the Company's ability to maintain internal controls and adequately manage risk.

145.    By reason of the foregoing, PrivateBancorp and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased common stock sold pursuant or traceable to the 2008 and/or 2009 Offerings pursuant to the 2008 and 2009 Offering Materials.

## COUNT III

### For Violations Of Section 15 Of The Securities Act Against The Officer Defendants (Excluding Defendant Solkema) and the Director Defendants

146.    This Count, relating to the allegations set forth in ¶¶ 71-75 and ¶¶ 108-112 *supra*, is asserted against the Officer Defendants (excluding Defendant Solkema) and Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class who purchased or otherwise acquired PrivateBancorp common stock sold pursuant and/or traceable to the 2008 and/or 2009 Offerings.

147.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

148.    With respect to the 2008 Offering, this Count is asserted against the Officer Defendants (excluding Defendants Solkema and Killips) and the Director Defendants (excluding Defendant Bobins).  With respect to the 2009 Offering, this Count is asserted against the Officer Defendants (excluding Defendant Solkema) and the Director Defendants.

149.    At all times relevant hereto, the Officer Defendants and Director Defendants were controlling persons of PrivateBancorp within the meaning of Section 15 of the Securities Act.

Each of the Officer Defendants and Director Defendants served as an executive officer and/or director of PrivateBancorp prior to and/or at the time of the 2008 and/or 2009 Offerings.

150.    The Officer Defendants and Director Defendants at times relevant hereto participated in the operation and management of PrivateBancorp, and conducted and participated, directly and indirectly, in the conduct of PrivateBancorp's business affairs.  As officers and directors of a publicly owned company, the Officer Defendants and Director Defendants had a duty to disseminate accurate and truthful information with respect to PrivateBancorp's financial condition and results of operations.  Because of their positions of control and authority as officers or directors of PrivateBancorp, the Officer Defendants and Director Defendants were able to, and did, control the contents of the 2008 and 2009 Offering Materials, which contained materially untrue financial information.

151.    By reason of the foregoing, the Officer Defendants and Director Defendants are liable under Section 15 of the Securities Act, to the same extent that PrivateBancorp is liable under Sections 11, 12(a)(2) of the Securities Act, to Plaintiff and the other members of the Class who purchased securities pursuant and/or traceable to the 2008 and 2009 Offerings pursuant to the applicable 2008 and 2009 Offering Materials.

## COUNT IV

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against PrivateBancorp and the Officer Defendants

152.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

153.    During the Class Period, PrivateBancorp and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein;

and (ii) cause Plaintiff and other members of the Class to purchase PrivateBancorp's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, PrivateBancorp and the Officer Defendants, and each of them, took the actions set forth herein.

154. PrivateBancorp and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PrivateBancorp's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

155. PrivateBancorp and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PrivateBancorp's financial well-being and prospects, as specified herein.

156. PrivateBancorp and the Officer Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PrivateBancorp's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PrivateBancorp and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged

in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

157.    Each of the Officer Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

158.    The Officer Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PrivateBancorp's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Officer Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Officer Defendants, if they did not have actual knowledge of the misrepresentations

and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

159. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PrivateBancorp's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by PrivateBancorp and the Officer Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by PrivateBancorp and the Officer Defendants, but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired PrivateBancorp's common stock during the Class Period at artificially high prices and were damaged thereby.

160. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding PrivateBancorp's imprudent lending practices and the credit quality concerns facing the Company, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PrivateBancorp common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

161. As a direct and proximate result of PrivateBancorp's and the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection

with their respective purchases and sales of the Company's common stock during the Class Period.

162.    By virtue of the foregoing, PrivateBancorp and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT V**

**Violation of Section 20(a) of
The Exchange Act Against the Officer Defendants**

163.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

164.    The Officer Defendants acted as controlling persons of PrivateBancorp within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    In particular, each of the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

166.    As set forth above, PrivateBancorp and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4.    As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a recessionary measure of damages; and

5.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 22, 2010


**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**


By:____/s/_ Avi Josefson_____
     Avi Josefson
     2835 N. Sheffield Avenue, Suite 409
     Chicago, Illinois 60657
     Tel: 773-883-5382
     avi@blbglaw.com
     Illinois Bar No. 6272453

     -and-

     Gerald H. Silk
     Laurence J. Hasson
     1285 Avenue of the Americas
     New York, New York 10019
     Telephone: (212) 554 1400
     Facsimile:  (212) 554 1444

     *Counsel for the City of New Orleans
     Employees' Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jerome Davis, on behalf of the New Orleans Employees' Retirement System ("New Orleans"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of New Orleans. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. New Orleans did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. New Orleans is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. New Orleans' transactions in the PrivateBancorp, Inc. Securities that are the subject of this action are set forth in the chart attached hereto.

5. New Orleans has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re NovaGold Resources, Inc. Securities Litigation*, Case No. 08-cv-7041 (S.D.N.Y.)
*General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust, et al,* Case No. 09-cv-1376 (N.D. Cal.)

6. New Orleans has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*New Orleans Employees' Retirement System v. UBS AG, et al.,* Case No. 09-cv-893 (S.D.N.Y.)

7. New Orleans has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re Teletech Litigation,* Case No. 08-cv-913 (S.D.N.Y.)
*Boilermakers National Annuity Trust v. WaMu Mortgage Pass-Through Certificates, Series 2006-ARI, et al.,* Case No. 09-cv-37 (W.D. Wash.)
*In re STEC, Inc. Securities Litigation,* Case No. 09-cv-1304 (C.D. Cal.)
*Sheet Metal Workers Local 32 Pension Fund, et al v. Terex Corp., et al.,* Case No. 09-cv-2083 (D. Conn.)

8. New Orleans will not accept any payment for serving as a representative party on behalf of the Class beyond New Orleans' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of October, 2010.

Jerome Davis
Chairman
*New Orleans Employees' Retirement System*

New Orleans Employees' Retirement System
Transactions in PrivateBancorp, Inc.

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/27/2007 | 100 | $28.0189 |
| Purchase | 12/11/2007 | 100 | $33.1719 |
| Purchase | 12/12/2007 | 200 | $33.2287 |
| Purchase | 1/15/2008 | 300 | $30.4511 |
| Purchase | 1/16/2008 | 300 | $30.9086 |
| Purchase | 1/18/2008 | 100 | $29.3930 |
| Purchase | 1/22/2008 | 100 | $30.0000 |
| Purchase | 1/23/2008 | 200 | $29.6109 |
| Purchase | 1/23/2008 | 100 | $29.5998 |
| Purchase | 1/24/2008 | 300 | $29.4116 |
| Purchase | 3/5/2008 | 500 | $29.9953 |
| Purchase | 6/11/2008 | 500 | $34.0000 |
| Purchase | 2/3/2009 | 1,400 | $15.6911 |
| Purchase | 2/3/2009 | 400 | $15.5832 |
| Purchase | 3/9/2009 | 100 | $10.6003 |
| Purchase | 3/10/2009 | 200 | $9.8802 |
| Purchase | 3/11/2009 | 100 | $9.7414 |
| Purchase | 3/16/2009 | 100 | $11.1279 |
| Purchase | 3/18/2009 | 600 | $12.4808 |
| Purchase | 10/23/2009 | 900 | $21.2255 |
| | | | |
| Sale | 9/29/2008 | (100) | $41.9899 |
| Sale | 9/30/2008 | (100) | $41.2561 |
| Sale | 9/30/2008 | (100) | $41.0750 |
| Sale | 9/30/2008 | (100) | $41.2538 |
| Sale | 10/1/2008 | (100) | $40.3782 |
| Sale | 10/2/2008 | (100) | $40.9531 |
| Sale | 10/2/2008 | (100) | $40.9788 |
| Sale | 10/23/2008 | (400) | $38.7490 |
| Sale | 10/24/2008 | (400) | $37.8545 |
| Sale | 10/31/2008 | (100) | $32.0354 |
| Sale | 10/31/2008 | (600) | $31.9660 |
| Sale | 2/23/2009 | (2,200) | $12.6500 |