# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CITY OF NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | : : : : : | Civ. A. No. 10-cv-6826 Honorable William T. Hart |
| Plaintiff, v. | : : : : : | |
| PRIVATEBANCORP, INC., LARRY D. RICHMAN, DENNIS L. KLAESER, KEVIN M. KILLIPS, RALPH B. MANDELL, KEVIN VAN SOLKEMA, DONALD L. BEAL, WILLIAM A. CASTELLANO, ROBERT F. COLEMAN, PATRICK F. DALY, WILLIAM A. GOLDSTEIN, JAMES M. GUYETTE, RICHARD C. JENSEN, PHILIP M. KAYMAN, CHERYL MAYBERRY MCKISSACK, WILLIAM J. PODL, EDWARD W. RABIN, JR., COLLIN E. ROCHE, WILLIAM R. RYBAK, ALEJANDRO SILVA, JAMES C. TYREE, JOHN B. WILLIAMS, NORMAN R. BOBINS, KEEFE, BRUYETTE & WOODS, INC., ROBERT W. BAIRD & CO. INCORPORATED, WILLIAM BLAIR & COMPANY, L.L.C., SUNTRUST ROBINSON HUMPHREY, INC., and J.P. MORGAN SECURITIES INC. | : : : : : : : : : : : : : : : : : : : : : | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** **ECF CASE** |
| Defendants. | : : : | |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

    EXCHANGE ACT CLAIMS ................................................................................... 2

I. JURISDICTION AND VENUE............................................................................... 7

II. PARTIES................................................................................................................. 8

    A. Lead Plaintiffs and Additional Plaintiff ........................................................ 8

    B. Exchange Act Defendants ................................................................................ 9

        1. The Company............................................................................................ 9

        2. Individual Defendants.............................................................................. 9

III. CONTROL PERSON ALLEGATIONS................................................................ 10

IV. CONFIDENTIAL SOURCES ............................................................................... 12

V. SUBSTANTIVE ALLEGATIONS......................................................................... 14

    A. The Company's "Growth Plan" ....................................................................... 14

    B. The Company's Underwriting Standards Deteriorate Under the Growth
       Plan .................................................................................................................. 15

    C. The Exchange Act Defendants Closely Tracked the Performance of
       PrivateBancorp's Loans .................................................................................. 21

    D. The Quality of the Company's Legacy Loan Portfolio Deteriorates................ 22

VI. THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND
     MISLEADING STATEMENTS AND OMISSIONS ........................................ 26

    A. November 2, 2007 8-K ..................................................................................... 26

    B. November 27, 2007 Earnings Call................................................................... 27

    C. January 28, 2008 Form 8-K ............................................................................. 28

    D. January 28, 2008 Earnings Call ...................................................................... 29

    E. May 6, 2008 10-Q............................................................................................ 31

    F. April 28, 2008 8-K........................................................................................... 33

G. May 1, 2008 8-K ........................................................................................... 34

H. July 29, 2008 Earnings Call ......................................................................... 34

I. August 11, 2008 10-Q .................................................................................. 38

J. October 27, 2008 8-K ................................................................................... 42

K. October 27, 2008 Earnings Call .................................................................. 44

L. November 10, 2008 10-Q ............................................................................ 47

M. The Truth Begins to Emerge ....................................................................... 51

   1. January 8, 2009 *Wall Street Journal* Article Partial Disclosure of the Truth ................................................................................................... 51

   2. January 26, 2009 8-K Partial  Disclosure of the Truth ............................... 52

   3. January 26, 2009 Earnings Call Partial Disclosure .................................... 53

N. March 2, 2009 10-K for FY 2008 ................................................................ 58

O. May 11, 2009 10-Q ...................................................................................... 63

P. July 27, 2009 8-K ......................................................................................... 64

Q. July 27, 2009 Earnings Call ........................................................................ 65

R. August 7, 2009 10-Q .................................................................................... 67

S. False and Misleading Core Financials  Throughout the Class Period ............................. 69

T. The Whole Truth About the Growth Plan Is Revealed .................................... 70

VII. LOSS CAUSATION/ECONOMIC LOSS .................................................... 72

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR .............................. 74

IX. PRESUMPTION OF RELIANCE ............................................................... 75

X. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ................ 76

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................. 78

  COUNT I  Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against PrivateBancorp and the Individual Defendants ................................................................................................... 78

COUNT II  Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........................................................................................ 79

SECURITIES ACT CLAIMS ........................................................................ 80

I. JURISDICTION AND VENUE ........................................................................ 81

II. PARTIES – 2008 Offering .............................................................................. 82

III. PARTIES – 2009 OFFERING ........................................................................ 86

IV. SUBSTANTIVE ALLEGATIONS ................................................................. 90

    A.  June 11, 2008 Offering ............................................................................ 92

    B.  May 14, 2009 Offering ............................................................................ 99

    C.  The Whole Truth is Revealed ................................................................ 104

V. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................ 105

COUNT III  For Violations Of § 11 Of The Securities Act Against The 2008 Offering Defendants ................................................................................... 105

COUNT IV  For Violations Of § 12(a)(2) Of The Securities Act Against Defendants PrivateBancorp, Richman, Mandell, Klaeser, And The 2008 Underwriter Defendants ............................................................................... 107

COUNT V  For Violations Of § 15 Of The Securities Act Against Defendants Richman, Mandell, And Klaeser ............................................... 108

COUNT VI  For Violations Of § 11 Of The Securities Act Against The 2009 Offering Defendants ............................................................................ 109

COUNT VII  For Violations Of § 12(a)(2) Of The Securities Act Against Richman, Mandell, Klaeser, Killips, PrivateBancorp and the 2009 Underwriter Defendants ............................................................................... 111

COUNT VIII  For Violations Of § 15 Of The Securities Act Against Richman, Mandell, Klaeser, and Killips ...................................................... 112

PRAYER FOR RELIEF – Applicable To All Claims .......................................... 113

JURY TRIAL DEMAND – Applicable To All Claims ........................................ 113

# INTRODUCTION

1.        Lead Plaintiffs State-Boston Retirement System and City of New Orleans

Employees' Retirement System ("Lead Plaintiffs") by their undersigned attorneys, hereby bring

this Amended Class Action Complaint ("Complaint") against PrivateBancorp, Inc.

("PrivateBancorp" or the "Company"), Larry D. Richman ("Richman"), Dennis L. Klaeser

("Klaeser"), Kevin M. Killips ("Killips"), Ralph B. Mandell ("Mandell"), Kevin Van Solkema

("Van Solkema"), Donald L. Beal ("Beal"), William A. Castellano ("Castellano"), Robert F.

Coleman ("Coleman"), Patrick F. Daly ("Daly"), William A. Goldstein ("Goldstein"), James M.

Guyette ("Guyette"), Richard C. Jensen ("Jensen"), Philip M. Kayman ("Kayman"), Cheryl

Mayberry McKissack ("McKissack"), William J. Podl ("Podl"), Edward W. Rabin ("Rabin"),

Collin E. Roche ("Roche"), William R. Rybak ("Rybak"), Alejandro Silva ("Silva"), James C.

Tyree ("Tyree"), John B. Williams ("Williams"), Norman R. Bobins ("Bobins"), Keefe, Bruyette

& Woods, Inc. ("KBW"), Robert W. Baird & Co. Incorporated ("Baird"), William Blair &

Company, L.L.C. ("William Blair"), Suntrust Robinson Humphrey, Inc. ("Suntrust"), and J.P.

Morgan Securities Inc. ("JPM").

2.        Lead Plaintiffs bring claims under the Exchange Act against PrivateBancorp,

Richman, Klaeser, Killips, Mandell, and Van Solkema (collectively, the "Exchange Act

Defendants").

3.        Lead Plaintiffs bring claims under the Securities Act against PrivateBancorp,

Richman, Klaeser, Killips, Mandell, Beal, Castellano, Coleman, Daly, Goldstein, Guyette,

Jensen, Kayman, McKissack, Podl, Rabin, Roche, Rybak, Silva, Tyree, Williams, Bobins, KBW,

Baird, William Blair, Suntrust, and JPM (collectively, the "Securities Act Defendants").

4.        The allegations herein are based on Lead Plaintiffs' personal knowledge as to

their own acts and on information and belief as to all other matters, such information and belief

having been informed by the investigation conducted by and under the supervision of their counsel, which included interviews of former employees of PrivateBancorp and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)); review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by PrivateBancorp, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company; media reports about the Company; and consultations with experts. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Lead Plaintiffs allege as follows.

5. This is a federal securities class action brought on behalf of purchasers of PrivateBancorp's publicly traded common stock between November 2, 2007 and October 23, 2009, inclusive (the "Class Period"), and investors who purchased or otherwise acquired PrivateBancorp's common stock pursuant and/or traceable to registered public offerings conducted on or about June 4, 2008 (the "2008 Offering") and on or about May 14, 2009 (the "2009 Offering"). Plaintiffs seek remedies under the Securities Act of 1933 (the "Securities Act")[1] and the Securities Exchange Act of 1934 (the "Exchange Act").

## EXCHANGE ACT CLAIMS

6. PrivateBancorp is a Chicago-based, regional bank that previously focused on private banking with a small concentration on commercial banking. However, beginning in November 2007, PrivateBancorp decided to aggressively grow the Company's franchise into

---

[1] *See* pp.80 *et seq.* for the relevant allegations regarding Plaintiffs' claims under the Securities Act. Plaintiffs' Securities Act claims do not incorporate any paragraphs in the Complaint unless specifically referenced.

"the bank of choice for middle market commercial and commercial real estate companies" in an attempt to transform itself into a major commercial lender. To that end, on November 2, 2007, PrivateBancorp's Board of Directors (the "PrivateBancorp Board") – led by Defendant Mandell (former Chief Executive Officer ("CEO") and current Chairman) – announced its approval of a Strategic Growth and Transformation Plan (the "Growth Plan") intended to rapidly expand the Company's business through increased lending and new business development. The key components of the Growth Plan were (1) the recruitment and retention of experienced middle market commercial bankers, and (2) a new incentive program to reward high-performing PrivateBancorp employees for increasing the price of the Company's stock.

7.     In executing the Growth Plan, PrivateBancorp aggressively poached bankers from LaSalle Bank, N.A. ("LaSalle") which in 2007 was in the process of being acquired by Bank of America Corp. In the two years that followed the announcement of the Growth Plan, the Company nearly doubled the ranks of its bankers, with over 160 LaSalle recruits joining PrivateBancorp.

8.     PrivateBancorp touted the Growth Plan as the "continuation of the Company's business model" and the "synergistic integration" of the LaSalle bankers into PrivateBancorp's "existing platform." In reality, however, there was no real intent to build on the Company's base. According to confidential witness testimony, no-one took the time to map out the growth plan. Instead, "[i]t was nebulous, shoot from the hip… just bring LaSalle, steal clients from BoA [Bank of America] and grow like hell." The Growth Plan, in other words, consisted of hiring as many LaSalle bankers as possible and driving them to initiate as many loans as possible, regardless of the credit quality or long-term risk to the Company.

9.     According to multiple CWs, PrivateBancorp permitted the LaSalle bankers that it hired to write any loans they desired, without oversight, while pushing the employees who had built the Company with integrity and thoughtful underwriting to the side.   As a result, PrivateBancorp rapidly deteriorated from a business built on sound lending practices into a Company with no meaningful underwriting standards, overtaken by reckless bankers aiming to cash in on lucrative performance based bonuses.

10.     CW testimony confirms the LaSalle personnel hired under the Growth Plan had "carte blanche" with regard to issuing loans and that everything they wrote was approved, in contrast to the prior, careful lending practices employed by the Company.

11.     Thus, the Growth Plan precipitated a complete collapse in the Company's underwriting practices.  As a result, although the Company appeared to investors to be growing, it was, in fact, saddled with large amounts of nonperforming loans issued under the Growth Plan.

12.     Although PrivateBancorp represented to investors during the Class Period that the core principle of the Growth Plan involved prudent and quality lending with rigorous risk management, consistent with the Company's prior underwriting practices, PrivateBancorp's thirst for growth caused the Company to take on hundreds of millions of dollars in high-risk, low quality loans, which the Company failed to disclose, even when substantial losses on those loans began to materialize.  Thus, PrivateBancorp's Class Period statements materially misled investors about, *inter alia*, (1) the success of the Growth Plan; (2) the strength of PrivateBancorp's loan portfolio; (3) PrivateBancorp's exposure to delinquent and/or nonperforming loans; (4) the adequacy of PrivateBancorp's loan loss provisions and reserves; (5) the amount of write-offs necessary to address the Company's growing credit-quality concerns;

(6) the Company's financial results and condition; and (7) PrivateBancorp's ability to maintain adequate internal, operational, and financial controls.

13.     At the same time that PrivateBancorp's new LaSalle hires were originating high risk loans to unqualified businesses, the Company's officers knew of massive losses on the "legacy" loans made prior to, or apart from, the Growth Plan loans.  In particular, the Exchange Act Defendants were aware of the extent of the problems in the Company's legacy loan portfolio by no later than February 2008 that would ultimately require write downs of $108 million.

14.     Instead of disclosing its legacy loan portfolio problems and the problematic new loans under the Growth Plan, PrivateBancorp sought to shore up its capital position by issuing materially false and misleading offering materials that enabled the Company to raise hundreds of millions of dollars from investors in registered public offerings of PrivateBancorp common stock during the Class Period.  On or about June 11, 2008, PrivateBancorp sold approximately 4 million shares of newly issued common stock at $34 per share, and 522,963 shares of the Company's Series A convertible preferred stock at $32.64 per share, resulting in net proceeds to the Company of $147.6 million.

15.     The truth concerning reckless lending under the Growth Plan was partially revealed on January 8, 2009, when *The Wall Street Journal* reported that out of the top 15 commercial mortgage-backed securities originators, LaSalle held the second highest delinquency rate for loans of 60 days or more.  PrivateBancorp had recruited and retained some 160 bankers from LaSalle (including Defendant Richman, the Company's CEO), who continued to write these irresponsible, high-risk loans at PrivateBancorp under the Company's Growth Plan. PrivateBancorp's stock price dropped from $28.14 per share to $25.62 per share or approximately 9% on the news in unusually heavy trading.

16.     On January 26, 2009, another partial disclosure of the truth occurred when PrivateBancorp shocked investors by announcing a net loss of $62 million for the fourth quarter 2008 and a net loss of $91.5 million for the year ended December 31, 2008, compared to a net loss of $15.1 million for the fourth quarter 2007 and net income of $11.8 million for the year ended December 31, 2007.  The Company's reported losses of nearly $2 per share vastly exceeded analysts' estimated losses of $0.14 per share, and were due largely to PrivateBancorp's *sudden write-off of $108.8 million worth of nonperforming loans*.  In response to the January 26 disclosure, PrivateBancorp stock plummeted approximately 22%, dropping from $19.70 per share to $15.32 in unusually heavy trading.  The Company falsely claimed that the need for the write down, which related solely to PrivateBancorp's legacy loan portfolio, resulted from a "proactive" loan review at the end of 2008.  In truth, there was no such review and the Company had known the extent of the problems that necessitated the write down for a year.  Shortly after disclosing the massive writedown, the Company terminated its CFO, Defendant Klaeser.

17.     By pinning the $100 million write-down on legacy loans, PrivateBancorp assured investors that the loans originated under the Growth Plan were high quality loans.  In so doing, the Exchange Act Defendants continued to conceal that the Company also held hundreds of millions of dollars in nonperforming or high-risk, low quality commercial and industrial loans originated under the Growth Plan, which would need to be written down in the near future.  The concealment of mounting problems in the Company's loans issued under the Growth Plan had the desired effect of allowing the Company's stock to rebound from the low it reached on January 26, 2009.

18.     Seizing on the opportunity to benefit from the recovery of the Company's stock price, and before it would have to announce significant write-downs in its Growth Plan loan

portfolio, PrivateBancorp conducted a second public offering of 11.87 million shares of Company stock on May 14, 2009, at $19.25 per share, raising $217 million. Thus, the Company preemptively raised capital to cushion the effect of the inevitable writedown it needed to take on nonperforming loans originated under the Growth Plan.

19.     The truth was revealed on October 26, 2009, when PrivateBancorp shocked investors by announcing a third quarter loss of $31.2 million, or $0.68 per share, when the market had expected a per-share *profit* for the quarter. Despite having written-off more than $100 million in bad loans in January 2009, the Company revealed that it held almost *$400 million* in nonperforming loans as of the third quarter 2009, compared to just $106.5 million of nonperforming loans in the third quarter of 2008. Unable to hide the full truth any longer, and in direct contravention of its January 26, 2009 false and misleading statement, PrivateBancorp admitted that its significantly elevated levels of nonperforming loans were originated under the Growth Plan. As a result, PrivateBancorp increased its provisions for bad loans to $90 million, compared to just $30 million in the third quarter of 2008. In response to this final disclosure of the truth, PrivateBancorp stock plummeted 37% in a single day, dropping from $19.00 per share to $11.98 per share on extraordinarily high trading volume. Shortly thereafter, the Company replaced its Chief Operating Officer.

## I.  JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions described herein, including the preparation and dissemination of materially false and misleading

public filings, occurred in this District. At all relevant times, PrivateBancorp's headquarters and principal offices were located in this District.

22.     In connection with the acts alleged herein, the Exchange Act Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## II.  PARTIES

### A.     Lead Plaintiffs and Additional Plaintiff

23.     Lead Plaintiff State-Boston Retirement System ("Boston") manages assets for more than 34,000 active and retired members throughout the city of Boston, Massachusetts. As evidenced by the Certification Boston filed in support of its Lead Plaintiff motion, Boston purchased or otherwise acquired PrivateBancorp stock during the Class Period and was damaged thereby.

24.     Lead Plaintiff City of New Orleans Employees' Retirement System ("New Orleans") manages assets for more than 6,600 participants throughout the city of New Orleans, Louisiana.   As evidenced by the Certification New Orleans filed with its initial complaint and in support of its Lead Plaintiff motion, New Orleans purchased or otherwise acquired PrivateBancorp stock pursuant to the June 11, 2008 offering and/or during the Class Period and was damaged thereby.

25.     Additional Plaintiff Erie County Employees Retirement System ("Erie") is a defined benefits plan that represents the active and retired employees of Erie County, Pennsylvania.  As evinced by the certification attached hereto as Exhibit A, Erie purchased or

otherwise acquired PrivateBancorp stock pursuant to both the June 11, 2008 offering and the

May 14, 2009 offering and was damaged thereby.

**B.     Exchange Act Defendants**

**1.     The Company**

26.     PrivateBancorp is a Chicago-based financial services company that is

incorporated in Delaware.  PrivateBancorp delivers customized business and personal financial

services to middle market companies, as well as business owners, executives, entrepreneurs and

families.  As of December 31, 2010, the Company had 34 offices in 10 states and $12.5 billion in

assets.

**2.     Individual Defendants**

27.     Defendant Richman is President and CEO of PrivateBancorp, and The

PrivateBank-Chicago, a wholly owned subsidiary of PrivateBancorp.  Richman assumed his

leadership role at the Company in November 2007.

28.     Defendant Mandell is Chairman and a co-founder of PrivateBancorp.  Mr.

Mandell has been on the PrivateBancorp Board since 1989 and is a director of all of the

Company's subsidiary banks.  Mr. Mandell was Chairman, President and CEO of

PrivateBancorp until his succession as President and CEO by Defendant Richman in November

2007.  Mr. Mandell remained Chairman of the Company throughout the Class Period.

29.     Defendant Klaeser was Chief Financial Officer ("CFO") of PrivateBancorp and

The PrivateBank-Chicago from April 2003 through his departure from the Company in March

2009.

30.     Defendant Killips succeeded Defendant Klaesar as the CFO of PrivateBancorp,

and has served in that capacity since March 2009.

31.     Defendant Solkema is Chief Credit (Risk) Officer at PrivateBancorp and has served in that capacity since January 2008.

### III.   CONTROL PERSON ALLEGATIONS

32.     Defendants Richman, Mandell, Klaeser, Killips, and Van Solkema (collectively, the "Individual Defendants"), because of their positions of control and authority as senior executive officers and/or directors of the Company, had access to the adverse undisclosed information about (1) the Company's reckless underwriting standards during the Class Period; (2) problems with the nonperforming loans in the Company's legacy loan portfolio; (3) problems with nonperforming loans originated under the Growth Plan; and (4) the Company's financials as a whole (including its operating plans, budgets and forecasts and reports of actual operations compared thereto).  Information on these undisclosed matters was accessible to the Individual Defendants through, *inter alia*, internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith with PrivateBancorp's business.  The Growth Plan and the Company's loan origination practices were core business operations.

33.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning each of PrivateBancorp's divisions, including its business, operations, growth, financial statements, and financial condition, as alleged herein.

34.     The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly

disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

35.     The Individual Defendants, as senior executive officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

36.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the Nasdaq National Market ("NASDAQ") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, products, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

37.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of

PrivateBancorp securities during the Class Period, which included the dissemination of materially false and misleading statements and concealment or omission of material adverse facts. The scheme: (i) deceived the investing public regarding PrivateBancorp's core financial statements, including key financial metrics such as earnings per share and loan assets, by concealing the true state of the Company's legacy loan portfolio and the nonperforming loans originated under the Growth Plan; (ii) misled the public into believing the Company relied on prudent underwriting practices when, in fact, those standards were nonexistent for loans originated under the Growth Plan; and (iii) caused Lead Plaintiffs and other members of the Class to purchase PrivateBancorp's securities at artificially inflated prices, which fell as the truth concerning the legacy loan portfolio, reckless underwriting practices and the nonperforming loans originated under the Growth Plan became known.

38.     In making the materially false and misleading statements complained of herein, the Individual Defendants, who were all senior officers and controlling persons of PrivateBancorp, were acting on behalf of the Company in the regular course of business. Therefore, each of the false statements made by the Individual Defendants is attributable to the Company.

## IV.  **CONFIDENTIAL SOURCES**

39.     The following Confidential Witnesses (referred to herein as "CW __") provided information to Lead Plaintiffs based upon their personal knowledge of facts relevant to the allegations herein.

40.     CW 1 served as a Managing Director of PrivateBancorp in Chicago from January 2004 through August 2009, and as Director of Operations from January 2006 through March 2008. As Director of Operations, CW 1 was responsible for deposit operations, loan operations

and client services system-wide. CW 1 reported directly to the Company's Chief Credit Officer, Defendant Van Solkema, interacting with Van Solkema daily and frequently meeting with Van Solkema to discuss problem loans. CW 1 was thus in a position to know about the Company's underwriting practices; the legacy loan portfolio, and the Growth Plan.

41.     CW 2 was a commercial lender at The PrivateBank, Alpharetta (GA) from May 2007 through September 2009. CW 2 was thus in a position to know about the Company's underwriting practices for commercial loans under the Growth Plan.

42.     CW 3 served as a Collateral Specialist at The PrivateBank, Chicago from October 2004 through September 2009. CW 3 was thus in a position to know about the Company's underwriting practices and the state of its loan portfolio.

43.     CW 4 served as President and Chief Operating Officer of The PrivateBank, Kansas City from 2005 through December 2009. CW 4 was thus in a position to know about the Company's underwriting practices, legacy loan portfolio, and the Growth Plan.

44.     CW 5 was a Vice President from 2005 through 2007 and then promoted to Managing Director of Commercial Loans at The PrivateBank, Michigan, from 2007 through January 2010. CW 5 was thus in a position to know about the Company's underwriting practices for commercial loans, legacy loan portfolio, and the Growth Plan.

45.     CW 6 was a Managing Director at the PrivateBank, Lake Forest (IL) from March 2002 through August 2010. CW 6 was thus in a position to know about the Company's underwriting practices, legacy loan portfolio, and the Growth Plan.

46.     CW 7 was a Managing Director at The PrivateBank, St. Louis from November 2000 through September 2009. CW 7 was thus in a position to know about the Company's underwriting practices and legacy loan portfolio.

47.     CW 8 was a Managing Director at The PrivateBank, Chicago from October 1997 through June 2010.  CW 8 was thus in a position to know about the Company's underwriting practices, legacy loan portfolio and the Growth Plan.

48.     CW 9 was a loan services representative and loan documenter at The PrivateBank – St. Louis from April 2008 through September 2010.  CW 9 was thus in a position to know about the Company's underwriting practices and loan portfolio.

## V.  <u>SUBSTANTIVE ALLEGATIONS</u>

### A.     <u>The Company's "Growth Plan"</u>

49.     On November 2, 2007, PrivateBancorp issued a press release entitled "Larry Richman Joins PrivateBancorp, Inc. as Chief Executive Officer" to announce its intention to engage in an expanded growth effort designed to fuel growth in its commercial and industrial lending business in a press release entitled "Larry Richman Joins PrivateBancorp, Inc. as Chief Executive Officer."  At the heart of this effort was the Company's new Growth Plan, which the Company described as "the continuation of the Company's business model with a goal of substantially increasing its commercial banking market share."  The Growth Plan was based on an aggressive recruitment strategy and new performance-based incentive program.  According to the November 2, 2007 press release, "[t]he key component of the Plan is the recruitment and retention of experienced middle market commercial bankers and *the synergistic integration of those bankers into PrivateBancorp's existing platform*…." (emphasis added).  The "recruitment and retention" component of the Growth Plan was to be executed using "inducement awards" and awards based on "the achievement of exceptional performance benchmarks."

50.     In executing the Growth Plan, PrivateBancorp aggressively poached the talent of its competitors to attract new commercial business to the Company.  PrivateBancorp recruited

primarily from LaSalle, which in 2007 was in the process of being acquired by Bank of America

Corp. In the two years that followed the announcement of the Growth Plan, the Company nearly

doubled the ranks of its bankers, with over 160 LaSalle recruits joining PrivateBancorp.

51. On May 1, 2008 PrivateBancorp filed a Form 8-K that announced the Company's

expansion into larger office space. According to this Form 8-K, the office space expansion was

necessitated by "exceptional growth in our banking team resulting from our…Growth Plan" and,

further, that the move "reflects the positive response we have received from the Chicago

marketplace to our…Growth Plan." The Company stated that "we have added over 150 new

hires, including 95 experienced managing directors, and a multitude of new client relationships

across the market segments we serve…."

**B.**     **The Company's Underwriting Standards**
        **Deteriorate Under the Growth Plan**

52. Prior to the implementation of the Growth Plan, PrivateBancorp touted its high

underwriting standards. For example, PrivateBancorp's 2006 10-K stated that the Company

engaged in a "careful" process of continuous portfolio monitoring for credit quality issues. The

2006 10-K further stated that credit was extended only when the applicant meets the Company's

adopted, comprehensive policies, that PrivateBancorp uses "sound credit principles to protect our

asset quality…." and that "[t]he quality and integrity of the borrower is crucial in the loan

approval process." The 2006 10-K also stated that "[w]e monitor the performance of our loan

portfolio through regular contact with our clients, continuous portfolio review and careful

monitoring of delinquency reports and internal watch lists."

53. With regard to commercial lending in particular, a core aspect of the Growth Plan,

the 2006 10-K described a thorough review process:

> Commercial loans can contain risk factors unique to the business of each
> borrower. In order to mitigate these risks, we seek to gain an understanding of the

business of each borrower, place appropriate value on collateral taken and structure the loan properly to make sure that collateral values are maintained while loans are committed. Appropriate documentation of commercial loans is also important to protect our interests.

* * *

Our credit approval process for commercial loans is comprehensive. We typically review the current and future cash needs of the borrower, the business strategy, management's ability, the strength of the collateral, and the strength of the guarantors. While our loan policies have guidelines for advances on different types of collateral, we establish eligible asset values on a case-by-case basis for each borrower. Our officer on the account must be able to validate his or her position during the approval process.

Our commercial lending underwriting process includes an evaluation of the borrower's financial statements and projections with an emphasis on operating results, cash flow, liquidity and balance sheet proportions as well as the collateral to determine the level of creditworthiness of the borrower. Generally, these loans are secured by a first priority security interest in all the assets of the borrower and also include the support of a personal guarantee of one or more of the principals of the borrower. Our policy permits an advance rate of 80% for accounts receivable; 25-50% for inventory; and 65% for machinery/equipment, which are confirmed periodically with the use of periodic borrowing base certificates to monitor the eligible collateral. In each case, based upon the overall financial strength of the business, the collateral and strength of the guarantor, if any, a risk rating is established for the loan.

54.    In its November 2, 2007 press release, PrivateBancorp touted the Growth Plan as the "continuation of the Company's business model," and the synergistic integration of the LaSalle bankers into PrivateBancorp's "existing platform." The Company's 2007 10-K assured investors that the Growth Plan marked an expansion of the PrivateBancorp model, and stated that "Notwithstanding this shift [of strategy under the Growth Plan], we continue our style of doing business using 'The PrivateBank approach'….We have adopted loan policies that contain general lending guidelines consistent with regulatory requirements and are subject to review and revision by the Board of Directors of each of the banks as well as our Board of Directors. We extend credit consistent with these Comprehensive loan policies."

- 16-

55.     In reality, the Growth Plan as described by the Company did not exist.  The Company's prior stringent underwriting standards were not applied to loans originated by the new LaSalle bankers under the Growth Plan and rather than "synergistic[ally] integrat[ing] those new bankers, the new LaSalle management gave its new hires a free hand to extend high-risk loans while forcing out the legacy team that had built the Company's reputation.  According to CW 1, the execution of the Plan "was nebulous, shoot from the hip… just bring LaSalle, steal clients from BoA [Bank of America] and grow like hell."

56.     The former LaSalle bankers hired under the Growth Plan were accustomed to lending under much less restrictive underwriting guidelines.  According to CW 3, LaSalle, from which PrivateBancorp had recruited and generously incentivized scores of loan officers, had a reputation in among the banking community in Chicago for "having a lot of bad [loans] …. They were the stereotype of the fast-talking, bad banker."  LaSalle also celebrated a culture that was "all about big salaries," according to CW 1.

57.     CW 4 observed that the former LaSalle personnel who joined the Company brought a practice of "aggressive, testosterone-fueled lending."  According to CW 9, LaSalle personnel "came in and said 'this is how we did things at LaSalle, and so this is how we want to do them here," leading legacy employees to conclude "it's LaSalle Bank now."

58.     Moreover, PrivateBancorp's new CEO Richman, who was charged with heading the expansion efforts, was a former executive of LaSalle, and had no experience running a public company, let alone expanding one.  According to CW 1, Richman "had a deer in the headlights look."

59.     Former PrivateBancorp employees directly observed that the Company's underwriting standards deteriorated precipitously during the Growth Plan.  CW 6 observed that

the Company's underwriting was "weak" and performed by entry-level, inexperienced employees during the Class Period, such that the contrast to other banks where that witness worked was "shocking."  According to Director of Operations CW 1, loans originated under the Company's Growth Plan by former LaSalle loan officers were approved by the Company's senior officers, including Defendant Van Solkema, with a "wink and nod."  CWs 7, 8 and 2 confirm that loans originated by former LaSalle personnel received little scrutiny, with CW 2 adding that LaSalle personnel hired under the Growth Plan had "carte blanche" with regard to issuing loans and that everything they wrote was approved.

60.     Former LaSalle clients also received special treatment when seeking a loan under the Growth Plan.   According to CW 1, the loan of approximately $10 million that PrivateBancorp extended to former LaSalle client Vienna Beef in or about the summer of 2008 is a typical example of loans originated by former LaSalle bankers under the Growth Plan that "came on the books with hair on them."   In other words, the LaSalle bankers were engaged in the same high-risk lending that they had done previously at LaSalle.

61.     CW 1 attended the meeting at which the Vienna Beef loan was presented, and directly observed the level of scrutiny applied to loans originated by the new LaSalle bankers. Defendant Van Solkema also attended that meeting.  According to CW 1, Vienna Beef had been a long-time LaSalle client that had experienced several years of poor financial results and seen a succession of chief financial officers cycle through its executive suite, the most recent of whom was brought in with help from bankers at LaSalle.

62.     According to CW 1, the Vienna Beef loan was recognized and booked as "sub-standard."   The loan was assigned a score of 6 on the 10-point scale used by the Company to assess credit risk.  On that scale, loans with scores of 1-4 were considered "perfectly acceptable,"

with a score of 1 being the best.  CW 1 explained that a loan scored at 5 was considered

acceptable, albeit with certain "substandard conditions" but that loans scored at 6 were

considered undesirable.  As CW 1 further explained, loans scored at 6 presented "concerns about

payment."  Prior to the Growth Plan, PrivateBancorp approved loans scored at 6 only

infrequently, when a loan was already outstanding and was being reviewed for renewal.

According to CW 1, the Vienna Beef loan was not the only substandard loan originated under the

Growth Plan that was rated a 6.

63.     At the meeting at which the Vienna Beef loan was approved, the credit risk posed

by Vienna Beef was discussed.  According to CW 1, Bruce Lubin, a senior banker from LaSalle,

described the loan as a bet on cattle futures and observed that PrivateBancorp would make

money if beef prices went down and lose money if beef prices went up.  CW 1 explained that

Van Solkema approved the loan "even though it had problems" because it was being priced

accordingly, despite the fact that Van Solkema was "not thrilled with it."  Though not used by

corporate bankers like Van Solkema, the more common term for high-risk loans that are priced

high to reflect that risk is "subprime."

64.     CW 1 stated that these otherwise-unacceptable loans were often made for no other

reason than to "drive deposit growth."  That is, the Company would make loans as an

accommodation to unqualified commercial borrowers to get deposit accounts and treasuries.

65.     CW 1 named Harlan Furniture, a company with a history of multiple

bankruptcies, as another example of a high-risk client who received a loan because of the cash

deposits it would bring to the Company.  CW 1 was responsible for arranging the delivery of

Harlan Furniture's cash deposits, and explained that the Company determined the benefits of

securing the client's approximately $10 million in cash deposits outweighed the concern about

high-risk loans of approximately $2-3 million.  Whatever the internal consideration, the

Exchange Act Defendants failed to disclose the riskiness of these loans (and others originated

under the Growth Plan) to investors.

66.     CW 9 confirmed that "tons" of other loans were also made to developer Bower &

Bailey, which failed shortly thereafter.  According to CW 1, the Company also extended

significant new loans, totaling approximately $20-30, million to General Growth, a commercial

real-estate developer and retail center manager, shortly before that company imploded and filed

for bankruptcy.

67.     According to CW 7, the former LaSalle bankers "felt like they knew the clients

they'd done business with before [at LaSalle], and so they had a willingness to lend to those

people again.  They thought they knew what they were getting …but then with a lot of those

[client] companies, they started to notice issues."  CW 8 confirmed that loans originated by

former LaSalle personnel went relatively unscrutinized.  CW 9 reviewed portions of the

Company's loan database in April 2008, well into the Growth Plan, and noticed numerous

"questionable" files.  According to CW 9, "I'd look in the system and see a client with three

delinquent loans and wonder why we were doing [business] with them."

68.     CW 5 confirmed that high-risk loans were a direct result of PrivateBancorp's

incentive program under the Growth Plan, which was designed to promote quantity over quality.

Indeed, under the Growth Plan, PrivateBancorp's managing directors were highly motivated to

deliver strong earnings growth and sharp stock price appreciation, because two-thirds of

PrivateBancorp's incentive awards were tied to performance – half vested upon the achievement

of pre-determined Earnings Per Share growth rate targets, and the other half vested upon the

achievement of pre-determined stock price appreciation targets.  The vesting requirements for

PrivateBancorp's incentive awards were as follows:

> Approximately half of the Performance Awards vest upon achievement of a 20% compounded annual growth rate in PrivateBancorp's stock price over a five-year period ending December 31, 2012.  The remaining Performance Awards vest upon achievement of earnings per share growth hurdles: 50%, 75% and 100% will vest if the sum of GAAP earnings per share is equivalent to compounded annual growth rates in earnings per share of 15%, 17.5% and 20%, respectively, over a five-year time period ending December 31, 2012. The baselines for the performance hurdles are the ten day average closing stock price prior to the date of the grant, $27.91, and the latest twelve months earnings per share as of September 30, 2007, $1.65.

69.     Loan quality, therefore, was sacrificed in order to reach certain financial targets.

As CW 1 explained, the new LaSalle hires "were required to grow," with every newly-hired

lender "expected to bring in $100 million in loans in the first year."  The Growth Plan permitted

the Company and its executives to drastically increase the loan portfolio, creating the illusion of

prosperity at the Company even though the increased loan portfolio was made up of poor quality

and, in many cases, failing loans.  According to CW 2, it was these failing loans that caused

PrivateBancorp's non-performing assets to "shoot up."

**C.**     **The Exchange Act Defendants Closely Tracked the**
         **Performance of PrivateBancorp's Loans**

70.     During the Class Period, the Exchange Act Defendants touted their frequent and

comprehensive loan reviews in earnings calls and SEC filings.  Defendant Van Solkema formed

a Credit Risk Committee shortly after arriving at the Company in March 2008, and held regular

meetings, many of which Richman attended.  According to CW 1, who attended the meetings,

the internal reporting reviewed at the meetings was so thorough that "everyone was buried under

risk reporting."

71.     Van Solkema has also admitted to tracking loan delinquencies closely.  On the

Company's July 29, 2008 conference call, Van Solkema stated:

About midway through the quarter, *I'm looking at the delinquencies, and I'm looking below the surface at why are these loans delinquent*. And what we saw is that there was a mixture of payment past-dues, which of course are our prime concern. *And to that we tie the risk ratings very, very closely*. And then we looked, and we also found some administrative past-dues -- loans that were past-due because their renewals were in process for permanent extension. So we really focused on both areas very tightly. *We held weekly meetings, and we continue to have them; that's become part of our culture and our conversation in the Company*.

Emphasis added.

72. According to CW 1, Van Solkema conducted quarterly "Watch List" meetings over the course of one to two days, during which he would review loans that were past due or trending negatively. A week before these meetings, Van Solkema and other senior officers received detailed reports of the Watch List loans. At the meetings, loans were reviewed by geographic region for each of the Company's branches.

73. In response to the clear problems in the Company's loan portfolio, the level of reporting regarding problems loans increased during the Class Period. According to CW 1, by April 2008 Van Solkema received direct reports on any loans that were 10 days past due. CW 1 described Van Solkema as "drilling down" on loans and holding weekly "come to Jesus" meetings to examine problems in the loan portfolio, with particular focus on the legacy portfolio. As a result, Defendant Van Solkema was "absolutely on top of problems in the legacy portfolio in 2008."

**D. The Quality of the Company's
Legacy Loan Portfolio Deteriorates**

74. The extensive reporting on the condition of the Company's loan portfolio, including the reports discussed above, gave the Company and the Individual Defendants extensive knowledge about massive losses incurred in the legacy loan portfolio no later than February 2008. Indeed, according to CW 1, the reports showed the extent of the problems with

the legacy loan portfolios in Michigan and Atlanta, in particular, by no later than the first quarter of 2008.

75.     At a meeting held no later than February 2008, CW 1 witnessed a lengthy discussion concerning the large losses incurred in the portfolios in those two regions.  1 described the meeting as a "dry run" for a Company Board meeting, convened to give those presenting to the Board an opportunity to walk through their presentations with senior management.  The meeting was attended by, among others, Defendants Richman and Mandell. During that meeting, executives from PrivateBancorp's Atlanta and Michigan offices, including Hugh McLean, David Provost and Brian Schmidt, were forced to explain the problems in their portfolios to the committee.  Jim Ruckstaetter, a Managing Director who preceded Defendant Van Solkema as Chief Credit Officer and who served as Van Solkema's deputy and direct report, questioned the reasons for problem loans at those banks, raising the question of whether imprudent lending was the cause.  In response, bankers from those offices, including McLean and Schmidt, cited regional conditions as the cause.

76.     While the reason for the problems loans was debatable, the existence and extent of those loans were clear to PrivateBancorp and its senior executives, including Van Solkema, by the time of that meeting, according to CW 1.  At the meeting, the bankers from Michigan and Atlanta described a "disastrous picture" for the banks' developer clients, with a massive number of undeveloped lots that would not have residential housing in the foreseeable future, and – as Brian Schmidt of Atlanta explained at the meeting – developer clients were "coming in and giving them the keys, saying its never coming back."

77.     According to CW 1, the problems in the legacy loan portfolio were known to be so severe that, in the first quarter of 2008, PrivateBancorp terminated Charlie Davis, the Chief

Credit Officer in St. Louis, because problems in the loan portfolio in his region had reached "critical mass."  Those problems directly related to credit risk, impacting the quality of the portfolio and heightening the risk of losses.  As CW 1 explained, the termination of a senior executive like Davis and the reasons for the termination would have been known to senior officers including the Individual Defendants, as well as Defendant Mandell.  In the wake Davis's termination, Ruckstaetter – who reported directly to Van Solkema – functioned as Chief Credit Officer for St. Louis..

78.    "Loan Reports" detailing the Company's underperforming loans were also sent to Defendants Richman, Killips and Van Solkema biweekly, according to CW 6.  CW 1 confirmed that the Board of Directors also received these biweekly reports, and CW 1 also observed that Van Solkema was especially knowledgeable about problem loans, stating Van Solkema was "well informed to the nth degree on delinquencies throughout 2008."

79.    Although the Exchange Act Defendants knew the extent of the problems with the Company's legacy loan portfolio by no later than February 2008, they waited almost a full year to disclose and writedown these failing legacy loans.

80.    For example, the losses in the Atlanta and Michigan portfolios were not disclosed until January 2009, when the Company announced $108 million in writedowns on the legacy loan portfolio.  According to CW 1, that $108 million included approximately $30 million each from Atlanta and Michigan – meaning that 12% of Atlanta's roughly $250 million loan portfolio and almost 9% of Michigan's roughly $350 million portfolio were written down.  In addition, according to CW 1 almost a full third, or approximately $36 million of the $108 million writedown, was attributable to nonperforming loans in the Company's Chicago home market.

81.     In disclosing these writedowns, the Company claims that it had uncovered problems with the legacy loans through a "proactive" portfolio review conducted at the end of 2008.  According to CW 1, no such review was conducted:  the portfolio review at the end of 2008 was the same as reviews conducted throughout that year.  The only distinction was the belated determination to disclose the loan losses to investors.  Moreover, according to CW 1, those losses did not reflect new developments at the end of 2008.  As CW 1 explained, it was not the case that "something suddenly blew up in November, was written off in December and disclosed in January" because land development loans like those being written off "don't go bad overnight."  Indeed, according to CW 1, the approximately $8-10 million in loans from the St. Louis portfolio that were included in the January 2009 write-down were known when Davis was terminated, months earlier.

82.     Van Solkema continued to be notified of loan problems after the January 2009 write down.  CW 1, who reported directly to Van Solkema, compiled additional "Tracking Reports" throughout 2009 for Van Solkema that gave Van Solkema a "clear status on past due loans."

83.     The Exchange Act Defendants had good reason to hide the failings of the Growth Plan and the severe problems in the legacy loan portfolio.  The Company conducted two public stock offerings during the Class Period, raising a total of over $300 million – enough to potentially off-set the huge write-downs the Company was eventually forced to take on both the loans issued under the Growth Plan, and on the existing legacy loans.

## VI.  THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.  November 2, 2007 8-K

84.     On November 2, 2007, the first day of the Class Period, the Company filed an 8-K

with a press release announcing the hiring of Richman as CEO, and the Company's intention to

engage in an expanded growth effort designed to fuel growth in its commercial and industrial

lending business:

> Mr. Richman was previously President and Chief Executive Officer of LaSalle Bank, N.A., Chicago.
>
> "We are thrilled to have Larry join us to lead PrivateBancorp into its next stage of growth, *building upon the unique approach to private banking that we have successfully fostered since our inception*…." said Ralph B. Mandell, Chairman of the Board, PrivateBancorp, Inc. "I will be fully engaged and look forward to working alongside Larry, the outstanding group of commercial bankers who have recently joined us, and our existing team of highly talented managers, to implement PrivateBancorp's Strategic Growth and Transformation Plan in the months ahead," said Mandell.
>
> * * *
>
> PrivateBancorp plans to hire additional Managing Directors over the next three quarters consistent with the Plan.  The Board of Directors has appointed a special committee of independent outside directors, which has overseen all aspects of the development of the Plan. *The Plan is based on the continuation of the Company's business model* with a goal of substantially increasing its commercial banking market share.
>
> *The key component of the Plan is the recruitment and retention of experienced middle market commercial bankers and the synergistic integration of those bankers into PrivateBancorp's existing platform.* As a key component of the Plan, the Board of Directors has established a Transformation Equity Award Program for making inducement awards as a means to attract talent and to promote the achievement of exceptional performance benchmarks. Two-thirds of these awards have performance-vesting provisions that create an incentive for management to achieve significant stock price appreciation or earnings per share growth hurdles ("Performance Awards"). The remaining one-third of the equity awards are stock options, which will vest over a five-year period.

Emphasis added.

85.     This statement was false and misleading because the Growth Plan was not "based on the Company's business model," which relied on prudent underwriting practices. Instead, the former LaSalle bankers who joined the Company originated loans with no regard for prudent underwriting practices, contrary to the Company's "synergistic integration" claim. According to CW 3, LaSalle "had a reputation in Chicago for having a lot of bad [loans] ….They were the stereotype of the fast-talking, bad banker." LaSalle also celebrated – and later introduced to PrivateBancorp – a culture that was "all about big salaries," according to CW 1. These bankers sacrificed quality for quantity, interested only in meeting their financial incentive targets. As CW 1 observed, loans were made to Vienna Beef, who had a "substandard risk code," as well as other unqualified commercial borrowers.

**B.     November 27, 2007 Earnings Call**

86.     On November 27, 2007, PrivateBancorp gave a preliminary report on the early progress of the Growth Plan in connection with a previously announced $200 million private placement:

> Related to the raise of capital, *we continue to make progress in executing our strategic growth and transformation plans*. Since the end of the third quarter 2007, we have hired 34 new managing directors. We will continue to recruit talented bankers in all our markets and are building on our strong foundation to substantially grow our client base and increase our middle market commercial banking capabilities.

Emphasis added.

87.     This statement was false and misleading because the Exchange Act Defendants were not making "progress executing" the Growth Plan. According to CW 1, the Growth Plan "was nebulous, shoot from the hip…just bring LaSalle, steal clients from BoA [Bank of America] and grow like hell."

- 27-

88.     On the same call, an analyst with Stifel Nicolaus questioned whether the

Company could sustain its projected growth:

> Ben Crabtree - Stifel Nicolaus - Analyst
>
> Given the size of your earning assets now at about a little over $4 billion, that's an
> awful lot of growth.  It seems to me that one of the implications here is you expect
> a major amount of balance sheet growth just next year by the end of next year….
> Well, I guess which only magnifies my questions then. I mean if you need $200
> million of, if you will, incremental equity, *you are telling us that these people are
> going to add, within a relatively short period of time, just several quarters, $1.5
> billion, $2 billion of earning assets. Is that correct*?
>
> Dennis Klaeser - PrivateBancorp - CFO
>
> Your interpretation is, I think, consistent with what we've been saying, *yes*.

Emphasis added.

89.     This statement is false and misleading because Klaeser failed to reveal that

PrivateBancorp would achieve these targets through imprudent high-risk lending that sacrificed

loan quality for quantity, placing the Company's loan portfolio at serious risk of impairment.

**C.    January 28, 2008 Form 8-K**

90.     On January 28, 2008 the Company issued fourth quarter 2007 earnings, and

stated:

> As anticipated, reported quarterly financial results were down considerably *as we
> aggressively implemented our Strategic Growth Plan*.  We announced the Plan in
> early November 2007, which sets forth our goal of recruiting experienced middle-
> market commercial bankers in order to substantially expand our client base and
> achieve significant balance sheet growth," commented Ralph B. Mandell,
> Chairman of PrivateBancorp, Inc., "*We have made significant progress towards
> implementing this Plan*, including the hiring of Larry Richman as our new
> President and CEO as well as a substantial number of senior commercial bankers
> and other new employees.  In fact, we increased the number of Managing
> Directors at the Company by 33 percent in the fourth quarter alone.  The 12
> percent loan growth experienced in the fourth quarter further validates the market
> opportunity," continued Mr. Mandell.

* * *

- 28-

"I'm excited about the strong and positive reaction of the marketplace to the Company's growth initiatives," said Larry Richman, President and CEO. "*Despite a very challenging market, we've been growing our client base quickly, as evidenced by the $451.7 million increase in our loan portfolio during the quarter. I'm further encouraged by the strength of our loan pipeline at the end of the quarter.*

Emphasis added.

91.     This statement was false and misleading because, as explained at ¶51, the

Company was not implementing the Growth Plan consistent with its stated "business model."

Moreover, Richman failed to disclose that the increase in the Company's loan portfolio stemmed

from risky underwriting practices and was resulting in an exponential increase in the number of

bad loans.

**D.**     **January 28, 2008 Earnings Call**

92.     On January 28, 2008, PrivateBancorp held an earnings call during which the

Exchange Act Defendants continued to tout the early success of the Growth Plan, including the

Company's record 12% loan growth:

Ralph Mandell - PrivateBancorp, Inc. - Chairman

*We have also reorganized our senior management team and adopted a transformational equity award program for both our new and existing management in order to promote the achievement of exceptional performance benchmarks. In so doing, we aligned management's interest with those of all of our stockholders with the goal of creating long-term stockholder value. Given our substantial loan growth and new clients in the fourth quarter*, we believe we are on our way to becoming the premier middle market commercial real estate, private and wealth management bank in all of our markets

\* \* \*

*Reflecting early success with our plan, the Company achieved record loan growth during the quarter* which resulted in a substantial increase in loan loss provision expense. While this is the first time PrivateBancorp has posted a loss for the quarter as a public company, we believe we are investing in the necessary people and infrastructure to execute the strategic growth plan. *We are already beginning to see the results of our investment as evidenced by our record 12% loan growth during the quarter.*

* * *

Larry Richman - PrivateBancorp, Inc. - President and CEO

*Reflecting early success with our Strategic Growth Plan, we achieved record loan growth of 12% during the quarter.*

* * *

Daniel Arnold - Sandler O'Neill & Partners - Analyst

Okay. And then just one last question on the charge-offs and the rate was I guess significantly higher in the fourth quarter than what you are looking for. I was wondering if there was anything causing that or if maybe you guys did kind of a comprehensive loan review or anything like that? I guess given the quarter to try to clean up balance sheet a little bit?

Dennis Klaeser - PrivateBancorp, Inc. - CFO

*Well, we are always diligent and do comprehensive loan review and I would say we did a very comprehensive loan review in the fourth quarter as you would expect.*

Emphasis added.

93.      This statement was materially false and misleading because the Exchange Act Defendants failed to disclose that loan growth under the Plan was due to high-risk lending to unqualified commercial businesses, *see* ¶¶56-69.

94.      A February 8, 2008 J.P Morgan analyst report reflected the market's understanding that the Company would not sacrifice credit quality for loan growth, and further notes that former LaSalle bankers were responsible for half of the new loan growth in the fourth quarter:

 PVTB has already hired nearly 70 top producers from LaSalle, with about 30 more on the runway…. *New hires were responsible for $250 million of the $450 million of loan growth delivered in the fourth quarter*…. While new lenders are eager to post strong loan growth, *management emphasized during our meetings that credit quality is still a primary concern for the company*.  In addition to recently hiring a new chief risk officer, *the company is carefully and diligently underwriting new loans* and has stated on its conference call that NCOs should remain in the mid teen range for 2008, granted the total number of loans will be sizably larger.

Emphasis added.

95.    Similarly, an April 23, 2008 J.P. Morgan analyst report stated that "we believe substantial upside exists from current levels tied to an improvement in both growth and risk profile over the next two years."

**E.    May 6, 2008 10-Q**

96.    The 10-Q for the first quarter 2008 stated:

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. *The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio. Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, and loan growth.* The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate.  Loans are charged-off when deemed to be uncollectable by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio.*

* * *

Provision for Loan Losses

We provide for an adequate allowance for loan losses that are probable and reasonably estimable in the portfolio. T*he provision for loan losses reflects management's assessment of the inherent losses in the loan portfolio. Our allowance for probable loan losses is reassessed monthly to determine the appropriate level of the reserve. Our analysis is influenced by the following factors: assessment of the credit risk of the loans in the portfolio, delinquent*

*loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience and loan growth.* A discussion of the allowance for loan losses and the factors on which provisions are based begins on page 36.

* * *

Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the committees of the Board of Directors at our board meetings. *The amount of additions to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, and loan growth.* The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

*We maintain an allowance for loan losses sufficient to absorb credit losses inherent in our loan portfolio. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is supported by available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio.* Management's application of the methodology for determining the allowance for loan losses resulted in an allowance for loan losses of $62.0 million at March 31, 2008 compared with $48.9 million at December 31, 2007. The increase in the allowance for loan losses from December 31, 2007 reflects management's judgment about the comprehensive risk of lending in our various markets and loan growth resulting from the addition of new lending personnel. We believe that the allowance for loan losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio.

Emphasis added.

97.     This statement is false and misleading because the Exchange Act Defendants

failed to maintain an allowance for loan losses that was sufficient to absorb the known credit

losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk

loans to unqualified borrowers.  The Exchange Act Defendants also failed to disclose the

deteriorating credit quality problems in their legacy loan portfolio, which they had known of since at least February 2008.  *See* ¶¶74-82.

**F.**     **April 28, 2008 8-K**

98.     The April 28, 2008 8-K reported the Company's first quarter 2008 results and stated:

> *Total loans increased 23%* to $5.1 billion at March 31, 2008 from $4.2 billion at December 31, 2007.  *The loan category that grew most substantially during the quarter was commercial loans (including both commercial and industrial and owner-occupied commercial real estate loans),* which increased to $1.8 billion or 36% of our total loans from $1.3 billion or 32% of total loans at year-end 2007. During the quarter, commercial real estate loans grew to $2.0 billion or 39% of our total loans from $1.6 billion or 38% of total loans at year-end 2007.

Emphasis added.

99.     This statement was false and misleading because the Exchange Act Defendants failed to disclose to the public that (1) commercial loan growth was coming at the expense of risky underwriting practices and a much higher volume of failing loans; and (2) the Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶74-82.

100.     An April 28, 2008 William Blair analyst report relayed management's repeated emphasis that loan growth would not mean a deterioration in the Company's underwriting standards:

> • Loan Growth. Loans increased by $958 million (double our forecast) from the fourth quarter (+23%) to $5.1 billion.  Management indicated that its loan pipeline remains strong and that second-quarter growth could match or exceed first-quarter growth.

> • Credit Quality. NPAs were 1.10% of total assets and NCOs were 0.35% of average loans (in line with our forecast). The company increased its loan loss reserve ratio to 1.21% from 1.17% at December 30. We believe elevated credit costs are indicative of the overall health of the economy *and not specific to PrivateBank's credit underwriting standards*.

Emphasis added.

**G.**     **May 1, 2008 8-K**

101.     On May 1, 2008 the Company filed an 8-K with a press release announcing the

Company's expansion into larger office space:

> [W]e have experienced exceptional growth in our banking team resulting from
> our Strategic Growth Plan and we need new headquarters space to accommodate
> the growth we expect to achieve in our franchise in the years ahead….We remain
> committed to the City of Chicago and *this move early in the execution of our
> Strategic Growth Plan reflects the positive response we have received from the
> Chicago marketplace to our Strategic Growth Plan*.  Since the plan was
> announced, we have added over 150 new hires, including 95 experienced
> managing directors, and a multitude of new client relationships across the market
> segments we serve.

Emphasis added.

102.     This statement was false and misleading because the Exchange Act Defendants

failed to inform investors that bankers hired to fuel the Growth Plan came largely from LaSalle,

which had a history of poor underwriting practices and aggressive bankers accustomed to a

culture that was "all about big salaries," according to CW 1.  Thus, the public remained unaware

that much of the "growth" under the Plan was due to large numbers of bad, high-risk loans.  The

Exchange Act Defendants further failed to disclose that since at least February 2008, the

Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶74-82.

103.     A June 12, 2008 J.P. Morgan report reiterated the Exchange Act Defendants'

message that there was no deterioration in credit quality: "With the company's new work-out

team [from LaSalle] working to resolve problem credits, the level of net charge-offs and NPAs

should stay about flat over the coming quarters."

**H.**     **July 29, 2008 Earnings Call**

104.     On July 29, 2008, PrivateBancorp held an earnings call in which Defendants

Richman, Mandell, Klaeser, and Van Solkema participated.  The Exchange Act Defendants

continued to tout the success of the Growth Plan and conceal PrivateBancorp's mounting credit

quality concerns:

> Larry Richman - PrivateBancorp, Inc. – CEO
>
> The value of our organization really lies in the value of our people. As Ralph mentioned, *we continued to add high-quality professionals to our team*. As such, our employee expenses increased by $19.1 million compared with a year ago, or $17.8 million excluding the accounting error correction….*The second group of hires fell largely in our operations and risk-management areas. Making sure we have an infrastructure in place to support our growth trajectory is critical to our success*….This leads me to a brief discussion of *what we're doing to enhance and improve our risk-management practices overall*. As I mentioned at the outset, Kevin Van Solkema is in the room here today. *Kevin came onboard earlier this year, and in a very short time has done a great job to enhance our risk-management procedures*, given the growth and diversification of our business. *Under Kevin's leadership and with the strong additions to his team, we have restructured our risk-management function to centralize policy and processes to align organizationally to better support the growth of our loan portfolio*. The risk-management team has implemented *common lending practices and policies to strengthen our credit review and underwriting standards*. The changes we've made and will continue to make allow [*sic*] us to be highly responsive to our clients while more aggressively managing our risk.  With all that said, we continue to make great progress against our strategic growth plan objectives.

Emphasis added.

105.    This statement was false and misleading because (1) Richman failed to disclose the "high-quality professionals" included former LaSalle bankers accustomed to a culture of risky lending; (2) the Company had no risk-management "infrastructure" to support its "growth trajectory," or the growth of its loan portfolio, instead abandoning its conservative underwriting standards in favor of generating more loans; and (3) there were no "common lending practices to…strengthen [PrivateBancorp's] credit review and underwriting standards" – indeed, the Company was making loans to clients considered "substandard risk."  *See* ¶¶56-69.  The Exchange Act Defendants further failed to disclose that since at least February 2008, the Company was already experiencing problems with its legacy loan portfolio. *See* ¶¶74-82.

106.     On the same call, Klaeser falsely stated that the Company was "careful" about the

new business brought in under the Growth Plan, and denied that there were any non-performing

loans originated under the Growth Plan:

Dennis Klaeser - PrivateBancorp, Inc. – CFO

*Commercial and industrial loans and owner-occupied commercial real estate loans now make up 42% of our total loan portfolio* -- from 36% last quarter and 26% as of June 30, 2007.

* * *

David Long - William Blair & Co. LLC - Analyst

*Regarding nonperformers and net charge-offs, are any of those tied to loans originated since November, when you guys established the strategic growth plan*?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

Hi, this is Kevin again.  The answer is no. *We have had very careful client selection of our new business that we brought in since November 1st. We have seen almost no delinquency whatsoever, and certainly no nonperformers or charge-offs*.

* * *

Daniel Arnold - Sandler O'Neill & Partners LP - Analyst

Okay. And just one last question on the loan growth -- I was just wondering what percentage of that, if you could break it down kind of, is from prior LaSalle clients that you guys are able to bring over, and what percentage is from completely new relationships that you guys have been forging.

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

This is Kevin. *I would say in excess of 75% is from prior relationships that we had at LaSalle*. We certainly are attracting clients from other spaces, however, and other banks. But certainly the preponderance is from the prior shop.

Daniel Arnold - Sandler O'Neill & Partners LP - Analyst

(inaudible)

Larry Richman - PrivateBancorp, Inc. - CEO

The other component of it is that not only -- in all cases, the clients are well known to us. And I think that's very important to know as well. *Because whether or not they bank with the bankers or not, the bankers have known them and have checked them out, and have received strong referrals. And the active selection process, and really the careful selection process, continues to be very important to us, and very strong.*

Daniel Arnold - Sandler O'Neill & Partners LP - Analyst

Now does the pipeline for you guys remain as strong as it has been? Can we expect to see $1 billion-plus increase in loan balances for the next quarter or two?

Larry Richman - PrivateBancorp, Inc. - CEO

I feel very confident in a very strong pipeline and very strong activity. And yet at the same time, as I mentioned earlier, *the selection process and the choice of doing business with these companies is as disciplined as it's ever been*. But we're very optimistic to see similar, or we'll call it $1 billion of loan growth roughly into the next quarter.

Emphasis added.

107.    This statement was false and misleading because (1) the Exchange Act Defendants failed to disclose that the growth in the commercial loan portfolio under the Plan was made up largely of high-risk loans made by former LaSalle bankers; (2) there was no "careful client selection," rather, as CWs witnessed, loans under the Growth Plan were made to clients rated at "substandard risk" with histories of bankruptcies, *see* ¶¶60-66; (3) the "selection process" of these troubled companies was far from "disciplined" – instead, former LaSalle clients with risky credit were given special dispensation, *see* ¶¶60-66; and (4) Van Solkema's denial that there were no non-performing loans originated under the Growth Plan ignored the reality that loans made under the Plan were to high risk clients whose businesses later failed, *see* ¶¶60-66.  The Exchange Act Defendants further failed to disclose that since at least February 2008, the Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶74-82.

108.    On the same call, Van Solkema falsely assured investors that the Company had a

stringent credit review process:

> Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer
>
> This is Kevin. We see deterioration in our watch list trends. Again, that's very
> centered around the for-sale residential sector. We have seen deterioration
> throughout the year and some spillage to the NPL. We have a very rigorous
> process around looking at watch list trends. *We have instituted a quarterly watch
> list review program here at the Bank. We call in the officers, we have them
> prepare quarterly reports on the individual clients. They present the status of
> those clients to a watch list committee. And we make a decision at that point
> whether or not the credit is properly risk-rated, classified, and if needed, to
> transfer it to our workout department.* So the trends are up, but the process has
> improved and tightened. *And I would say that we have fully identified at the
> present time all watch list loans that we have.*

Emphasis added.

109.    This statement was false and misleading because the Exchange Act Defendants

failed to disclose that loans were made under the Growth plan to clients who were rated at a

"substandard risk," and that many of the loans originated under the Growth Plan were thus bad

loans that would inevitably fail, and should have been on the Company's watch list.  The

Exchange Act Defendants further failed to disclose that since at least February 2008, the

Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶74-82.

110.    Even as the Company's underwriting standards were collapsing under the

imported LaSalle culture, it continued to hire more former LaSalle bankers to fuel the Growth

Plan.  A July 29, 2008 Sun Trust analyst report noted that the Company had hired an "additional

25 Managing Directors during 2Q08.  This compares to 34 hired in 1Q08.  Since the Strategic

Growth Plan was first announced in 4Q07, the bank has hired a total of ~120 MD's bring[ing]

the total for the bank to 294."

## I.    **August 11, 2008 10-Q**

111.    The Company's 10-Q for the second quarter 2008 stated:

We are committed to differentiating our Company in the marketplace through the quality of our people, commitment to our clients, discipline around the quality of our portfolios, and our processes and the solid fundamentals that will support our growth. *Management is keenly focused on the key performance indicators of operating efficiency, revenue growth, deposit and loan growth, asset quality and capital in order to enhance stockholder value as we continue to execute our Plan*.

\* \* \*

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio*. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio. During the second quarter 2008, we enhanced our allowance methodology and established a market-specific reserve model that includes the quantification of external and internal factors impacting different markets. Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. *Our analysis is influenced by the following factors: assessment of the credit risk of the loans in the portfolio, impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans*, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations and loan growth. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Upon the determination of an appropriate allowance level, management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate. Loans are charged-off when deemed to be uncollectable by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio*.

\* \* \*

Provision for Loan Losses

*We provide for an adequate allowance for loan losses that are probable and reasonably estimable in the portfolio. The provision for loan losses reflects management's assessment of the inherent losses in the loan portfolio. Our allowance for probable loan losses is reassessed monthly to determine the appropriate level of the reserve.* Our analysis is influenced by the following

factors: *assessment of the credit risk of the loans in the portfolio, impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans*, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations and loan growth….

* * *

Loans

Total gross loans increased to $6.4 billion at June 30, 2008, an increase of approximately 54%, from $4.2 billion at December 31, 2007. Company-wide, the loan growth since December 31, 2007 has occurred in all categories, but primarily in the commercial and commercial real estate categories. *Our Strategic Growth Plan is driving our loan growth and our loan pipeline remains strong*. Accordingly, we anticipate approximately $1.0 billion in loan growth per quarter for the next two quarters.

* * *

*We are closely monitoring exposure and sector performance of loans extended to finance residential development*; either land developed for home sites or homes available for sale. This sector performance has weakened from prior periods and is expected to remain weak into 2009, which has caused us to initiate a specific review process followed on all subject residential development loans. On a monthly basis, a specific review is held with the assigned relationship team to update activity regarding residential developments financed. We analyze and monitor sale activity, payment status, underlying valuation support and guarantor support (if available). From this review process, risk ratings and loan classifications are validated.

Approximately $501.0 million, or 8%, of the Company's total loan portfolio is in the residential development sector. The sector exposure is nearly evenly split between land development and vertical constructions (homes, condominiums and townhouses). Approximately 60% of these loans are on property located in the Chicago market, 18% in the Atlanta market, 11% in the St. Louis market, 10% in the Michigan market and 1% in the Milwaukee market. A portion of our residential development loan exposure is supported with interest reserves, which are closely monitored for adequacy. Where loans do not have an interest reserve or where the interest reserve is, or is about to be fully absorbed, the supplementary source of cash flow to support required payments is closely analyzed through our monthly reviews.

Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the Board of Directors. *The amount of additions to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on*

*a variety of factors, including an assessment of the credit risk of the loans in the portfolio, impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans*, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations, and loan growth. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

*During the second quarter 2008, the Company enhanced its allowance methodology.* Our previous methodology, adopted in the second quarter 2005, provided a loan loss reserve calculation based on each of the market area's loan portfolios by loan type and by risk rating multiplied by the sum of historical loss and loss adjustment factors (i.e. reserve factors), specific reserves set aside for impaired loans to comprise an allocated reserve amount and the application of an unallocated percentage in recognition that there are other factors affecting the determination of probable losses inherent in the portfolio that are not necessarily captured in the allocation portion of the reserve….

*Beginning with the second quarter 2008, we enhanced the existing methodology with the institution of a market area specific reserve model that includes the quantification of external and internal factors impacting each one of our different market areas.* External factors include the national and regional economic, political and legal environment quantified by unemployment percentage, changes in housing starts, personal bankruptcy filings, non-farm job growth and mortgage delinquencies. *Internal factors include aggregate loan portfolio asset quality measures not directly reflected in individual loan risk ratings such as the weighted average risk rating and OREO percentage, the relative success of credit administration efforts measured by past due loan percentages, external loan review and bank examination results and internal asset quality review results as well as other factors including loan portfolio diversification, loan growth and staffing changes.*

*We maintain an allowance for loan losses sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is supported by available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio. Management's application of the methodology for determining the allowance for loan losses resulted in an allowance for loan losses of $79.0 million at June 30, 2008 compared with $62.0 million at March 31, 2008 and $48.9 million at December 31, 2007. The increase in the allowance for loan losses from December 31, 2007 *reflects management's judgment about the comprehensive risk of lending in our various markets and loan growth resulting from the execution of our Strategic Growth Plan. We believe that the allowance for loan*

*losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio.*

\* \* \*

Delinquent Loans

*We monitor the performance of our loan portfolio through regular contact with our clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists.* As the delinquent status of a loan may determine its risk rating, the allowance for loan losses may be directly affected by loans that are performing despite past-due status.

Emphasis added.

112.    This statement was false and misleading because (1) the Exchange Act Defendants did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; (2) the Exchange Act Defendants failed to disclose the high-risk loans originated under the Growth Plan while touting purportedly stringent credit review and underwriting standards in the 10-Q; and (3) the Exchange Act Defendants failed to disclose the credit deterioration problems with their legacy loan portfolio, which they had been aware of since at least February 2008. *See* ¶¶74-82.

**J.    October 27, 2008 8-K**

113.    On October 27, 2008 the Company filed an 8-K with a press release announcing third quarter 2008 results and touting the Growth Plan:

Execution of the Strategic Growth Plan

During the third quarter, the Company continued to execute on fundamental elements of its Strategic Growth Plan:

    • *The Company continues to selectively and deliberately grow by developing relationships with clients that it knows and understands.* In this particular market, there are opportunities that the Company has been able to capitalize on, given its relationship-based philosophy….

\* \* \*

• *Loans grew $1.0 billion during the quarter*, in line with the Company's expectations and the guidance the Company gave in the second quarter of 2008.

\* \* \*

Non-performing assets to total assets were 1.18 percent at September 30, 2008, compared to 0.98 percent at June 30, 2008, and 0.97 percent at December 31, 2007. The Company had $106.5 million in total non-performing assets at September 30, 2008, compared to $73.1 million at June 30, 2008 and $48.3 million at December 31, 2007. *This increase is primarily driven from deterioration in residential development loan exposures in various markets. The Company has not seen meaningful deterioration in credit quality in other major loan types*. Each non-performing loan generally is secured and carries personal guaranties.

\* \* \*

*In response to the challenging asset quality environment, the Company has taken several steps to effectively and proactively manage its risk exposure* including enhancing its risk management infrastructure, moving to monthly executive management review of all residential development loans in all markets, and maintaining appropriate risk-rating assignments. The Company continues to anticipate challenges related to asset quality until the housing environment begins to stabilize.

Emphasis added.

114.    This statement was false and misleading because (1) the Company did not "selectively and deliberately grow" – the Growth Plan was characterized by rapid, reckless lending that favored quantity over quality, *see* ¶¶56-69; (2) the Exchange Act Defendants failed to disclose that the $1 billion growth in loans resulted from loans made to "substandard risk" clients, without regard to conservative underwriting principles; and (3) "meaningful deterioration in credit quality" was already affecting commercial loans made under the Growth Plan.  The Exchange Act Defendants further failed to disclose that since at least February 2008, the Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶74-82.

**K.**    **October 27, 2008 Earnings Call**

115.    On October 27, 2008 PrivateBancorp held an earnings call recognizing the first anniversary of the Growth Plan, in which Defendants Richman, Klaeser, Mandell and Van Solkema participated:

> Larry Richman - PrivateBancorp, Inc. - CEO, Exec. Managing Director
>
> Relationship means *we know our clients, we know the prospects we are calling on, we know their businesses* and we know their management teams. We know what they want to accomplish and how to help them get there. *Those relationships, that selectivity, is what allowed us to add $1 billion of new loans and to grow our client deposits by 14% in the third quarter….An important area that we have been and will continue to be focused on is risk management and credit quality.* Like many banks in the marketplace today, we saw an increase in our non-performing assets during the third quarter as well as an uptick in our net charge-offs. *The increase in non-performing assets is largely due to the deterioration of -- in residential development loans in our various markets. Though we have seen weakening in this area, we have not seen meaningful deterioration in credit quality in any other major market type….*We stated that we would build significant middle-market client base. Since the prior year's third quarter we have added $3.7 billion in new loans, or 99% growth, with a more diversified portfolio. *Commercial and industrial loans are now 46% of the portfolio* while commercial real estate loans have decreased to 33% of our portfolio….We feel *we are well positioned to become the leading relationship-based middle-market commercial bank.*
>
>                         * * *
>
> Dennis Klaeser - PrivateBancorp, Inc. - CFO, Treasurer
>
> We continue to experience deterioration of residential development loans and anticipate that this softness will continue. *We have not seen meaningful deterioration in credit quality in any other loan types….We continue to take active steps in managing our risk exposure* and enhancing our risk management infrastructure.

Emphasis added.

116.    This statement was false and misleading because (1) the Exchange Act Defendants failed to disclose that the $1 billion growth in loans resulted from loans made to "substandard risk" clients, without regard to conservative underwriting principles; and (2)

"meaningful deterioration in credit quality" was already affecting commercial loans made under

the Growth Plan.  The Exchange Act Defendants further failed to disclose that since at least

February 2008, the Company was already experiencing problems with its legacy loan portfolio.

*See* ¶¶74-82.

117.    On the same call, Richman continued to falsely assert that the Company was

being "cautious" and "selective" with loans made under the Growth Plan:

Steven Alexopoulos - JP Morgan - Analyst

Okay, can you talk for a minute about the market demand for loans? Any signs of
slowing, just given what's going on in the economy?

Larry Richman - PrivateBancorp, Inc. - CEO, Exec. Managing Director

Steve, it's very interesting. We are continuing to see a very strong pipeline. We're
also continuing to see a tremendous amount of deal flow, *yet we are very, very
selective, and, I'll call it, cautious*. And so, we're continuing to evaluate a number
of new alternatives. So the deal flow continues to be strong, but at the same time
*our selectivity is probably giving us a chance* -- we're probably turning down even
more loans now than I think we would have -- at least I would have addressed at
the last call.

* * *

Larry Richman - PrivateBancorp, Inc. - CEO, Exec. Managing Director

Steve, it's Larry again. I'm very optimistic in what we have seen to date and we
have really seen as *we had contemplated are some very, very good, deep core
relationships*. And those relationships are generating not only loans but strong
deposit growth and also strong fee income. We are now starting to be able to work
across lines of business to do deep relationship-building with these clients. *So we
are starting to see some real strong successes that were contemplated when we
put this strategic business plan in place*.

* * *

Kenneth James - Robert W. Baird - Analyst

Okay. And then, for the near to intermediate term, from a modeling perspective,
do you think we should be sticking with that $1 billion number that you have had
for three quarters here in a row? Or anything that might change that dramatically
to lower? Or is $1 billion still good?

Larry Richman - PrivateBancorp, Inc. - CEO, Exec. Managing Director

I'm hesitant to give guidance. *We are continuing to see strong loan activity and loan opportunities. We are continuing to be very, very selective*. So I feel like we're going to continue to support the strong growth, but I don't want to be in a position of being able to give you a sense that it's $1 billion. It could be less than that, but it will still be strong.

Emphasis added.

118.   This statement was false and misleading because (1) the Company was not "cautious" or "selective" when it came to loans originated under the Growth Plan – aggressive bankers disregarded underwriting guidelines and made loans to high-risk clients with "substandard risk codes," in order to drive up loan volume at all costs; (2) the Exchange Act Defendants failed to disclose that their clients under the Growth Plan included businesses with troubled financials, *see* ¶¶56-69.  The Exchange Act Defendants further failed to disclose that since at least February 2008, the Company was already experiencing problems with its legacy loan portfolio.  *See* ¶¶ 74-82.

119.   On the same call, the Exchange Act Defendants continued to falsely deny that there were nonperforming loans in the Growth Plan portfolio:

Daniel Arnold - Sandler O'Neill - Analyst

And were any of the NPAs that came on -- have any of those come since you guys started the strategic approved -- credits that you approved since you started the strategic growth plan, or are these all legacy stuff?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

*All of the deterioration that we're seeing in the portfolio is from the legacy portfolio*. The transformational business, *the new business we have added since last -- a year ago has performed as expected and very, very well. We have seen no past dues arise from that portfolio. We've certainly seen no deterioration into watch or non-performing*.  So this is really being fed, Dan, from the residential development sector.

Emphasis added.

120.    This statement was false and misleading because the Company was making high-risk loans to commercial clients with troubled financial histories, *see* ¶¶56-69.

121.    An October 27, 2008 William Blair analyst report emphasized the Exchange Act Defendants' misstatements:

> PrivateBank has hired more than 140 managing directors since its Strategic Growth Plan was announced one year ago….While not immune to the deteriorating economic conditions, *we believe PrivateBank's more stringent underwriting standards will keep NCOs well below its peer group average…. Management indicated that is has become more selective than even a quarter ago* given the worsening economic backdrop and that it has also turned down more deals than expected. Net, *we are comfortable with its underwriting standards* during this challenging environment and note that the company has been able to extract better terms and pricing on loans as competition has softened due to turmoil in the banking segment. *Management indicated that no loans underwritten since the beginning of the plan in November have been placed on nonperforming status.*

Emphasis added.

## L.    November 10, 2008 10-Q

122.    The Company's 10-Q for the third quarter of 2008 stated:

> We continue to see strong revenue growth as a result of the execution of our Plan, driven by our organic balance sheet growth. *We are selective in the clients we choose to do business with, opting for people and businesses we know and with which we have relationships.* Based on our strategy, loans and deposits have continued to grow at a substantial pace.

> \* \* \*

> Credit Quality

> The credit markets remain challenging, and *the Company continues to make asset quality monitoring a key priority.*

> \* \* \*

> Delinquencies (loans 30-89 days past due and still accruing) at September 30, 2008, were $50.0 million, or 0.67% of total loans, compared to $30.1 million in delinquencies, or 0.47% of total loans, at June 30, 2008, and $102.6 million, or 2.46% of total loans at December 31, 2007. This reduction in delinquencies as a percent of total loans since year-end 2007 is a direct result of a disciplined focus on actively reducing delinquent accounts.

* * *

We are committed to differentiating our Company in the marketplace through the quality of our people, commitment to our clients, *discipline around the quality of our portfolios and our processes, and the solid fundamentals that will support our growth.* Management is keenly focused on the key performance indicators of operating efficiency, revenue growth, deposit and loan growth, *asset quality* and capital in order to enhance stockholder value as we continue to execute our Plan.

* * *

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio. *During the second quarter 2008, we enhanced our allowance methodology and established a market-specific reserve model that includes the quantification of external and internal factors impacting different markets. Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance.* Our analysis is influenced by the following factors: *assessment of the credit risk of the loans in the portfolio,* impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations and loan growth. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Upon the determination of an appropriate allowance level, management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate. Loans are charged-off when deemed to be uncollectable by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio.*

* * *

Provision for Loan Losses

We provide for an adequate allowance for loan losses that are probable and reasonably estimable in the portfolio. The provision for loan losses reflects management's assessment of the inherent losses in the loan portfolio. *Our allowance for probable loan losses is reassessed monthly to determine the*

*appropriate level of the reserve*.  Our analysis is influenced by the following factors: *assessment of the credit risk of the loans in the portfolio*, impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations and loan growth.

\* \* \*

*We are closely monitoring exposure and sector performance of loans extended to finance residential development; either land developed for home sites or homes available for sale*.  This sector performance has weakened from prior periods and is expected to remain weak into 2009, which has caused us to initiate a specific review process on all residential development loans.  On a monthly basis, a specific review is held with the assigned relationship team to update activity regarding residential developments financed.  We analyze and monitor sale activity, payment status, underlying valuation support and guarantor support (if available).  From this review process, risk ratings and loan classifications are validated.

\* \* \*

Allowance for Loan Losses

*Loan quality is monitored by management and reviewed by the Board of Directors.  The amount of additions to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including an assessment of the credit risk of the loans in the portfolio*, impaired loans, evaluation of current economic conditions in the regional market areas, trends in asset quality, delinquent loans, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, loan portfolio concentrations, and loan growth.  The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

*During the second quarter 2008, the Company enhanced its allowance methodology*.  Our previous methodology, adopted in the second quarter 2005, provided a loan loss reserve calculation based on each of the market area's loan portfolios by loan type and by risk rating multiplied by the sum of historical loss and loss adjustment factors (i.e. reserve factors), specific reserves set aside for impaired loans to comprise an allocated reserve amount and the application of an unallocated percentage in recognition that there are other factors affecting the determination of probable losses inherent in the portfolio that are not necessarily captured in the allocation portion of the reserve.  At the market area level, the loan loss reserve calculations reflected differences between the market areas as a

result of the composition and risk rating profile of each market area's loan portfolio along with variance in the unallocated percentage. The total of the historical loss and loss adjustment factors or reserve factors, however, were the same for all the market areas.

*Beginning with the second quarter 2008, we enhanced the existing methodology with the institution of a market area specific reserve model that includes the quantification of external and internal factors impacting each one of our different market areas.* External factors include the national and regional economic, political and legal environment quantified by unemployment percentage, changes in housing starts, personal bankruptcy filings, non-farm job growth and mortgage delinquencies. *Internal factors include aggregate loan portfolio asset quality measures not directly reflected in individual loan risk ratings such as the weighted average risk rating* and OREO percentage, the relative success of credit administration efforts measured by past due loan percentages, external loan review and bank examination results and internal asset quality review results as well as other factors including loan portfolio diversification, loan growth and staffing changes.

*We maintain an allowance for loan losses sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is supported by available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio. Management's application of the methodology for determining the allowance for loan losses resulted in an allowance for loan losses of $102.2 million at September 30, 2008 compared with $48.9 million at December 31, 2007. The increase in the allowance for loan losses from December 31, 2007 reflects management's judgment about the comprehensive risk of lending in our various markets and loan growth resulting from the execution of our Strategic Growth Plan. *We believe that the allowance for loan losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio.*

Emphasis added.

123. This statement was false and misleading because (1) the Exchange Act Defendants did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; (2) the Exchange Act Defendants failed to disclose the high-risk loans originated under the Growth Plan while touting purportedly stringent credit review and underwriting standards in the 10-Q; and (3) the Exchange Act Defendants failed to disclose the

credit deterioration problems with their legacy loan portfolio, which they had been aware of

since at least February 2008. *See* ¶¶74-82.

**M.     The Truth Begins to Emerge**

> **1.     January 8, 2009 *Wall Street Journal* Article**
> **Partial Disclosure of the Truth**

124.    A January 8, 2009 article in *The Wall Street Journal* reported on the growing

delinquencies in the commercial real estate mortgage sector, noting that out of the top 15

commercial mortgage-backed securities originators, *LaSalle held the second highest* 60-day-or-

more delinquency rate at 1.63%.  News of LaSalle's imprudent lending practices raised

immediate concerns among Company investors that the numerous bankers aggressively recruited

by PrivateBancorp over the past two years as part of the Growth Plan, including roughly 140

managing directors and PrivateBancorp's CEO Richman, had brought with them LaSalle's

culture of irresponsible, high-risk lending.  On the disclosure of this news, PrivateBancorp's

stock dropped from $28.14 per share on the previous day's closing to $25.62 per share, or

approximately 9% on unusually heavy volume, with 987,812 shares traded compared to an

average daily volume over the Class Period of 436,313 shares.

125.    A January 9, 2009 William Blair analyst report noted the market's reaction, even

while continuing to accept the Exchange Act Defendants' Growth Plan story of disciplined and

conservative lending, and expressing its disagreement with the market's interpretation of the

disclosure:

> PrivateBank's shares declined more than 9% Thursday. We believe the decline
> was driven by comments from an article in *The Wall Street Journal* on Thursday,
> January 8, which were incorrectly interpreted as a potential negative for
> PrivateBank's current underwriting standards. The article highlighted LaSalle
> Bank as having a relatively high delinquency rate on the underlying commercial
> mortgages within commercial mortgage backed securities (CMBS) that it
> originated.  *Recall that PrivateBank has hired roughly 140 managing directors
> from LaSalle over the last 15 months*. We believe that extrapolating LaSalle's

performance in CMBS to PrivateBank's underwriting standards is a fundamental mistake.

Emphasis added.

### 2. January 26, 2009 8-K Partial Disclosure of the Truth

126.     On January 26, 2009 the Company filed an 8-K with a press release announcing a net loss of $62 million for the fourth quarter 2008 and a net loss of $91.5 million for fiscal year 2008.  The press release revealed that after a purportedly "proactive" review of its residential development loans, the Company needed to take a sudden write-down of $108.8 million in nonperforming loans.  Contrary to this statement, and as confirmed by various CWs, the extent of the problems in the loan portfolios involved in the write-down were known to the Exchange Act Defendants no later than February of 2008, a full year earlier than the Company's disclosure. *See* ¶¶74-82.  Despite disclosing problems with the legacy loan portfolio, the Exchange Act Defendants misled investors by continuing to conceal the poor quality loans originated under the Growth Plan:

> The Strategic Growth Plan resulted in substantial new client growth that generated a 9 percent increase in revenue over third quarter 2008 and an 84 percent increase in revenue year over year….Loans increased in the fourth quarter by $595.7 million or 8 percent over the third quarter as the Company continued a pattern of *selective client development*.

> * * *

> *None of the losses reported were from loans originated since the commencement of the Strategic Growth Plan in the fourth quarter 2007.  These loans continue to perform as expected with no significant payment past dues*.

> * * *

> Progress against Strategic Growth Plan objectives is measured by key performance indicators including revenue, deposit and loan growth, asset quality, operating efficiency and profitability, as well as selective client acquisition….The Company makes loans based on relationships that are well-tested and analyzed.

*All loans are subject to a selective screening and approval process* including downside stress testing and consideration of the economic climate.

Emphasis added.

### 3. January 26, 2009 Earnings Call Partial Disclosure

127.    On January 26, 2009, the Exchange Act Defendants held an earnings call, during which they continued to falsely tout the purported continued success of the Growth Plan despite having to take the large writedown in the Company's residential development loan portfolio. The Exchange Act Defendants also falsely characterized the Company's extensive writedown of the Company's residential loans as a product of a "comprehensive" and "proactive" review:

Ralph Mandell - PrivateBancorp, Inc. - Chairman

In spite of unprecedented economic headwinds, I'm proud of what we have accomplished over the last year since launching our strategic growth plan. *That plan is as strong today as when we announced it in November, 2007, evidenced by the growth we have seen in loans, deposits, and revenue; the quality people we've brought on board; and the opportunities that are before us with our expanded focus on commercial middle market lending*. Larry and the entire Management team have done a remarkable job achieving positive growth momentum despite the pressures of the economy…. We undertook a comprehensive loan portfolio review in the fourth quarter, which Kevin will discuss more in a minute. As a result of this review and the significant deterioration in our residential development loan portfolio, we determined the best course of action was to charge off a large portion of this portfolio. We recorded a $108.8 million in net charges, primarily related to the residential development portfolio. We believe the charge-offs, while obviously large, allow us to put these problems -- these problem loans behind us.  *More importantly, this will not have a lasting effect on the success of the strategic growth plan.*

\* \* \*

Larry Richman - PrivateBancorp, Inc. - President, CEO and Director

The loss in the fourth quarter is very disappointing. *But when it comes to our core business as defined as the strategic growth plan, we have made significant progress toward our objectives*. Throughout the course of the year we have increased our new clients, loans, deposits, fee income, and revenue, and continued to manage our expenses. We have begun to create positive operating leverage as we envisioned in our plan.  Our results show that if we keep our focus on developing high-quality client relationships, our Company can grow even in the

most challenging times and is poised for tremendous success when the economy rebounds. *By continuing our pattern of selective relationship development, the Company's loan portfolio increased in the fourth quarter by more than $700 million*, or $596 million after the $108.8 million in net charges. This pace is slower than we have seen since the launch of the strategic growth plan *but reflects our more conservative risk appetite* in the current economic environment. And what does it mean by selective relationship development? We are working with clients we know, and in many cases we have been with them before through other difficult economic cycles. *The loans we have added in 2008 were put through rigorous stress testing*, and we're underwriting with this challenged economic environment in mind. With this discipline we have added nearly $4 billion in new loans this year, almost doubling the size of our loan portfolio from the end of 2007. Importantly, commercial and industrial loans -- including owner occupied commercial real estate -- now make up half of our loan portfolio compared to 32% at the end of last year. We believe this is a much more favorable loan mix….We will continue to pursue a pattern of selective client acquisition with a focus on sustainable organic revenue growth, with an extra dose of caution given the economic client climate. We remain committed to our stakeholders with a focus on revenue growth, expense control, and risk management.

Emphasis added.

128.    This statement was false and misleading because loans originated under the

Growth Plan were not "conservative" or "selective" but were high-risk, low quality loans, *see*

¶¶56-69.  Contrary to the claim that loans in 2008 "were put through rigorous stress testing," CW

9 reviewed portions of the Company's loan database in April 2008, and noticed numerous

"questionable" files.  According to CW 9, "I'd look in the system and see a client with three

delinquent loans and wonder why we were doing [business] with them."

129.    Analysts on the call were skeptical about the nature and timing of

PrivateBancorp's substantial write-off.  According to an analyst with Sandler O'Neill, "the

problems in Michigan and in Atlanta aren't anything new. You know, it's been pretty much

broadcast what the problems were there.  So I'm wondering, were the nonperformers do you

think understated in the third quarter, or did it really deteriorate that much more in one quarter?"

In response to this question, Defendant Solkema rebuffed any implication that the $108.8 million

write-off was not timely taken, reiterating that PrivateBancorp took "proactive" steps to address

its nonperforming loans in order to flush them through the balance sheet. That representation, which prevented investors from learning that they had been deceived, was false. Contrary to Van Solkema's assertion, and as detailed above, the Company did not discover the problems in the legacy loan portfolio through a proactive review in the fourth quarter of 2008 and those losses were known to the Exchange Act Defendants by no later than February 2008. Indeed, the sheer size of the losses in certain regions – roughly 12% of the Atlanta portfolio and almost 9% of the Michigan portfolio – indicate that the Company's senior executives knew of, or were reckless for not knowing, material problems in those portfolios long before the January 26 disclosure.

130. On the same call, the Exchange Act Defendants continued to deny that there were any credit quality problems with loans made under the Growth Plan, and touted non-existing underwriting standards:

> Dennis Klaeser - PrivateBancorp, Inc. – CFO
>
> With regards to our loan portfolio, we continue to achieve a greater diversification in our loan portfolio compared to a year ago. Commercial loans, including C&I loans and owner occupied commercial real estate loans, continue to be the fastest-growing segment of the loan portfolio and increased to $4 billion, or 50%, of the Company's total loans from $1.3 billion, or 32%, of total loans at December 31, 2007.
>
> * * *
>
> In addition to this proactive residential development portfolio review, *our standard practice is to carefully review all other underperforming and nonperforming loans*. We update collateral values and cash flow capacity in order to validate the appropriate action plan on each account. *An important tenant of our credit culture is for relationship managers to properly risk rate all loans and where deterioration is apparent to escalate promptly*. The comprehensive review process included the insight of the relationship manager, senior lending management, and our risk management team to thoroughly scrutinize the capacity of repayment and the value of the underlying collateral.
>
> * * *

*The Company makes loans based on relationships that are well tested and analyzed. All loans are subject to a diligent credit quality screening and approval process including downside stress testing and consideration of the current and expected economic climate.* Underlying assets are conservatively valued and reflect appropriate advance rates in these challenging market conditions. As I said, *none of the loans that we charged down or transferred to non-accrual were part of the strategic growth plan.* All loans originated are held on the balance sheet. *Loans originated as part of the strategic growth plan continue to perform as expected with no significant payment past-dues.* Despite the challenging market conditions, *we believe this is an excellent time for long-term quality loan growth, supported by appropriate underwriting*, pricing, and loan structures.

\* \* \*

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

Dan, let me start the comments here. *We continue to review all components to the portfolio*, and I think that it is reflected in sort of the proactive move that we decided to take this quarter. The commercial real estate business under the strategic growth plan was, so to speak, written with a eye on the economic environment that currently exists. So the underwriting was done with the perspective of the challenging environment that we're under. *So we feel very good about it. It is current. It is performing, and we've developed some very, very good, deep quality relationships with good credit* -- and the after-banking relationships as well.

\* \* \*

Ben Crabtree - Stifel Nicolaus - Analyst

And have you generated much in the way of a meaningful amount of loans in your really new markets, the ones you added in the -- late in the second half of 2008?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

That is part of the strategic growth plan. We have generated a nice amount of growth in middle market commercial relationships in the markets.

Ben Crabtree - Stifel Nicolaus - Analyst

In Minneapolis and Denver and places like that?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

Absolutely. *We have very good, strong success with really good people working on it.*

* * *

Kenneth Puglisi - Sandler O'Neill - Analyst

Okay. And the review, the comprehensive review, was focused on residential development and nonperforming. So I can assume from that that none of the new loans that were put on since the strategic growth program started were in that comprehensive review?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

That's absolutely correct. I would just clarify one thing, that it wasn't just nonperforming loans that we looked at. We looked at underperforming loans as well. But sometimes (multiple speakers)

Kenneth Puglisi - Sandler O'Neill - Analyst

I see. Okay. Thank you.

Larry Richman - PrivateBancorp, Inc. - President, CEO and Director

But I would like to say one other thing, just clarify that *every new loan under the strategic growth plan has been and continues to be reviewed*. So it's not as if they weren't reviewed, but they weren't part of Kevin's analysis.

Emphasis added.

131.    This statement was false and misleading because (1) the Growth Plan was executed by former LaSalle bankers who were aggressively making high-risk loans to unqualified clients – the opposite of "deep quality relationships with good credit"; (2) as confirmed by CW 9, the rate of delinquent loans in 2008 was increasing, *see* ¶67, despite the "continuous" review asserted by Richman.

132.    In response to the partial revelations from the January 26, 2009 8-K and earnings call that the Company had credit quality deterioration with its legacy loan portfolio, the market sent PrivateBancorp stock plummeting 22%, from $19.70/share to $15.32/share on unusually heavy volume, with 2,981,131 shares traded compared with an average daily volume over the Class Period of 436,313 shares.  The Exchange Act Defendants' false assurances concerning the strength of the Growth Plan and the "comprehensive" review that purportedly resolved all

problems in the Company's legacy loan portfolio, by concealing the Company's true condition, prevented a larger decline.

133. In February 2009, the Company hired Defendant Killips as its new CFO. His connection to LaSalle was not lost on analysts covering the Company – a February 9, 2009 Oppenheimer report noted that "Killips appears to have had a long history with LaSalle Bank, having served for nearly 10 years as North American Chief Accounting Officer and Corporate Controller."

**N.** **March 2, 2009 10-K for FY 2008**

134. The Company's 2008 10-K stated:

The PrivateBank Approach

Our Plan emphasizes the development of new and existing client relationships with larger privately held and public companies, the originating of larger credits and a greater rate of balance sheet growth than we had experienced prior to 2008. This Plan, which we embarked on in late 2007, represents a substantial shift in our strategic direction and has caused us to change the way we manage our business and to manage, going forward, around lines-of-business. *Notwithstanding this shift, we continue our style of doing business using "The PrivateBank approach".* We believe the organization of our Company around lines-of-business enhances "The PrivateBank approach" with deeper banking service capabilities and relationships to serve clients in our target markets.

\* \* \*

*The fundamentals of "The PrivateBank approach" have remained consistent since our founding and since launching our Plan.* We have enhanced our business model to drive a new pattern of strategic growth, relying on "The PrivateBank approach", including an emphasis on: (1) middle market client relationships, (2) larger and varied credits, (3) an expanded product suite of cash management and other fee generating services, and (4) *enhancements to risk management infrastructure*.

\* \* \*

Lending Activities

We provide a full range of commercial, real estate and personal lending products and services to our clients. *We have adopted loan policies that contain general*

- 58-

*lending guidelines consistent with regulatory requirements and are subject to review and revision by our credit policy committee and shared with the boards of directors of each of the banks and the holding company. We extend credit consistent with these comprehensive loan policies and update them on regular basis.*

The goal of our lending program is to meet the credit needs of our diverse client base *while using sound credit principles to protect our asset quality.* Our business and credit strategy is relationship-driven and we strive to provide a reliable source of credit, a variety of lending alternatives, and sound financial advice to our clients. *When extending credit, our decisions are based upon our client's ability to repay the loan, as well as the value of any collateral securing the loan. The quality and integrity of the borrower is crucial in the loan approval process. We monitor the performance of our loan portfolio through regular contact with our clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists.*

\* \* \*

To address the changes in the complexity and complexion of our credit business going forward, management has developed a bi-weekly loan committee review process so it can focus on time-sensitive approvals of credits that respond to our clients' needs. *Our loan committee of the Board of Directors has heightened its focus on credit risk management, loan policies and other issues related to supervising the management of a larger more complicated loan portfolio.* We believe our new approach to credit management will allow us to deliver our traditional "PrivateBank approach" of providing credit to our clients—which involves highly responsive, customized solutions—while managing our credit risks at an enterprise-level with appropriate interaction between our Board and management.

\* \* \*

Enterprise Risk Management

*In September 2008, we enhanced and further implemented a robust enterprise risk management ("ERM") process, as we understood the need for a comprehensive and cohesive view of risk throughout the organization. In alignment with the further development of our ERM process, the supporting governance was also strengthened. A Management Risk Committee chaired by the Chief Risk Officer, and involving members of key senior management leadership positions, was formed to review and identify existing and emerging risks of the Company.* At a board level, a Business Risk Committee was formed to provide independent oversight of management's execution of ERM and related actions. Our development of ERM practices, which encompass all elements of our business,

provides a sound foundation for identifying and managing risk(s). ERM applies to all components of our operations. *It provides for a vigorous departmental vetting of risks at our regular ERM committee meetings that result in action plans to mitigate and escalate risk from throughout the company.* We aim to leverage the expertise and experience of our entire team, not just those in the Risk Management department. Our ERM philosophy and practice provides us with an effective system to manage risk and enables us to grow our business in a sustainable way.

* * *

We substantially invested in our risk infrastructure during the year, significantly improving the transparency of our loan portfolio, *and have taken steps we believe were necessary to reduce additional potentially significant losses in the future.*

* * *

As a result of rapid deterioration in economic conditions, during the fourth quarter 2008 we undertook a comprehensive review of all underperforming assets with a particular emphasis on our residential development loan portfolio. This resulted in a substantial charge at year end in recognition that residential development is a very weak sector in several of our markets. *Notably, none of the charges were related to loans originated as part of the Plan, but were from the legacy loan portfolio.* We will continue to proactively monitor our loan portfolio during 2009, and despite the challenging environment, we continue to see great opportunities to expand our franchise and grow our client base.

* * *

We seek to reduce our credit risk through disciplined credit underwriting at the individual borrower level combined with the establishment and maintenance of loan portfolio sub-limits by loan type, collateral and selected industries to promote loan portfolio diversification and active credit administration. *We do not engage in sub-prime commercial or residential lending* and do not securitize our loans for sale.

* * *

Credit Quality Management and Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the Board of Directors directly and through the work of our board committees at our regular board meetings. *We have established a system of internal controls to mitigate credit risk. Chief among the controls is the management Loan Committee process which presents selected credits based on amount and risk before a group of seasoned credit professionals which vet the loan at approval and then at appropriate intervals. Also in place to monitor and manage loan quality are standard lending and credit policies, underwriting criteria, and collateral*

*safeguards. We monitor and implement our formal credit policies and procedures and regularly evaluate trends, collectability, and collateral protection within the loan portfolio*. Our policies and procedures are regularly reviewed and modified in order to manage risk as conditions change and new credit products are offered.

Our credit administration policies include a comprehensive loan rating system. This system allows for common reference across loan types *and facilitates the identification of emerging problems in loan transactions*. Our internal credit review function performs regular reviews of the lending groups to assess the accuracy of loan ratings and the adherence to credit policies. Exam results are communicated to senior lending and risk management executives as well specified Board of Director committees. Lending officers have the primary responsibility for monitoring their client relationships and effecting timely changes to loan ratings as events warrant. We believe that any significant change in the overall quality of the loan portfolio will be reflected in the cumulative effect of changes to these loan ratings.

*In addition, our senior lenders actively review those loans that call for more extensive monitoring and may warrant some degree of remediation. These loans are reviewed quarterly by a committee of senior lending and risk management officers, including the Chief Executive Officer and Chief Risk Officer, which assesses and directs actions plans to minimize the risk of these loans*. More troubled loans are reviewed on a monthly basis for heightened oversight with such reviews including the participation of the Chief Executive and Chief Risk Officer.

\* \* \*

During 2008 in response to the diverging geographic performance of our lending portfolio and the deteriorating economic environment we modified our allowance for loan loss methodology as of June 30, 2008 to include the use of amplification factors based on geographic performance characteristics and local economic conditions. This resulted in a significant increase in loan loss reserve levels. While the allowance for loan loss methodology required a lower reserve percentage *on the more favorably risk rated loans booked under our Plan*, total volume of new loans booked necessitated sizeable provisions each quarter. The magnitude and speed of the economic deterioration noted in the second half of 2008 triggered an intensive loan portfolio review and collateral revaluation during December 2008 which culminated in net loan charge-offs totaling $108.8 million during the fourth quarter versus $125.8 million for all of 2008. The portfolio review included all residential real estate development loans and other underperforming assets. ….We believe the near-term economic environment will not materially improve and the actions taken, particularly during the fourth quarter 2008, were designed to minimize balance sheet risk by recognizing losses inherent in our loan portfolio.

\* \* \*

We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio and credit undertakings that are not specifically identified. *Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience.* The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate. Loans are charged-off when deemed to be uncollectible by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio.* The allowance for loan losses as a percentage of total loans was 1.40% as of December 31, 2008, compared to 1.17% at December 31, 2007.

* * *

It is our policy to review each prospective credit in order to determine the appropriateness and, when required, the adequacy of security or collateral to obtain prior to making a loan.

Emphasis added.

135. This statement was false and misleading because (1) the Exchange Act Defendants did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; and (2) the Exchange Act Defendants failed to disclose the high-risk loans originated under the Growth Plan while touting purportedly stringent credit review and underwriting standards in the 2008 10-K, including the assertion that the Company did not make

"subprime" commercial loans, even though the Company was making loans to commercial

clients with "substandard risk ratings."

O.     **May 11, 2009 10-Q**

136.     The Company's 10-Q for the first quarter of 2009 stated:

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio and credit undertakings that are not specifically identified. *Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including, among other factors, assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area,* actual charge-offs and recoveries during the period, industry loss averages and historical loss experience. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

* * *

Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the Loan Committee of the Board of Directors. The amount of addition to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including, among other factors, *assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience.* The determination of the level of the allowance also involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

* * *

We increased our allowance for loan losses to $127.0 million as of March 31, 2009, up $14.3 million from $112.7 million at December 31, 2008. The ratio of the allowance for loan losses to total loans was 1.50% as of March 31, 2009, up from 1.40% as of December 31, 2008. *Given the comprehensive review of all underperforming and nonperforming loans completed at the end of the first quarter and the adequacy of loss factors used in our analysis, we believe that the allowance for loan losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio as of March 31, 2009.* The loan loss allowance as a percentage of nonperforming loans was 78% at March 31, 2009 compared to 85% at December 31, 2008. Total loans charged off, net of recoveries, in first quarter 2009 were 0.17% of average loans compared to 5.49% at December 31, 2008.

Emphasis added.

137. This statement was false and misleading because (1) the Exchange Act Defendants did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; and (2) the Exchange Act Defendants failed to disclose the high-risk loans originated under the Growth Plan while touting purportedly stringent credit review and underwriting standards in the 10-Q.

**P.    July 27, 2009 8-K**

138. On July 27, 2009, PrivateBancorp filed an 8-K with a press release headlined "Strategic Growth Plan Continues to Generate Positive Results With Strong Core Fundamentals," announcing second quarter results and emphasizing the purported success of the Growth Plan:

The Strategic Growth Plan continues to generate positive results for our business," said Larry D. Richman, President and Chief Executive Officer, PrivateBancorp, Inc. "*We are pleased with another quarter of solid loan growth*, although the pace of growth has slowed given the current economic environment. *We continue to add new, quality clients*, leading to growing deposits, improving margins and stronger net interest income this quarter."

* * *

- 64-

Commercial loans increased to 53 percent of the Company's total loans at the end of the second quarter 2009 from 42 percent of total loans at June 30, 2008, and 52 percent of total loans at March 31, 2009.

Emphasis added.

139.    This statement was false and misleading because the Exchange Act Defendants failed to disclose the growing problems and poor credit quality with high-risk loans made under the Growth Plan to unqualified borrowers, *see* ¶¶56-69.

**Q.    July 27, 2009 Earnings Call**

140.    On July 27, PrivateBancorp conducted an earnings call in which Defendants Richman, Killips, and Van Solkema continued to hide the growing problems with high-risk loans made under the Growth Plan:

Larry Richman - PrivateBancorp, Inc. - President and CEO

If you have had a chance to review the results we released this morning, you have seen that *the second quarter was marked by continued execution of our strategic growth plan*. That is really the overarching message this quarter, that we continue to make steady progress against our plan…. As I've said in the last few quarters, we continue to be affected by the economic environment. While we have seen some early signs of stability, the level of uncertainty continues to remain very high. For us, this means ensuring that *we are running our business prudently, consistent with the economic conditions around us*….Now let me turn to our core business in the second quarter and give you some highlights as to what we have accomplished. As we've noted, *the core fundamentals of our business and the strategic growth plan are strong*. We continue to add new clients, leading to loan and deposit growth as well as increased market share….The pace of loan growth slowed in the second quarter. That is due in part to slower demand in the marketplace and in part to *the selectivity we are employing in new business development. We look very carefully at new opportunities and only move forward with ones that fit our criteria -- solid loan quality through discipline and underwriting and a significant banking relationship.*

* * *

Kevin Killips - PrivateBancorp, Inc. - Managing Director and Chief Financial Officer

Turning to loans, total loans increased 3%, as Larry said, to $8.7 billion from $8.5 billion last quarter and were up 36% from $6.4 billion a year ago. We continue to

be an active lender in all the markets we serve and are *adding loans that are appropriate for our relationship-based portfolio*.

\* \* \*

Kevin Van Solkema - PrivateBancorp, Inc. - Managing Director and Chief Risk Officer

Once again this quarter, *it is important to note, none of the loans charged off or classified as nonperforming were originated as part of the strategic growth plan portfolio*. The higher provision expense is a result of continued deterioration and weakness in the broader economy and the related stress on our customers and our continued proactive efforts to address problem loans….. Finally, addressing past-due reported loans, our credit management practices require all past-due loans are strictly administered.

\* \* \*

Tony Davis - Stifel Nicolaus - Analyst

You mentioned, Larry, that commercial -- or maybe Kevin did -- that commercial draw rates were down a bit, and I wonder if you could flesh out a little color there -- a little more color there in terms of maybe some comment about the unfunded commitment backlog or where your draw rate is right now in the commercial book versus say normal. And in effect, is the slowdown the market, or is it you guys being just a bit more persnickety I guess on standards?

Larry Richman - PrivateBancorp, Inc. - President and CEO

Let me start to address this -- and I laugh at your persnickety comment. I think *we call it selective, and we continue to evaluate credits from the standpoint of quality and selectivity through very solid underwriting*. And in fact, probably if anything there's been a tighter discipline or a more active discipline around understanding downside. Downside today is a lot different than we could've imagined three, four years ago in the markets. *And so that goes into the underwriting and the selectivity. So we're picking quality*. We are also picking those that have active strong relationships that can drive balances and fees. And that's -- and could be long-term relationships.

Emphasis added.

141. This statement was false and misleading because (1) high-risk loans originated under the Growth Plan by former LaSalle bankers were made to unqualified clients, resulting in an increasing number of delinquencies, *see* ¶¶56-69; (2) the Company was sacrificing loan quality for quantity without regard to meaningful underwriting standards.

- 66-

**R.**     **August 7, 2009 10-Q**

142.    The Company's10-Q for the second quarter 2009 stated:

We primarily lend to businesses and consumers in the market areas in which we operate. Within these areas, we diversify our loan portfolio by loan type, industry, and borrower.

*It is our policy to review each prospective credit in order to determine the appropriateness and, when required, the adequacy of security or collateral to obtain prior to making a loan.* In the event of borrower default, we seek recovery in compliance with state lending laws and our lending standards and credit monitoring procedures.

                                        * * *

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio and credit undertakings that are not specifically identified. *Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including, among other factors, assessment of the credit risk of the loans in the portfolio*, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience.

                                        * * *

Through second quarter 2009, we continue to see strong net revenue growth as a result of the execution of the Strategic Growth Plan (the "Plan") we launched in the fourth quarter 2007, driven by our organic balance sheet growth. *We are selective in the clients we choose to do business with, opting for people and businesses we know and with which we have relationships*. Based on our strategy, loans and deposits have continued to grow.

                                        * * *

Provision for Loan Losses

The provision for loan losses is determined by management as the amount to be added to the allowance for loan losses after net charge-offs have been deducted to bring the allowance to a level which, in management's best estimate, is necessary *to absorb probable and reasonably estimable losses inherent in the existing loan portfolio.*

\* \* \*

Portfolio Composition

Our loan portfolio is comprised of commercial, real estate (which includes commercial real estate, construction, and residential real estate) and personal loans. Outstanding loans totaled $8.7 billion as of June 30, 2009, an increase of 9% from December 31, 2008. The increase since December 31, 2008 was led by growth in commercial loans which grew 15% from December 31, 2008 comprising 53% of the Company's loan portfolio. *We believe we are well positioned to both pursue and take advantage of prudent, targeted lending opportunities.*

\* \* \*

Allowance for Loan Losses

*Loan quality is monitored by management and reviewed by the Loan Committee of the Board of Directors. The amount of addition to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including, among other factors, assessment of the credit risk of the loans in the portfolio,* delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience. The determination of the level of the allowance also involves the exercise of judgment by management.

Emphasis added.

143.    This statement was false and misleading because (1) the Exchange Act

Defendants did not provide an allowance for loan losses that was sufficient to absorb the credit

losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk

loans to unqualified borrowers; and (2) the Exchange Act Defendants failed to disclose the high-

risk loans originated under the Growth Plan while touting purportedly stringent credit review and

underwriting standards in the 10-Q.

**S.**     **False and Misleading Core Financials**
          **Throughout the Class Period**

144.     In addition to the false statements above, the Company's key financial metrics which were issued in the Company's SEC filings (set forth below) were rendered false and misleading by the Exchange Act Defendants' failure to (1) disclose that loan growth was due to reckless lending under the Growth Plan, with a concomitant surge in failing loans during the Class Period; and (2) timely write-down failing legacy loans, which the Exchange Act Defendants knew of as early as February 2008:

| Source | Net Loans (thousands) | Interest Income from loans (including fees) (thousands) | Diluted EPS |
|---|---|---|---|
| 2007 10-K | $4,128,904.00 | $282,979.00 | 0.53 |
| 3/31/2008 10-Q | $5,074,092.00 | $76,113.00 | -0.34 |
| 6/30/2008 10-Q | $6,338,005.00 | $84,231.00 | -0.48 |
| 9/30/2008 10-Q | $7,338,914.00 | $99,408.00 | -0.23 |
| 2008 10-K | $7,924,135.00 | $367,104.00 | -3.13 |
| 3/31/2009 10-Q | $8,356,630.00 | $92,944.00 | 0.14 |
| 6/30/2009 10-Q | $8,588,838.00 | $95,997.00 | 0.06 |
| 9/30/2009 10-Q | $8,835,665.00 | $107,749.00 | -0.68 |
| 2009 10-K | $8,851,786.00 | $411,830.00 | -0.95 |
| 3/31/2010 10-Q | $8,680,003.00 | $111,062.00 | -0.35 |
| 6/30/2010 10-Q | $8,619,028.00 | $112,839.00 | -0.01 |
| 9/30/2010 10-Q | $8,768,737.00 | $105,608.00 | 0.06 |

| Source | Non-performing loans (thousands) | Total loans charged off YTD (thousands) |
|---|---|---|
| 2007 10-K | $38,983.00 | -$6,316.00 |
| 3/31/2008 10-Q | $46,517.00 | -$4,050.00 |
| 6/30/2008 10-Q | $57,348.00 | -$10,027.00 |
| 9/30/2008 10-Q | $88,057.00 | -$16,997.00 |
| 2008 10-K | $131,919.00 | -$126,686.00 |
| 3/31/2009 10-Q | $162,896.00 | -$3,466.00 |

| Source | Non-performing loans (thousands) | Total loans charged off YTD (thousands) |
|---|---|---|
| 6/30/2009 10-Q | $183,526.00 | -$19,617.00 |
| 9/30/2009 10-Q | $359,918.00 | -$59,759.00 |
| 2009 10-K | $395,447.00 | -$101,260.00 |
| 3/31/2010 10-Q | $385,047.00 | -$57,447.00 |
| 6/30/2010 10-Q | $374,209.00 | -$109,370.00 |
| 9/30/2010 10-Q | $431,815.00 | -$159,992.00 |

T.      **The Whole Truth About the Growth Plan Is Revealed**

145.    On October 26, 2009, PrivateBancorp held an earnings call where the Exchange Act Defendants finally revealed the truth about the Growth Plan. After continuously asserting throughout the Class Period that there was no credit quality deterioration in loans originated under the Growth Plan, the Exchange Act Defendants admitted that a large portion of those loans were nonperforming loans and needed to be written down:

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

*Our operating results reflect a significant deterioration in our commercial real estate portfolio and the addition of a handful of commercial loans that became non-performing* in the quarter. The weakness in the general economy and, in particular, with commercial real estate with higher vacancy rates, very limited sales activity, a little financing activity altogether have impacted our portfolio quality to a meaningful level. *We have moved some commercial borrowers to non-performing as a result of declining revenue and strained cash flow.* We also have two shared national credits that moved to non-performing. We are seeing limited liquidity at both the borrower and guarantor level. In sum, we are observing an escalation of negative trends in borrower events over and above what we had previously observed.

*With that said, non-performing loans increased to $360 million, up from $183 million at June 30, or 3.99% of total loans. The concentration of non-performing loans, including those new to this quarter, are commercial real estate and commercial construction loans. In addition, we had $33 million of commercial loans which moved to non-performing loan status during the quarter.*

Our allowance for loan losses increased this quarter to 2.14% from 1.60% at the end of the second quarter and up meaningfully from 1.37% a year ago. Our third

quarter provision for loan losses was $90 million, up from $21.5 million in the second quarter, reflecting our judgment of maintaining a loan loss reserve level appropriate to our loan portfolio position and broader market conditions. Loans charged off were $40.1 million, offset by recoveries of $2.8 million, resulting in net charge-offs of $37.3 million in the quarter. Charge-offs have escalated and reflect real estate collateral values which have fallen appreciably, especially land values.

* * *

Terry McEvoy - Oppenheimer & Co. - Analyst

Just looking at the inflow of NPA's in the third quarter, *how much of that came from credits that were on the books prior to November '07 [when the Growth Plan was implemented]* versus those that were originated after that date?

Kevin Van Solkema - PrivateBancorp, Inc. - Chief Risk Officer

*Over 60% were from credits originated prior to November 2007*. And that's measured as a percentage of dollars when I look at the numbers of accounts where about 90% of those accounts that actually moved to non-performing status in the quarter were from what I'll call the legacy book.

Emphasis added.

146.    Also on October 26, 2009 the Exchange Act Defendants filed an 8-K with a press release announcing that it had replaced its Chief Operating Officer.

147.    The sudden nature and the sheer size of the unexpected writedown stunned analysts, who immediately questioned the aggressiveness of the Growth Plan, under which approximately 40% of PrivateBancorp's nonperforming loans had originated. An October 26, 2009 Oppenheimer report stated that "[t]he emergence of credit deterioration at PrivateBancorp in loans originated during the 'Strategy Growth Plan' (since Nov. '07) will no doubt result in the questioning of the company's decision to grow aggressively over the past two years."

148.    An October 26, 2009 J.P. Morgan report observed "what a difference one earnings report can make. Since we last published on PVTB, we have now learned from the company's 3Q09 earnings report that *the quality of the loan portfolio is in far worse shape than*

*we had believed based on recent trends and the quality of the loan growth that the company has recorded since the Strategic Growth Plan was put in place was of much lower quality than we had originally thought*." (Emphasis added).

149.    Similarly, an October 29, 2009 Stern Agee report noted "[the] departure from the previous six quarters—approximately 40% of the LQ increase in NPLs was due to loans originated since November 2007 [the start of the Growth Plan]."

150.    In response to the October 26 disclosures, PrivateBancorp stock fell over 37%, dropping from $19.00 per share to $11.98 on unusually heavy volume, with 855,174 shares traded compared with an average daily volume over the Class Period of 436,313 shares.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

151.    During the Class Period, as detailed herein, PrivateBancorp and the Individual Defendants made false and misleading statements and engaged in a course of conduct that artificially inflated the price of PrivateBancorp common stock and operated as a fraud or deceit on Plaintiffs and the Class by misrepresenting the Company's business and prospects. Later, when PrivateBancorp and the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of PrivateBancorp common stock plunged. As a result of their purchases of PrivateBancorp common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

152.    The Exchange Act Defendants' false statements and omissions, identified herein in Section VI, had the intended effect and caused PrivateBancorp's common stock to trade at artificially inflated levels up to and above $42 per share during the Class Period. As a direct

result of the disclosures on January 8, 2009, January 26, 2009 and October 26, 2009, however PrivateBancorp's stock price suffered material, statistically significant declines.

153.    On January 8, 2009, it was revealed by the *Wall Street Journal* that out of the top 15 commercial mortgage-backed securities originators, LaSalle held the second highest delinquency rate for loans of 60 days or more.  This news caused warranted fears for PrivateBancorp investors because the bank under its Growth Plan had recruited and retained some 140 bankers from LaSalle who continued to write these irresponsible, high-risk loans at PrivateBancorp.  As a result of this news, PrivateBancorp's stock price dropped from $28.14 per share to $25.62 per share or approximately 9%.

154.    On January 26, 2009, after it was disclosed that PrivateBancorp had a net loss of $62 million for the fourth quarter 2008, a net loss of $91.5 million for the year ended December 31, 2008, and reported losses of nearly $2 per share due largely to PrivateBancorp's sudden write-off of $108.8 million worth of nonperforming loans**,** PrivateBancorp's stock fell approximately 22%, dropping from $19.70 per share to $15.32.

155.    Finally, on October 26, 2009, PrivateBancorp shocked investors by announcing a third quarter loss of $31.2 million, or $0.68 per share and  revealed that it held almost $400 million in nonperforming loans as of the third quarter 2009, compared to just $106.5 million of nonperforming loans in the third quarter of 2008.  PrivateBancorp disclosed that its significantly elevated levels of nonperforming loans were originated under the Growth Plan which they had touted during the Class Period as been highly effective.   In response to the Company's October 26 disclosure, PrivateBancorp's stock fell 37%, dropping from $19.00 per share to $11.98.

156.    Individually and collectively, the drops on January 8, January 26 and October 26, 2009 removed the inflation from PrivateBancorp's stock price, causing real economic loss of at

least $13.92 per share to investors who had purchased the Company's common stock during the Class Period.

157.    The decline in PrivateBancorp's stock price at the end of the Class Period was a direct result of the nature and extent of the Exchange Act Defendants' prior false statements and omissions being revealed to investors and the market.  The timing and magnitude of PrivateBancorp's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

158.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not "forward looking statements" when made.  To the extent there were any forward-looking statements, there was no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, PrivateBancorp and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PrivateBancorp who knew that those statements were false when made.  Moreover, to the extent that PrivateBancorp and the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of

certain "risks," those disclosures were also false and misleading since they did not disclose that PrivateBancorp and the Individual Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures false and misleading.

## IX.  PRESUMPTION OF RELIANCE

159.    At all relevant times, the market for PrivateBancorp's publicly traded securities was an efficient market for the following reasons, among others:

- PrivateBancorp common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Exchange, a highly efficient and automated market;

- As a regulated issuer, PrivateBancorp filed periodic public reports with the SEC;

- PrivateBancorp regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- PrivateBancorp was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period, including analysts at Howe, Barnes Hoefer & Arnett; J.P. Morgan; RBC Capital Markets; Suntrust; Price Target; William Blair; Oppenheimer; Datamonitor; Fox-Pitt, Kelton, Conchran, Caronia Waller; and Sterne Agee & Leach Inc.  These analysts wrote reports that were distributed to the sales force and certain customers of their respective brokerage

firms.  Each of these reports was publicly available and entered the public marketplace.

160.    As a result, the market for PrivateBancorp's publicly traded common stock promptly digested current information regarding PrivateBancorp from all publicly-available sources and reflected such information in PrivateBancorp's stock prices. Under these circumstances, all purchasers of PrivateBancorp's common stock during the Class Period suffered similar injury through their purchase of PrivateBancorp's common stock at artificially inflated prices, and a presumption of reliance applies.

## X.    **CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS**

161.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased PrivateBancorp's common stock between November 2, 2007 and October 23, 2009, inclusive, and who were damaged thereby, and on behalf of all persons who purchased or otherwise acquired PrivateBancorp's stock pursuant and/or traceable to the June 11, 2008 and May 1, 2009 Offerings.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PrivateBancorp's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of PrivateBancorp shares were traded publicly during the Class Period on NASDAQ and as of August 4, 2010,

PrivateBancorp had 71,395,369 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by PrivateBancorp and/or its transfer agent and from the Underwriter Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

164.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

165.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (i)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (ii)    Whether statements made by PrivateBancorp and the Individual Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PrivateBancorp;

    (iii)    Whether the 2008 and 2009 Offering Materials issued by PrivateBancorp contained untrue statements of material facts or omitted to state material information; and

(iv)    To what extent the members of the Class have sustained damages and the proper measure of damages.

166.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

167.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

168.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against PrivateBancorp and the Individual Defendants**

169.    Lead Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiffs and all other members of the

Class, against Defendant PrivateBancorp and the Individual Defendants (collectively, the "Section 10(b) Defendants").

170.     Throughout the Class Period, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  The Section 10(b) Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase the Company's securities at inflated prices.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

171.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

172.     The Individual Defendants acted as controlling persons of PrivateBancorp within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174.    As set forth above, PrivateBancorp and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## SECURITIES ACT CLAIMS

175.    These claims for relief do not incorporate by reference the paragraphs above, unless specifically noted by paragraph number.

176.    In connection with the Company's June 11, 2008 stock offering, Plaintiffs assert claims against Defendants Richman, Mandell, Klaeser, the Director Defendants, as defined below in ¶192 , and the Underwriter Defendants, as defined below in ¶190 (collectively, the "2008 Offering Defendants), for violations of §§ 11, 12(a)(2) and/or 15 of the Securities Act of

1933 (the "1933 Act"), on behalf of all persons and entities, other than the 2008 Offering Defendants and certain related persons and entities, who purchased or acquired the Company's securities pursuant or traceable to PrivateBancorp's S-3 Shelf Registration Statement No. 333-150767 dated May 9, 2008, Prospectus dated May 9, 2008 and Prospectus Supplement dated June 5, 2008 (collectively, the "2008 Offering Materials"), and were damaged thereby.

177.    In connection with the Company's May 14, 2009 stock offering, Plaintiffs assert claims against Defendants Richman, Mandell, Killips, and Klaeser, the 2009 Director Defendants, as defined below in ¶200, and the 2009 Underwriter Defendants, as defined below in ¶198 (collectively, the "2009 Offering Defendants"), for violations of §§ 11, 12(a)(2) and/or 15 of the Securities Act, on behalf of all persons and entities, other than Defendants and certain related persons and entities, who purchased or acquired the Company's securities pursuant or traceable to PrivateBancorp's S-3 Shelf Registration Statement No. 333-150767 dated May 9, 2008, Prospectus dated May 9, 2008 and Prospectus Supplement dated May 13, 2009 (collectively, the "2009 Offering Materials"), and were damaged thereby.

178.    Lead Plaintiffs do not allege or intend to allege any claims or assertions of fraud, and their claims in this section of the Complaint are rooted exclusively in theories of innocent and/or negligent conduct to which the strict liability provisions of the foregoing statutes apply.

## I.   JURISDICTION AND VENUE

179.    The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, 77l(a)(2), and 77o.

180.    This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

181.    Venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v; PrivateBancorp's principal executive offices are located within this District.

182.    Many of the acts and omissions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of the materially untrue and misleading Offering Materials, took place in this District.

183.    In connection with the allegations herein, the 2008 Offering Defendants and the 2009 Offering Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## II.  PARTIES – 2008 Offering

184.    Lead Plaintiffs are defined in ¶¶23-24 above, which are incorporated by reference.

185.    Plaintiffs assert the claims in connection with the 2008 Offering on behalf of members of the Class who purchased or acquired PrivateBancorp securities pursuant or traceable to the Company's public offering of 4 million shares of common stock on or about June 11, 2008 (collectively, "Plaintiffs").

186.    Defendant PrivateBancorp is defined in ¶26 above, which definition is incorporated by reference.

187.    Defendants Richman, Mandell, and Klaeser are defined in ¶¶27-29 above, which definitions are incorporated by reference.

188.    On May 9, 2008, Richman, Mandell, and Klaeser signed the Registration Statement on Form S-3 (Registrant No. 333-150767), pursuant to which the shares in the June 11, 2008 offering were issued.

189.    Richman, Mandell, and Klaeser signed the Form 10-K for the fiscal year ended

December 31, 2007; Richman and Klaeser signed the Company's Quarterly Report on Form 10-

Q for the quarter ended March 31, 2008, and Richman and/or Klaeser signed PrivateBancorp's

Current Reports on Form 8-K filed on January 28, 2008, February 29, 2008, March 19, 2008,

April 28, 2008, May 1, 2008, May 12, 2008, and May 15, 2008, each of which were incorporated

by reference in the 2008 Offering Materials.

190.    Defendants Keefe Bruyette, Robert Baird, William Blair, and SunTrust

(collectively, the "2008 Underwriter Defendants") sold and distributed shares in the 2008

Offering to the investing public, earning cumulative fees of $5.4 million.  The extent of the 2008

Underwriter Defendants' participation in the 2008 Offering was as follows:

| Underwriters | Number of Shares |
| --- | --- |
| Keefe Bruyette | 1,920,000 |
| Robert Baird | 1,160,000 |
| William Blair | 640,000 |
| SunTrust | 280,000 |

191.    The June 5, 2008 Prospectus Supplement further states that "[i]n connection with

the offering, certain of the underwriters or securities dealers may distribute prospectuses by

electronic means, such as by making the prospectus supplement in electronic format available on

their websites or by e-mail."

192.    The following Defendants are collectively referred to as the "2008 Director

Defendants":

(a)     Donald L. Beal was a director of PrivateBancorp from 1991 through December 2009. Defendant Beal signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(b)     William A. Castellano was a director of PrivateBancorp from 1991 through February 2010. Defendant Castellano signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(c)     Robert F. Coleman has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board. Defendant Coleman signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(d)     Patrick F. Daly was a director of PrivateBancorp from July 2004 through January 2010. Defendant Daly signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(e)     William A. Goldstein was a director of PrivateBancorp from April 2003 through December 2009. Defendant Goldstein signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(f)     James M. Guyette has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board. Defendant Guyette signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(g)     Richard C. Jensen was a director of PrivateBancorp from January 2000 through July 2008. Defendant Jensen signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(h)     Philip M. Kayman was a director of PrivateBancorp from 1990 through May 2010.  Defendant Kayman signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(i)     Cheryl Mayberry McKissack has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant McKissack signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(j)     William J. Podl was a director of PrivateBancorp from August 1999 through May 2009.  Defendant Podl signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(k)     Edward W. Rabin, Jr. has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant Rabin signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(l)     Collin E. Roche has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Roche signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(m)     William R. Rybak has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant Rybak signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(n)     Alejandro Silva has been a director of PrivateBancorp since August 2005 and continues to serve on the PrivateBancorp Board.  Defendant Silva signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(o)     James C. Tyree has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Tyree signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

(p)     John B. Williams was a director of PrivateBancorp from April 2004 through July 2008.  Defendant Williams signed the May 9, 2008 Shelf Registration Statement and 2007 10-K incorporated by reference into the 2008 Offering Materials.

### III.  <u>PARTIES – 2009 OFFERING</u>

193.     Plaintiffs assert the claims in connection with the 2009 Offering on behalf of members of the Class who purchased or acquired PrivateBancorp securities pursuant or traceable to the Company's public offering of over 11 million shares of common stock on or about May 14, 2009 (collectively, "Plaintiffs").

194.     Defendant PrivateBancorp is defined in ¶26 above, which is incorporated by reference.

195.     Defendants Richman, Mandell, Killips and Klaeser are defined in ¶¶27-30 above, which are incorporated by reference.

196.     On May 9, 2008, Richman, Mandell, and Klaeser signed the Registration Statement on Form S-3 (Registrant No. 333-150767), pursuant to which the shares in the May 14, 2009 offering were issued.

197.    Richman and Mandell signed the Form 10-K for the fiscal year ended December 31, 2008; Richman and Killips signed the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009, and Richman, Killips and/or Klaeser signed PrivateBancorp's Current Reports on Form 8-K filed on January 26, 2009, February 3, 2009, February 9, 2009, February 26, 2009, March 5, 2009, and April 27, 2009, each of which were incorporated by reference in the 2009 Offering Materials.

198.    Defendants J.P. Morgan, Keefe Bruyette, Robert Baird, William Blair, and SunTrust (collectively, the "2009 Underwriter Defendants") sold and distributed shares in the May 14, 2009 Offering to the investing public, earning cumulative fees of $11.2 million.  The extent of the 2009 Underwriter Defendants' participation in the 2009 Offering was as follows:

| Underwriters | Number of Shares |
| --- | --- |
| J.P. Morgan | 6,960,000 |
| Keefe Bruyette | 1,160,000 |
| Robert Baird | 1,160,000 |
| William Blair | 1,160,000 |
| SunTrust | 1,160,000 |

199.    The May 13, 2009 Prospectus Supplement further states that "[a] prospectus in electronic format may be made available on the web sites maintained by one or more underwriters, or selling group members, if any, participating in the offering."

200.    The following Defendants are collectively referred to as the "2009 Director Defendants":

(a)     Donald L. Beal was a director of PrivateBancorp from 1991 through December 2009.  Defendant Beal signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(b)     Norman R. Bobins has been a director of PrivateBancorp since July 2008 and continues to serve on the PrivateBancorp board.  Defendant Bobins signed the 2008 10-K incorporated by reference into the 2009 Offering Materials.

(c)     William A. Castellano was a director of PrivateBancorp from 1991 through February 2010.  Defendant Castellano signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(d)     Robert F. Coleman has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board.  Defendant Coleman signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(e)     Patrick F. Daly was a director of PrivateBancorp from July 2004 through January 2010.  Defendant Daly signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(f)     William A. Goldstein was a director of PrivateBancorp from April 2003 through December 2009.  Defendant Goldstein signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(g)     James M. Guyette has been a director of PrivateBancorp since 1990 and continues to serve on the PrivateBancorp Board.  Defendant Guyette signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (h)     Richard C. Jensen was a director of PrivateBancorp from January 2000 through July 2008.  Defendant Jensen signed the May 9, 2008 Shelf Registration Statement.

      (i)     Philip M. Kayman was a director of PrivateBancorp from 1990 through May 2010.  Defendant Kayman signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (j)     Cheryl Mayberry McKissack has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant McKissack signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (k)     William J. Podl was a director of PrivateBancorp from August 1999 through May 2009.  Defendant Podl signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (l)     Edward W. Rabin, Jr. has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant Rabin signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (m)     Collin E. Roche has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Roche signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

      (n)     William R. Rybak has been a director of PrivateBancorp since December 2003 and continues to serve on the PrivateBancorp Board.  Defendant Rybak signed the

May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(o)     Alejandro Silva has been a director of PrivateBancorp since August 2005 and continues to serve on the PrivateBancorp Board.  Defendant Silva signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(p)     James C. Tyree has been a director of PrivateBancorp since December 2007 and continues to serve on the PrivateBancorp Board.  Defendant Tyree signed the May 9, 2008 Shelf Registration Statement and 2008 10-K incorporated by reference into the 2009 Offering Materials.

(q)     John B. Williams was a director of PrivateBancorp from April 2004 through July 2008.  Defendant Williams signed the May 9, 2008 Shelf Registration Statement.

## IV.   SUBSTANTIVE ALLEGATIONS

201.     PrivateBancorp is a Chicago-based, financial services company that when originally formed concentrated primarily on private banking for high-net worth individuals and families with a small concentration on commercial banking.  However, beginning in November 2007, PrivateBancorp decided to aggressively grow the Company's franchise into "the bank of choice for middle market commercial and commercial real estate companies."

202.     In furtherance of this goal, on November 2, 2007, PrivateBancorp's Board of Directors (the "PrivateBancorp Board") – led by Defendant Mandell (former Chief Executive Officer ("CEO") and current Chairman) – announced its approval of a Strategic Growth and Transformation Plan (the "Growth Plan") intended to expand the Company's business through

increased lending and new business development. The key components of the Growth Plan were (1) the recruitment and retention of experienced middle market commercial bankers, and (2) a new incentive program to reward high-performing PrivateBancorp employees for increasing the price of the Company's stock.

203.     In executing the Growth Plan, PrivateBancorp aggressively poached the talent of its competitors to attract new commercial business to the Company. PrivateBancorp's primary source for recruitment was LaSalle Bank, N.A. ("LaSalle"), which in 2007 was in the process of being acquired by Bank of America Corp. In the two years that followed the announcement of the Growth Plan, the Company nearly doubled the ranks of its bankers, with over 160 LaSalle recruits joining PrivateBancorp.

204.     PrivateBancorp permitted the LaSalle bankers that it hired to write any loans they desired, without oversight, while pushing the legacy employees who had built the Company with integrity and thoughtful underwriting to the side. As a result, PrivateBancorp was no longer a business built on sound lending practices, but a Company with no meaningful underwriting standards, overtaken by reckless bankers aiming to cash in on lucrative performance based bonuses.

205.     Essentially, the LaSalle personnel hired under the Growth Plan had "carte blanche" with regard to issuing loans and that everything they wrote was approved, in contrast to the prior, careful lending practices employed by the Company.

206.     Thus, the Growth Plan precipitated a complete collapse in the Company's underwriting practices. As a result, the Company was saddled with large amounts of nonperforming loans issued under the Growth Plan.

207.     PrivateBancorp's thirst for growth caused the Company to take on hundreds of millions of dollars in high-risk, low quality loans under the Growth Plan.

208.     In addition to the failure of the Growth Plan, by early 2008 significant problems began to develop in the Company's legacy loan portfolio, including real estate development.  *See* ¶75, incorporated by reference.  The Company failed to timely write down these nonperforming loans, instead waiting almost a year, until January of 2009, before taking a huge write down of more than $100 million.

## A.     June 11, 2008 Offering

209.     On June 11, 2008, PrivateBancorp conducted a public offering of 4 million shares of common stock.  The shares were issued pursuant to the 2008 Offering Materials, and were underwritten by the 2008 Underwriting Defendants.  The shares were traded on the NASDAQ, with a daily average volume over the Class Period of  436,313 shares.

210.     The January 28, 2008 8-K that was incorporated by reference in the 2008 Offering Materials contained the following materially false and misleading statements:

> As anticipated, reported quarterly financial results were down considerably *as we aggressively implemented our Strategic Growth Plan.*  We announced the Plan in early November 2007, which sets forth our goal of recruiting experienced middle-market commercial bankers in order to substantially expand our client base and achieve significant balance sheet growth," commented Ralph B. Mandell, Chairman of PrivateBancorp, Inc., "*We have made significant progress towards implementing this Plan*, including the hiring of Larry Richman as our new President and CEO as well as a substantial number of senior commercial bankers and other new employees.  In fact, we increased the number of Managing Directors at the Company by 33 percent in the fourth quarter alone.  The 12 percent loan growth experienced in the fourth quarter further validates the market opportunity," continued Mr. Mandell.

> * * *

> "I'm excited about the strong and positive reaction of the marketplace to the Company's growth initiatives," said Larry Richman, President and CEO. "*Despite a very challenging market, we've been growing our client base quickly, as evidenced by the $451.7 million increase in our loan portfolio during the quarter.*

> *I'm further encouraged by the strength of our loan pipeline at the end of the quarter.*

Emphasis added.

211.     This statement was false and misleading because the increase in the loan portfolio was due to risky lending under the Growth Plan, resulting in a rapidly increasing number of bad loans.

212.     The 2007 10-K that was incorporated by reference in the 2008 Offering Materials contained the following materially false and misleading statements:

> Investing in Infrastructure and Integration. As we continue to implement our Strategic Growth Plan, we are focused on building infrastructure to support our growth *as well as integrating our new employees into our organization*. Our significant investment in infrastructure includes *additional risk management*, operations, legal and compliance resources, in addition to securing additional physical space for not only new banking offices but corporate functions as well. Our integration activities include ensuring we are developing internally or through outsourced private label providers the products and services our clients need and realigning our internal resources and management structure along business lines.
>
> <p style="text-align:center">* * *</p>
>
> Our Strategic Growth Plan emphasizes the development of client relationships with larger private and public companies, the making of larger credits and a greater rate of balance sheet growth than the Company has experienced in the past. This represents a substantial shift in our strategic direction, and has caused us to change the way we manage our business and to manage, going forward, around lines-of-business. *Notwithstanding this shift, we continue our style of doing business* using "The PrivateBank approach".
>
> <p style="text-align:center">* * *</p>
>
> Lending Activities
>
> We provide a full range of commercial, real estate and personal lending products and services to our clients. We have adopted loan policies that contain general lending guidelines consistent with regulatory requirements and are subject to review and revision by the Board of Directors of each of the banks as well as our Board of Directors. We extend credit consistent with these Comprehensive loan policies.

The goal of our lending program is to meet the credit needs of our diverse client base *while using sound credit principles to protect our asset quality*. Our business and credit strategy is relationship-driven and we strive to provide a reliable source of credit, a variety of lending alternatives, and sound financial advice to our clients. *When extending credit, our decisions are based upon our client's ability to repay the loan from non-speculative sources. The quality and integrity of the borrower is crucial in the loan approval process. We monitor the performance of our loan portfolio through regular contact with our clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists.*

\* \* \*

Commercial Loans. Our commercial loan portfolio is comprised of lines of credit to businesses for working capital needs, term loans for equipment and expansion, letters of credit and owner-occupied commercial real estate loans. We classify owner-occupied commercial real estate loans as commercial loans because we primarily look to the business for repayment. Unsecured loans are made to businesses when a guarantor, as a secondary source of repayment, has a significant ability to repay and a significant interest in the business entity. Commercial loans can contain risk factors unique to the business of each borrower. In order to mitigate these risks, *we seek to gain an understanding of the business of each borrower, place appropriate value on collateral taken and structure the loan properly to make sure that collateral values are maintained while loans are committed. Appropriate documentation of commercial loans is also important to protect our interests.*

\* \* \*

Our commercial lending underwriting process includes an evaluation of the borrower's financial statements and projections with an emphasis on operating results, cash flow, liquidity and balance sheet proportions *as well as the collateral to determine the level of creditworthiness of the borrower*. Generally, these loans are secured by a first priority security interest in all the assets of the borrower and also include the support of a personal guarantee of one or more of the principals of the borrower.

\* \* \*

Provision for Loan Losses

We provide for an adequate allowance for loan losses that are probable and reasonably estimable in the portfolio. *The provision for loan losses reflects management's latest assessment of the inherent losses in the loan portfolio*. Our allowance for probable loan losses is reassessed monthly to determine the appropriate level of the reserve. Our analysis is influenced by the following factors: *assessment of the credit risk of the loans in the portfolio*, delinquent loans, impaired loans, evaluation of current economic conditions in the market

area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience. A discussion of the allowance for loan losses and the factors on which provisions are based begins on page 50.

\* \* \*

Allowance for Loan Losses

*Loan quality is monitored by management* and reviewed by the committees of the Board of Directors at our regular board meetings. The amount of additions to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, *including assessment of the credit risk of the loans in the portfolio*, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

*We maintain an allowance for loan losses sufficient to absorb credit losses inherent in our loan portfolio*. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is supported by available and relevant information.

The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio and credit undertakings that are not specifically identified. Management's application of the methodology for determining the allowance for loan losses resulted in an allowance for loan losses of $48.9 million at December 31, 2007 compared with $38.1 million at December 31, 2006. The increase in the allowance for loan losses from December 31, 2006 reflects management's judgment about the comprehensive risk of lending in our various markets, the addition of new lending personnel as well as strong loan growth from all offices in 2007. *We believe that the allowance for loan losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio*.

\* \* \*

Other than those loans reflected in the table above, we had no significant loans for which the terms had been renegotiated or restructured, or for which there were serious doubts as to the ability of the borrower to comply with repayment terms.

Potential Problem Loans. In addition to those loans reflected in the table above, we may identify some loans through our problem loan identification process which exhibit a higher than normal credit risk. Loans in this category include

loans with characteristics such as past maturity more than 90 days, those that have recent adverse operating cash flow or balance sheet trends, or loans that have general risk characteristics that management believes might jeopardize the future timely collection of principal and interest payments. The balance in this category at any reporting period can fluctuate based on the timing of cash collections, renegotiations and renewals. *At December 31, 2007, there were no potential problem loans that are not included above as non-accrual or past due.*

\* \* \*

Evaluation of Disclosure Controls and Procedures

As of the end of the period covered by this report, we carried out an evaluation, under the supervision, and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures as contemplated by Exchange Act Rule 13a-15. Based upon, and as of the date of that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective, in all material respects, in timely alerting them to material information relating to the Company (and its consolidated subsidiaries) required to be included in the periodic reports the Company is required to file and submit to the SEC under the Exchange Act.

Emphasis added.

213.    This statement was false and misleading because the Company's loan loss reserves were inadequate to cover the poor credit quality in the high-risk loans generated under the Growth Plan by former LaSalle bankers, which were made to unqualified borrowers.  The deteriorating credit quality problems in the Company's legacy loan portfolio were also not disclosed.

214.    The 10-Q for the first quarter 2008 stated:

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio.* The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio. Our allowance for loan losses is assessed monthly to determine

the appropriate level of the allowance. *The amount of the allowance for loan losses is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio,* delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, and loan growth. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate. Loans are charged-off when deemed to be uncollectable by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio.*

\* \* \*

Provision for Loan Losses

We provide for an adequate allowance for loan losses that are probable and reasonably estimable in the portfolio. The provision for loan losses reflects management's assessment of the inherent losses in the loan portfolio. Our allowance for probable loan losses is reassessed monthly to determine the appropriate level of the reserve. Our analysis is influenced by the following factors: *assessment of the credit risk of the loans in the portfolio*, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience and loan growth. A discussion of the allowance for loan losses and the factors on which provisions are based begins on page 36.

\* \* \*

Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the committees of the Board of Directors at our board meetings. *The amount of additions to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages, historical loss experience, and loan growth*. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

> *We maintain an allowance for loan losses sufficient to absorb credit losses inherent in our loan portfolio. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is supported by available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio.*

Emphasis added.

215.     This statement is false and misleading because the Securities Act Defendants failed to maintain an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers.

216.     The April 28, 2008 8-K reported the Company's first quarter 2008 results and stated:

> *Total loans increased 23%* to $5.1 billion at March 31, 2008 from $4.2 billion at December 31, 2007. *The loan category that grew most substantially during the quarter was commercial loans (including both commercial and industrial and owner-occupied commercial real estate loans),* which increased to $1.8 billion or 36% of our total loans from $1.3 billion or 32% of total loans at year-end 2007. During the quarter, commercial real estate loans grew to $2.0 billion or 39% of our total loans from $1.6 billion or 38% of total loans at year-end 2007.

Emphasis added.

217.     This statement was false and misleading because it failed to disclose to the public that commercial loan growth was coming at the expense of risky underwriting practices and a much higher volume of failing loans; and also failed to disclose the deteriorating credit quality problems in their legacy loan portfolio.

218.     The truth concerning reckless lending under the Growth Plan was partially revealed on January 8, 2009, when the Wall Street Journal reported that out of the top 15 commercial mortgage-backed securities originators, LaSalle held the second highest delinquency rate for loans of 60 days or more. PrivateBancorp had recruited and retained some 140 bankers

from LaSalle who continued to write these irresponsible, high-risk loans at PrivateBancorp under the Company's Growth Plan.  PrivateBancorp's stock price dropped from $28.14 per share to $25.62 per share or approximately 9% on the news in unusually heavy trading.  As a result of the Company's repeated assurances however, analysts rebuffed the notion that the LaSalle bankers hired under the Growth Plan were originating high-risk loans.

219.     On January 26, 2009, another partial disclosure of the truth occurred when PrivateBancorp shocked investors by announcing a net loss of $62 million for the fourth quarter 2008 and a net loss of $91.5 million for the year ended December 31, 2008, compared to a net loss of $15.1 million for the fourth quarter 2007 and net income of $11.8 million for the year ended December 31, 2007.  The Company's reported losses of nearly $2 per share vastly exceeded analysts' estimated losses of $0.14 per share, and were due largely to PrivateBancorp's sudden write-off of $108.8 million worth of nonperforming loans.  In response to the January 26 disclosure, PrivateBancorp stock plummeted approximately 22%, dropping from $19.70 per share to $15.32 in unusually heavy trading.   In making that disclosure, the Company stated that the write downs resulted from a "proactive" portfolio review conducted at the end of 2008. Because they had been assured that the problem loans and the need for a write down was discovered only after the 2008 Offering, investors did not learn of the falsity of the 2008 Offering Materials at that time.

**B.**     **May 14, 2009 Offering**

220.     On May 14, 2009, PrivateBancorp conducted a second public offering of 11.87 million shares of Company stock at $19.25 per share (the 2009 Offering), raising $217 million. The shares were issued pursuant to the 2009 Offering Materials, and were underwritten by the 2009 Underwriting Defendants.

221.    The 2008 10-K that was incorporated by reference in the 2009 Offering Materials contained the following materially false and misleading statements:

The PrivateBank Approach

Our Plan emphasizes the development of new and existing client relationships with larger privately held and public companies, the originating of larger credits and a greater rate of balance sheet growth than we had experienced prior to 2008. This Plan, which we embarked on in late 2007, represents a substantial shift in our strategic direction and has caused us to change the way we manage our business and to manage, going forward, around lines-of-business. *Notwithstanding this shift, we continue our style of doing business using "The PrivateBank approach".* We believe the organization of our Company around lines-of-business enhances "The PrivateBank approach" with deeper banking service capabilities and relationships to serve clients in our target markets.

\* \* \*

*The fundamentals of "The PrivateBank approach" have remained consistent since our founding and since launching our Plan.* We have enhanced our business model to drive a new pattern of strategic growth, relying on "The PrivateBank approach", including an emphasis on: (1) middle market client relationships, (2) larger and varied credits, (3) an expanded product suite of cash management and other fee generating services, and (4) *enhancements to risk management infrastructure*.

\* \* \*

Lending Activities

We provide a full range of commercial, real estate and personal lending products and services to our clients. *We have adopted loan policies that contain general lending guidelines consistent with regulatory requirements and are subject to review and revision by our credit policy committee and shared with the boards of directors of each of the banks and the holding company. We extend credit consistent with these comprehensive loan policies and update them on regular basis.*

The goal of our lending program is to meet the credit needs of our diverse client base *while using sound credit principles to protect our asset quality.* Our business and credit strategy is relationship-driven and we strive to provide a reliable source of credit, a variety of lending alternatives, and sound financial advice to our clients. When extending credit, *our decisions are based upon our client's ability to repay the loan, as well as the value of any collateral securing the loan. The quality and integrity of the borrower is crucial in the loan approval process.* We monitor the performance of our loan portfolio through regular contact with our

clients, continuous portfolio review and careful monitoring of delinquency reports and internal watch lists.

\* \* \*

To address the changes in the complexity and complexion of our credit business going forward, management has developed a bi-weekly loan committee review process so it can focus on time-sensitive approvals of credits that respond to our clients' needs. *Our loan committee of the Board of Directors has heightened its focus on credit risk management, loan policies and other issues related to supervising the management of a larger more complicated loan portfolio.* We believe our new approach to credit management will allow us to deliver our traditional "PrivateBank approach" of providing credit to our clients—which involves highly responsive, customized solutions—while managing our credit risks at an enterprise-level with appropriate interaction between our Board and management.

\* \* \*

Enterprise Risk Management

In September 2008, we enhanced and further implemented a robust enterprise risk management ("ERM") process, as we understood the need for a comprehensive and cohesive view of risk throughout the organization. In alignment with the further development of our ERM process, the supporting governance was also strengthened. *A Management Risk Committee chaired by the Chief Risk Officer, and involving members of key senior management leadership positions, was formed to review and identify existing and emerging risks of the Company.* At a board level, a Business Risk Committee was formed to provide independent oversight of management's execution of ERM and related actions. Our development of ERM practices, which encompass all elements of our business, provides a sound foundation for identifying and managing risk(s). ERM applies to all components of our operations. *It provides for a vigorous departmental vetting of risks at our regular ERM committee meetings that result in action plans to mitigate and escalate risk from throughout the company.* We aim to leverage the expertise and experience of our entire team, not just those in the Risk Management department. Our ERM philosophy and practice provides us with an effective system to manage risk and enables us to grow our business in a sustainable way.

\* \* \*

As a result of rapid deterioration in economic conditions, during the fourth quarter 2008 we undertook a comprehensive review of all underperforming assets with a particular emphasis on our residential development loan portfolio. This resulted in a substantial charge at year end in recognition that residential development is a very weak sector in several of our markets. *Notably, none of the charges were*

*related to loans originated as part of the Plan, but were from the legacy loan portfolio*. We will continue to proactively monitor our loan portfolio during 2009, and despite the challenging environment, we continue to see great opportunities to expand our franchise and grow our client base.

* * *

We seek to reduce our credit risk through disciplined credit underwriting at the individual borrower level combined with the establishment and maintenance of loan portfolio sub-limits by loan type, collateral and selected industries to promote loan portfolio diversification and active credit administration. *We do not engage in sub-prime commercial or residential lending* and do not securitize our loans for sale.

* * *

We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio and credit undertakings that are not specifically identified. *Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience*. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

Management adjusts the allowance for loan losses by recording a provision for loan losses in an amount sufficient to maintain the allowance at the level determined appropriate. Loans are charged-off when deemed to be uncollectible by management. *We believe that the allowance for loan losses is adequate to provide for estimated probable credit losses inherent in our loan portfolio*. The allowance for loan losses as a percentage of total loans was 1.40% as of December 31, 2008, compared to 1.17% at December 31, 2007.

* * *

It is our policy to review each prospective credit in order to determine the appropriateness and, when required, the adequacy of security or collateral to obtain prior to making a loan.

Emphasis added.

222.    This statement was false and misleading because (1) it did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; and (2) it failed to disclose the high-risk loans originated under the Growth Plan.

223.    The Company's 10-Q for the first quarter of 2009 that was incorporated by reference in the 2009 Offering Materials contained the following materially false and misleading statements:

Allowance for Loan Losses

*We maintain an allowance for loan losses at a level management believes is sufficient to absorb credit losses inherent in our loan portfolio*. The allowance for loan losses represents our estimate of probable losses in the portfolio at each balance sheet date and is based on a review of available and relevant information. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships as well as probable losses inherent in our loan portfolio and credit undertakings that are not specifically identified. *Our allowance for loan losses is assessed monthly to determine the appropriate level of the allowance. The amount of the allowance for loan losses is determined based on a variety of factors, including, among other factors, assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area*, actual charge-offs and recoveries during the period, industry loss averages and historical loss experience. The unallocated portion of the reserve involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

* * *

Allowance for Loan Losses

Loan quality is monitored by management and reviewed by the Loan Committee of the Board of Directors. The amount of addition to the allowance for loan losses, which is charged to earnings through the provision for loan losses, is determined based on a variety of factors, including, among other factors, *assessment of the credit risk of the loans in the portfolio, delinquent loans, impaired loans, evaluation of current economic conditions in the market area, actual charge-offs and recoveries during the period, industry loss averages and*

*historical loss experience*. The determination of the level of the allowance also involves the exercise of judgment by management and reflects various considerations, including management's view that the reserve should have a margin that recognizes the imprecision inherent in the process of estimating credit losses.

\* \* \*

We increased our allowance for loan losses to $127.0 million as of March 31, 2009, up $14.3 million from $112.7 million at December 31, 2008. The ratio of the allowance for loan losses to total loans was 1.50% as of March 31, 2009, up from 1.40% as of December 31, 2008. *Given the comprehensive review of all underperforming and nonperforming loans completed at the end of the first quarter and the adequacy of loss factors used in our analysis, we believe that the allowance for loan losses is adequate to provide for probable and reasonably estimable credit losses inherent in our loan portfolio as of March 31, 2009.* The loan loss allowance as a percentage of nonperforming loans was 78% at March 31, 2009 compared to 85% at December 31, 2008. Total loans charged off, net of recoveries, in first quarter 2009 were 0.17% of average loans compared to 5.49% at December 31, 2008.

Emphasis added.

224.    This statement was false and misleading because (1) it did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio, which was based on high-risk loans to unqualified borrowers; and (2) it failed to disclose the high-risk loans originated under the Growth Plan.

## C.    The Whole Truth is Revealed

225.    On October 26, 2009, PrivateBancorp shocked investors by announcing a third quarter loss of $31.2 million, or $0.68 per share, when the market had expected a per-share profit for the quarter. Despite having written-off more than $100 million in bad loans in January 2009, the Company revealed that it held almost $400 million in nonperforming loans as of the third quarter 2009, compared to just $106.5 million of nonperforming loans in the third quarter of 2008. PrivateBancorp further admitted that its significantly elevated levels of nonperforming loans were originated under the Growth Plan. As a result, PrivateBancorp increased its

provisions for bad loans to $90 million, compared to just $30 million in the third quarter of 2008.

In response to this final disclosure of the truth, PrivateBancorp stock plummeted 37%, dropping

from $19.00 per share to $11.98. Shortly thereafter, the Company replaced its Chief Operating

Officer.

226. Members of the Class purchased PrivateBancorp common stock pursuant or

traceable to the June 11, 2008 and May 14, 2009 Offering Materials, which were materially

untrue and/or omitted to state those material facts necessary to make the statements therein not

misleading, and they were damaged thereby.

## V. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**For Violations Of § 11 Of The Securities Act**
**Against The 2008 Offering Defendants**

227. Plaintiffs repeat and reallege ¶¶176-226 as if fully set forth herein.

228. This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k,

against the 2008 Offering Defendants. Plaintiffs do not intend to allege, and have not alleged,

fraud on the part of any 2008 Offering Defendant.

229. The 2008 Offering Materials were inaccurate and misleading, contained untrue

statements of material facts regarding the Company's legacy loan portfolio, Growth Plan and

underwriting practices, omitted to state other facts necessary to make the statements made not

misleading, and concealed and failed adequately to disclose material facts as described above.

230. The 2008 Offering Defendants were responsible for the contents and

dissemination of the 2008 Offering Materials issued in connection with the June 11, 2008

offering of common stock described above, and caused them to be filed with the SEC. With the

exception of the 2008 Underwriter Defendants, each of the 2008 Offering Defendants signed the

Registration Statement pursuant to which the stock for the June 11, 2008 offering was issued and/or the 2007 10-K that was incorporated by reference into the 2008 Offering Materials.

231.    By incorporating the 2007 10-K into the 2008 Offering Materials, the 2008 Offering Defendants assumed the duty to provide all material information about PrivateBancorp's legacy loan portfolio, Growth Plan and underwriting practices.

232.    As the issuer of the common stock in the June 11, 2008 public offering, PrivateBancorp is liable to the Plaintiffs, who acquired the common stock pursuant to the false and misleading 2008 Offering Materials, under § 11 of the Securities Act.

233.    Plaintiffs acquired the common stock described above pursuant to the 2008 Offering Materials without knowledge of the truth of any misrepresented fact or omission.

234.    None of the 2008 Offering Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2008 Offering Materials were true and without omissions of any material facts and were not misleading.  Each of the 2008 Offering Defendants named in this Count acted negligently in issuing the 2008 Offering Materials.

235.    The 2008 Offering Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the 2008 Offering Materials, which misrepresented or failed to disclose, inter alia, the facts set forth above.  By reasons of the conduct herein alleged, each 2008 Offering Defendant violated § 11 of the Securities Act.

236.    At the times they acquired the common stock described above, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

237.     This Count has been brought within one year after the discovery of the untrue

statements or omissions, or after such discovery could have been made by the exercise of

reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT IV

**For Violations Of § 12(a)(2) Of The Securities Act
Against Defendants PrivateBancorp, Richman, Mandell, Klaeser,
And The 2008 Underwriter Defendants**

238.     Plaintiffs repeat and reallege ¶¶176-237 as if fully set forth herein.

239.     This Count is brought by Plaintiffs pursuant to § 12(a)(2) of the Securities Act, 15

U.S.C. § 77l, on behalf of themselves and all other members of the Class who acquired the

common stock in the June 11, 2008 public offering described above, pursuant to the 2008

Offering Materials, against the Defendants named in this Count (the "§ 12 2008 Offering

Defendants"). This claim does not sound in fraud and should be read to exclude any reference in

the preceding paragraphs to recklessness, fraud, or intentional acts by the § 12 2008 Offering

Defendants.

240.     The § 12 2008 Offering Defendants were sellers and offerors of the common

stock offered pursuant to the 2008 Offering Materials.

241.     The 2008 Offering Materials contained untrue statements of material facts,

omitted to state other facts necessary to make the statements made not misleading, and concealed

but failed to disclose material facts. The § 12 2008 Offering Defendants' actions of solicitation

included participating in the preparation of the false and misleading Offering Materials.

242.     The § 12 2008 Offering Defendants  were obligated to make a reasonable and

diligent investigation of the statements contained in the 2008 Offering Materials, to ensure that

such statements were true and that there was no omission to state a material fact required to be

stated in order to make the statements contained therein not misleading. The § 12 2008 Offering

Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the 2008 Offering Materials as set forth above.

243.    Plaintiffs acquired the common stock from the June 11, 2008 offering pursuant to the defective 2008 Offering Materials.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2008 Offering Materials.

244.    By reason of the conduct alleged herein, the § 12 2008 Offering Defendants violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs are entitled to damages pursuant to § 12(a)(2).

245.    This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT V

### For Violations Of § 15 Of The Securities Act
### Against Defendants Richman, Mandell, And Klaeser

246.    Plaintiffs repeat and reallege ¶¶176-245 as if fully set forth herein.

247.    This Count is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against Defendants Richman, Mandell, and Klaeser.

248.    Defendants Richman, Mandell, and Klaeser exercised direct control over PrivateBancorp, acting as day-to-day managers of PrivateBancorp, and by virtue of their positions as Officers and/or Directors of PrivateBancorp.  As a result of Richman's, Mandell's, and Klaeser's actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the 2008 Offering Materials, Richman, Mandell, and Klaeser had the power, and exercised the same, to cause PrivateBancorp

to engage in the violations of law complained of herein and were able to and did control the contents of the 2008 Offering Materials.

249.     As a result of their control over PrivateBancorp, Defendants  Richman, Mandell, and Klaeser are jointly and severally liable with and to the same extent as PrivateBancorp to Plaintiffs.

## COUNT VI

### For Violations Of § 11 Of The Securities Act
### Against The 2009 Offering Defendants

250.     Plaintiffs repeat and reallege ¶¶176-249 as if fully set forth herein.

251.     This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons or entities who acquired PrivateBancorp common stock pursuant to, or traceable to, the May 9, 2008 Registration Statement.  Plaintiffs bring this claim against the 2009 Offering Defendants.  Plaintiffs do not intend to allege, and have not alleged, fraud on the part of any 2009 Offering Defendant.

252.     The 2009 Offering Materials were inaccurate and misleading, contained untrue statements of material facts regarding the Company's Growth Plan, underwriting standards, and nonperforming loans, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

253.     The 2009 Offering Defendants were responsible for the contents and dissemination of the 2009 Offering Materials issued in connection with the May 14, 2009 offering of common stock described above, and caused them to be filed with the SEC.  With the exception of the 2009 Underwriter Defendants, each of the 2009 Offering Defendants signed the Registration Statement pursuant to which the stock for the May 14, 2009 offering was issued and/or the 2008 10-K that was incorporated by reference into the 2009 Offering Materials.

254. By incorporating the 2008 10-K into the 2009 Offering Materials, the 2009 Offering Defendants assumed the duty to provide all material information about PrivateBancorp's legacy loan portfolio, Growth Plan and underwriting practices.

255. As the issuer of the common stock in the May 14, 2009 public offering, PrivateBancorp is liable to the Plaintiffs, who acquired the common stock pursuant to the false and misleading 2009 Offering Materials, under § 11 of the Securities Act.

256. Plaintiffs acquired the common stock described above pursuant to the 2009 Offering Materials without knowledge of the truth of any misrepresented fact or omission.

257. None of the 2009 Offering Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2009 Offering Materials were true and without omissions of any material facts and were not misleading. Each of the 2009 Offering Defendants named in this Count acted negligently in issuing the 2009 Offering Materials.

258. The 2009 Offering Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the 2009 Offering Materials, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each 2009 Offering Defendant violated § 11 of the Securities Act.

259. At the times they acquired the common stock described above, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

260.     This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

261.     By reason of the conduct alleged herein, each of the 2009 Offering Defendants violated § 11 of the Securities Act.  As a direct and proximate result of the 2009 Offering Defendants' conduct, members of the Class have sustained substantial damage in connection with the purchase of the common stock issued pursuant to or traceable to the 2009 Offering Materials.

## COUNT VII

**For Violations Of § 12(a)(2) Of The Securities Act
Against Richman, Mandell, Klaeser, Killips,
PrivateBancorp and the 2009 Underwriter Defendants**

262.     Plaintiffs repeat and reallege ¶¶176-261 as if fully set forth herein.

263.     This Count is brought pursuant to § 12(a)(2) of the Securities Act on behalf of all purchasers of PrivateBancorp common stock pursuant to the 2009 Offering Materials against the Defendants named in this Count (the "§ 12 2009 Offering Defendants").  This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the § 12 2009 Offering Defendants.

264.     Each of the Defendants named in this Count was an offeror or seller of a security, specifically PrivateBancorp common stock sold in the May 14, 2009 Offering.

265.     The 2009 Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed but failed to disclose material facts.  The § 12 2009 Offering Defendants' actions of solicitation included participating in the preparation of the false and misleading 2009 Offering Materials.

266.     The § 12 2009 Offering Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the 2009 Offering Materials, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These § 12 2009 Offering Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the 2009 Offering Materials as set forth above.

267.     Members of the Class acquired the common stock pursuant to the defective 2009 Offering Materials.  Members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2009 Offering Materials.

268.     By reason of the conduct alleged herein, the § 12 2009 Offering Defendants violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act.  Accordingly, members of the Class are entitled to damages pursuant to § 12(a)(2).

269.     This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT VIII

### For Violations Of § 15 Of The Securities Act
### Against Richman, Mandell, Klaeser, and Killips

270.     Plaintiffs repeat and reallege ¶¶176-269 as if fully set forth herein.

271.     This Count is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against Defendants Richman, Mandell, Klaeser, and Killips.

272.     Defendants Richman, Mandell, Klaeser, and Killips exercised direct control over PrivateBancorp acting as day-to-day managers of PrivateBancorp, and by virtue of their

positions as Officers and/or Directors of PrivateBancorp. As a result of Richman's, Mandell's, Klaeser's, and Killips's actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the 2009 Offering materials, Richman, Mandell, Klaeser, and Killips had the power, and exercised the same, to cause PrivateBancorp to engage in the violations of law complained of herein and were able to and did control the contents of the 2009 Offering Materials.

273.     As a result of their control over PrivateBancorp, Defendants Richman, Mandell, Klaeser, and Killips are jointly and severally liable with and to the same extent as PrivateBancorp to Plaintiffs and the Class.

### PRAYER FOR RELIEF – Applicable To All Claims

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(i)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(ii)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(iv)    As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a recessionary measure of damages; and

(v)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND – Applicable To All Claims

Plaintiffs hereby demand a trial by jury.

DATED:      February 18, 2011

<div style="margin-left: 40%;">

**LABATON SUCHAROW LLP**

_____/s/ Jonathan Gardner_____
Jonathan Gardner
Christopher J. Keller
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com

Gerald H. Silk
Michael D. Blatchley
Laurence J. Hasson
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Avi Josefson
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
2835 N. Sheffield Avenue, Suite 409
Chicago, Illinois 60657
Telephone: (773) 883-5382
Facsimile: (212) 554-1444

*Co-Lead Counsel for Lead Plaintiffs and the
Class*

Michael Yarnoff
John Gross
BARROWAY TOPAZ KESSLER MELTZER &
CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

</div>