**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF NEW ORLEANS EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | Case No. 10 CV 6826 |
| | ) | |
| Plaintiff, | ) | Honorable William T. Hart |
| | ) | |
| v. | ) | **ECF CASE** |
| | ) | |
| PRIVATEBANCORP, INC., LARRY D. RICHMAN, DENNIS L. KLAESER, KEVIN M. KILLIPS, RALPH B. MANDELL, KEVIN VAN SOLKEMA, DONALD L. BEAL, WILLIAM A. CASTELLANO, ROBERT F. COLEMAN, PATRICK F. DALY, WILLIAM A. GOLDSTEIN, JAMES M. GUYETTE, RICHARD C. JENSEN, PHILIP M. KAYMAN, CHERYL MAYBERRY MCKISSACK, WILLIAM J. PODL, EDWARD W. RABIN, COLLIN E. ROCHE, WILLIAM R. RYBAK, ALEJANDRO SILVA, JAMES C. TYREE, JOHN B. WILLIAMS, NORMAN R. BOBINS, KEEFE, BRUYETTE & WOODS, INC., ROBERT W. BAIRD & CO. INCORPORATED, WILLIAM BLAIR & COMPANY, L.L.C., SUNTRUST ROBINSON HUMPHREY, INC., J.P. MORGAN SECURITIES INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT**
**OF DEFENDANTS' JOINT MOTION TO DISMISS**
**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 5

I.     PLAINTIFFS FAIL ADEQUATELY TO PLEAD A VIOLATION OF THE
EXCHANGE ACT........................................................................................... 5

     A.     The PSLRA's Heightened Pleading Requirements. ............................... 5

     B.     The Complaint Fails to State a Claim with Respect to the Purported Failure to
Write-Down Certain "Legacy Loans" Prior to January 2009. ................ 6

          1.     The Complaint Does Not Adequately Plead Any Misstatements
Regarding the Legacy Loans. ...................................................... 7

          2.     The Complaint's Allegations Do Not Give Rise to a Strong Inference
That the 10(b) Defendants Acted with Scienter in Their Statements about
and Treatment of the Legacy Loans......................................... 13

     C.     The Complaint Fails to State a Claim with Respect to Statements About the
Status of Growth Plan Loans. ............................................................. 16

     D.     The Complaint Fails Adequately to State a Claim of Misrepresentations Arising
from an Alleged Deliberate Strategy of Generating High-Risk, Low Quality
Loans. ................................................................................................. 20

     E.     The Complaint's Remaining Allegations of False Statements Are Insufficient....28

     F.     The Complaint's Allegations as to Individual Officer Defendants Are
Insufficient, and Its Group Pleading Approach Is Impermissible......................... 31

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR A VIOLATION OF EITHER
SECTION 11 OR 12 OF THE SECURITIES ACT......................................... 35

     A.     The Claims Regarding the 2008 Offering Are Insufficient. .................. 36

     B.     The Claims Regarding the 2009 Offering Are Insufficient. .................. 40

CONCLUSION....................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ................................................32

*Adam v. Silicon Valley Bancshares*,
  1994 WL 619300 (N.D. Cal. Feb. 8, 1994) ..........................................18

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006) ...............................................18

*Anderson v. Simon*,
  217 F.3d 472 (7th Cir. 2000) .......................................................1

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) ...............................................11, 25, 32

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990) ....................................................9, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................36, 39, 40

*Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)........................................................22

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009)................................................23

*Christidis v. First Pennsylvania Mortg. Tr.*,
  717 F.2d 96 (3d Cir. 1983).........................................................38

*City of Livonia Employees' Ret. Sys. v. The Boeing Co.*,
  2010 WL 2169491 (N.D. Ill. May 26, 2010) .....................................15, 31

*Coates v. Heartland Wireless Commc'ns, Inc.*,
  26 F. Supp. 2d 910 (N.D. Tex. 1998) ..............................................27

*Davis v. SPSS, Inc.*,
  431 F. Supp. 2d 823 (N.D. Ill. 2006) ..........................................27, 34

*DeMaria v. Andersen*,
  153 F. Supp. 2d 300 (S.D.N.Y. 2001)...............................................37

*DiLeo v. Ernst & Young*
  901 F.2d 624 (7th Cir. 1990) .................................................. passim

**Page(s)**

CASES

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................................27

*Eckstein v. Balcor Film Investors*,
   58 F.3d 1162 (7th Cir. 1995) ...............................................................................35

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) ...............................................................................15

*Fait v. Regions Fin. Corp.*,
   712 F. Supp. 2d 117 (S.D.N.Y. 2010)..............................................................35, 38

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........................................................25

*Freidus v. ING Groep .N.V.*,
   --- F. Supp. 2d ----, 2010 WL 3554097 (S.D.N.Y. Sept. 14, 2010)........................37

*Garnett v. Millennium Med. Mgmt. Res.*,
   2010 U.S. Dist. LEXIS 131035 (N.D. Ill. Dec. 9, 2010) ........................................39

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) .............................................................................5, 27

*Higginbotham v. Baxter Int'l, Inc.*,
   2005 U.S. Dist. LEXIS 12006 (N.D. Ill. May 25, 2005) .........................5, 17, 32, 35

*Hill v. The Tribune Co.*,
   2006 U.S. Dist. LEXIS 71244 (N.D. Ill. Sept. 29, 2006) ..........................................5

*Hinerfeld v. United Auto Group*,
   1998 WL 397852 (S.D.N.Y. July 15, 1998) ..........................................................38

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
   936 F.2d 759 (2d Cir. 1991)................................................................................37

*In re Allscripts, Inc. Sec. Lit.*,
   2001 WL 743411 (N.D. Ill. June 29, 2001) .....................................................23, 27

*In re Bally Total Fitness Sec. Litig.*,
   2006 U.S. Dist. LEXIS 93986 (N.D. Ill. July 12, 2006).........................................32

*In re Barclays Bank PLC Sec. Litig.*,
   2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) .........................................15, 35, 37, 38

iii

**Page(s)**

CASES

*In re Career Educ. Corp. Sec. Litig.,*
    2007 WL 1029092 (N.D. Ill. March 29, 2007)...................................................................... 18

*In re CIT Group, Inc. Sec. Litig.,*
    349 F. Supp. 2d 685 (S.D.N.Y.2004)...................................................................................38

*In re Donald Trump Casino Sec. Litig.,*
    7 F.3d 357 (3d Cir. 1993)....................................................................................................30

*In re Downey Sec. Litig.,*
    2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009)....................................................18

*In re E.spire Commc'ns, Inc. Sec. Litig.,*
    127 F. Supp. 2d 734 (D. Md. 2001) ...................................................................................19

*In re FBR Inc. Sec. Litig.,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................................30

*In re First Chicago Corp. Sec. Litig.,*
    769 F. Supp. 1444 (N.D. Ill. 1991) ..............................................................................20, 23

*In re Guidant Corp. Sec. Litig.,*
    536 F. Supp. 2d 913 (S.D. Ind. 2008) ...............................................................................32

*In re Huntington Bancshares Inc. Sec. Litig.,*
    674 F. Supp. 2d 951 (S.D. Ohio 2009) ..............................................................................22

*In re Newell Rubbermaid Sec. Litig.,*
    2000 U.S. Dist. LEXIS 15190 (N.D. Ill. Oct. 4, 2000)........................................................36

*In re United Am. Healthcare Corp. Sec. Litig.,*
    2007 WL 313491 (E.D. Mich. Jan. 30, 2007).....................................................................30

*In re XM Satellite Radio Holdings Sec. Litig.,*
    479 F. Supp. 2d 165 (D.D.C. 2007) ..................................................................................30

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.,*
    2010 U.S. Dist. LEXIS 30693 (E.D. Wis. Mar. 30, 2010) ...................................................18

*Johnson v. Tellabs, Inc.,*
    262 F. Supp. 2d 937 (N.D. Ill. 2003) ................................................................................15

*Kademian v. Ladish Co.,*
    792 F.2d 614 (7th Cir. 1986) .............................................................................................20

**Page(s)**

CASES

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................27

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) .....................................................................30

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) ......................................................................27

*Mathews v. Centex Telemanagement, Inc.*,
    1994 WL 269734 (N.D. Cal. June 8, 1994) ...............................................38

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................15

*Nat'l Junior Baseball League v. Pharmanet Dev. Group, Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ............................................................22

*Nolte v. Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ......................................................................11

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................33

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996).............................................................................37

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000).......................................................................33

*Panter v. Field*,
    646 F.2d 271 (7th Cir. 1981) ......................................................................31

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    2011 WL 338865 (S.D. Ind. Jan. 28, 2011)...............................................14

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................................. passim

*Reiss v. Pan Am. World Airways, Inc.*,
    711 F.2d 11 (2d Cir. 1983).........................................................................14

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ......................................................................30

**Page(s)**

CASES

*Santa Fe Industries, Inc. v. Green*,
    430 U.S. 462 (1977).........................................................................................20

*Schlifke v. Seafirst Corp.*,
    866 F.2d 935 (7th Cir. 1989) ........................................................................14

*Spears v. Metro. Life Ins. Co.*,
    2009 WL 2408928 (N.D. Ind. Aug. 4, 2009).................................................14

*St. Lucie County Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*,
    2011 U.S. Dist. LEXIS 19788 (N.D. Ill. Feb. 28, 2011) ...........................9, 29

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008).......................................................................................31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)...........................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................... passim

*United States v. Morris*,
    80 F.3d 1151 (7th Cir. 1996) ....................................................................37, 38

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)...............................................................................11, 38

*Wilkes v. Heritage Bancorp, Inc.*,
    1990 WL 263612 (D. Mass. Nov. 21, 1990) .................................................18

*Woodward v. Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010)............................................................18

*Wright v. Int'l Bus. Machs. Corp.*,
    796 F. Supp. 1120 (N.D. Ill. 1992) ................................................................30

*Zerger v. Midway Games, Inc.*,
    2009 U.S. Dist. LEXIS 96872 (N.D. Ill. Oct. 19, 2009)................................11

*Zimmerman v. Shawmut Nat'l Corp.*,
    1991 WL 274342 (D. Conn. Dec. 13, 1991)..................................................18

**Page(s)**

STATUTES

15 U.S.C. §77k(a) ..................................................................................................35

15 U.S.C. §77l(a)(2) ..............................................................................................35

15 U.S.C. § 78u-4(b)(1) ......................................................................................5, 6

15 U.S.C. § 78u-4(b)(2) ..........................................................................................6

15 U.S.C. § 78u-4(b)(3)(A) .....................................................................................6

Defendants[1], by their respective counsel, submit this memorandum in support of their joint motion to dismiss Plaintiffs' amended class action complaint (the "Complaint").

## INTRODUCTION

PrivateBancorp, Inc. ("PVTB" or the "Company") is "a Chicago-based regional bank" with branches in a handful of other cities. (Compl. ¶6.) Like so many other small and mid-sized banks, it and its borrowers felt the dramatic repercussions during 2008-09 of the United States' worst economic downturn since the Great Depression. As residential housing values plunged, PVTB first took write-downs of loans to residential developers – loans made during the tenure of previous management, which the Complaint terms "legacy loans" (*id.* at ¶13). After a series of quarter-by-quarter increases in loss provisions taken during the course of 2008 – and repeated warnings by PVTB that conditions were continuing to deteriorate (with non-performing loans increasing in amounts that it expressly detailed) (*see* pp. 7-8, *infra*) – in January 2009 PVTB decided to take an additional $108.8 million write-down of these "legacy loans." This write-down followed the disastrous fourth quarter of 2008, a quarter in which the S&P 500 declined almost 23% (far more than its 8.9% third quarter decline) and the NASDAQ experienced an almost 25% decline (versus 8.8% in the third quarter). (Ex. 1.)[2]

The collapse of residential housing prices eventually had ripple effects throughout the economy, including in the commercial sector, as consumer spending sharply contracted. This

[1] "Defendants" include PrivateBancorp, Inc. ("PVTB"); Larry D. Richman, Dennis L. Klaeser, Kevin M. Killips, Ralph B. Mandell, and Kevin Van Solkema ("the Officer Defendants"); Donald L. Beal, William A. Castellano, Robert F. Coleman, Patrick F. Daly, William A. Goldstein, James M. Guyette, Richard C. Jensen, Philip M. Kayman, Cheryl Mayberry McKissack, William J. Podl, Edward W. Rabin, Jr., Collin E. Roche, William R. Rybak, Alejandro Silva, James C. Tyree, John B. Williams, and Norman R. Bobins ("the Director Defendants"); Keefe, Bruyette & Woods, Inc., Robert W. Baird & Co., Inc., William Blair & Co., L.L.C., Suntrust Robinson Humphrey, Inc., and J.P. Morgan Securities, Inc. ("the Underwriter Defendants").

[2] It is well settled that, in deciding a motion to dismiss, this Court may consider matters of public record, including documents filed with the SEC, reported stock prices, and documents referenced in the pleadings (such as the various quarterly earnings call transcripts cited throughout the Complaint). *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

too affected PVTB, which had recently expanded its commercial and commercial real estate lending efforts.  In November 2007, new management at PVTB had initiated a Strategic Growth and Transformation Plan (the "Plan" or "Growth Plan"), the stated goal of which was to "becom[e] the premier middle-market commercial, commercial real estate, private, and wealth management bank in [PVTB's] chosen markets."  (Ex. 2 (2007 10-K) at 3.)  PVTB designed the Plan based on its anticipation that Bank of America's purchase of LaSalle Bank would produce a "gap in middle market lending and commercial banking" that would enable PVTB to "recruit a significant number of senior commercial banking and other officers" and thereby "successfully … fill that [commercial lending] gap."  (*Id.*)  And PVTB did in fact succeed in its plan to hire a significant number of commercial bankers and expand its commercial lending.

In the third quarter of 2009, however, the economic contagion accelerated once again, further affecting both PVTB's legacy loans and more recent commercial lending.  PVTB's non-performing loans almost doubled during the third quarter, and that, in turn, promptly led PVTB to announce additional write-downs in October 2009.  (Compl. ¶145.)  This third-quarter deterioration was by no means limited to Growth Plan loans; instead, 90% of the newly non-performing loans, and sixty percent (60%) of the increase in non-performing loan amounts, were attributable to "legacy" loans that had now gone bad.  (*Id.*)

Ignoring the broader economic context, as well as many of its own allegations, the 114 page, 273 paragraph Complaint unsuccessfully attempts to transform these events into some deliberate, fraudulent scheme by the Officer Defendants and PVTB (collectively, "the 10(b) Defendants").  The Complaint attempts to create the illusion of a factual foundation for these charges by mentioning a handful of ex-PVTB employees, most of them lower level personnel,[3] who provide anecdotal and largely irrelevant pejorative characterizations (and are apparently

---

[3]  Seven of the nine confidential witnesses (CWs 2, 3, 5, 6, 7, 8, and 9) are not described as having been anything more than "Managing Directors" (or lesser positions) in a company that had over 300 managing directors – which was close to 50% of its entire full-time equivalent workforce – by the end of 2008. (Ex. 3 (4Q08 Earnings Call Transcript) at 13; Ex. 4 (2008 10-K) at 3.)  In any event, the only confidential witnesses who purport to offer anything other than their own subjective characterizations are CWs 1 and 9.

embittered by the influx of ex-La Salle Bank bankers and new management at PVTB). Yet despite its sprawling nature, the Complaint's claims under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") are focused on three categories of alleged misrepresentations (which are repeated over and over, with minor variations on the same three themes).[4] As discussed below, not one of these three categories of alleged misrepresentations is adequately pleaded, or supported by the particularized facts required by the PSLRA. And far from there being a "strong" inference of scienter as to any of these alleged misstatements, or as to any of the 10(b) Defendants, the few pleaded facts point in precisely the opposite direction.

The first two categories of alleged misstatements both relate to an alleged failure to take write-offs sooner than they were taken. *First*, the Complaint claims that PVTB concealed the deterioration in its "legacy loan" portfolio during 2008, and falsely represented its condition by not earlier determining to write-off the $108.8 million in "legacy loan" write-offs announced in January 2009. As discussed below (in section I.B.), the first assertion is flatly inaccurate – throughout 2008, PVTB repeatedly informed the market of deterioration in its "legacy loan" portfolio (making particular note of the deterioration in the Michigan and Atlanta markets singled out by the Complaint), and quarterly increased its loss reserves while also quarterly disclosing *in detail* the increases in its non-performing loans. And while the Complaint seeks to imply that the 10(b) Defendants "knew" by February 2008 of the need for the later $108.8 million write-off, there is no factual allegation in the Complaint from *any* source, including CW 1, that any of the 10(b) Defendants were so advised or so believed at the time. Instead, the Complaint seeks to fudge the critical issue by claiming that the 10(b) Defendants were advised in February 2008 that certain unspecified loans had "problems" in unspecified amounts. Plaintiffs' claim that the $108.8 million in write-offs taken in January 2009 should have been taken earlier is nothing more than an inappropriate exercise in 20/20 hindsight with respect to determinations that are, as the Seventh Circuit has recognized, inherently matters of judgment.

---

[4]  The few stray claims of other misstatements or omissions are discussed in section I.E. below.

*Second*, the Complaint attempts a similarly illegitimate exercise with respect to the timing of the write-offs taken in October 2009 with respect to certain loans that were part of the "Growth Plan" portfolio. *See* section II.C. below. Once again, there is not a single source cited which indicates that any of the 10(b) Defendants was ever told to take these write-offs at any earlier time, or believed they should. And while the Complaint conclusorily asserts that some Growth Plan loans were in the "non-performing" category prior to the third quarter of 2009, it provides neither any factual support nor any specificity for that proposition.

*Third,* the Complaint levels the extraordinary accusation that the 10(b) Defendants deliberately abandoned risk concerns and instead sought to issue poor quality loans under the Growth Plan that they knew "would need to be written down in the near future." (Compl. ¶17.) The Complaint offers no plausible motivation for this seemingly nonsensical behavior, much less one contributing to a "strong inference" of scienter. The loans in question were not sold off, syndicated or securitized. (*Id*. at ¶134, p. 60.) Instead they were retained by PVTB, which would itself therefore suffer from poor loans going bad. Nor is this a circumstance in which any of the Officer Defendants is alleged to have sold stock or reaped any other unusual short-term benefit. And the Complaint's speculative effort at providing some explanation as to why the Officer Defendants would pursue such a counterproductive course is itself entirely circular: they allegedly did so in order to raise enough funds through the securities offerings to cover the bad loans that the 10(b) Defendants were deliberately generating. (*Id*. ¶83.)

Yet not only does the claim of deliberate abandonment of quality and risk standards make no sense in these circumstances, it does not come close to being adequately supported by the Complaint's factual allegations. *See* section I.D. below. Plaintiffs' attempt to invent this story is founded almost entirely on four isolated "examples" of loans, that together constituted a miniscule percentage (far less than 1%) of the Company's loans – and which are, once again, at best exercises in 20/20 hindsight. *See* pp. 22-24, *infra*. The Complaint then attempts to supplement these inadequate "examples" with conclusory assertions from various "confidential witnesses," consisting primarily of pejorative characterizations rather than specific facts. And

the Complaint proceeds to contradict its own theory, going so far as to allege that PVTB's Credit Risk Committee held regular meetings at which the internal reporting "was so thorough that 'everyone was buried under risk reporting.'"  (Compl. ¶70.)

Finally, the Complaint attempts to transmute these three categories of alleged misrepresentations into claimed violations of Sections 11 and 12 of the Securities Act of 1933 (the "Securities Act") in connection with two public offerings of PVTB's common stock, made on June 11, 2008 (the "2008 Offering") and May 14, 2009 (the "2009 Offering").[5]  As discussed in section II, however, these Securities Act claims fail for many of the same reasons that the Exchange Act claims fail, *i.e.*, the Complaint has not adequately alleged a factual basis for its underlying claims of misrepresentations or actionable omissions.

For these reasons, and those set forth below, the entire Complaint should be dismissed.

## ARGUMENT

### I.   PLAINTIFFS FAIL ADEQUATELY TO PLEAD A VIOLATION OF THE EXCHANGE ACT.

#### A.   The PSLRA's Heightened Pleading Requirements.

Plaintiffs' alleged violations of Section 10(b) of the Exchange Act must be considered with reference to the PSLRA's pleading requirements.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).  Because this Court has extensive experience in applying these requirements,[6] the 10(b) Defendants will touch on them only briefly here.

First, Plaintiffs must plead the circumstances establishing the falsity of the alleged misrepresentations with particularity.  15 U.S.C. § 78u-4(b)(1).  This is particularly true of allegations that are founded on "information and belief," for which the complaint must

---

[5]  The Offerings were made pursuant to a May 9, 2008 Shelf Registration Statement and Supplemental Prospectuses signed by the Director Defendants ("the Offering Materials").  (Compl. ¶¶176-177.)  All Underwriter Defendants served as underwriters for the 2009 Offering and all of them except J.P. Morgan Securities served as underwriters for the 2008 Offering.  (*Id.* ¶¶190, 198.)

[6]  *See, e.g., Higginbotham v. Baxter Int'l, Inc.*, 2005 U.S. Dist. LEXIS 12006 (N.D. Ill. May 25, 2005); *Hill v. The Tribune Co.*, 2006 U.S. Dist. LEXIS 71244 (N.D. Ill. Sept. 29, 2006).

specifically set forth "with particularity all facts on which that belief is formed."[7]  *Id.*

Second, the PSLRA requires that, with respect to *each* alleged act or omission, a plaintiff "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *Pugh*, 521 F.3d at 693.  For a Section 10(b) claim, the required state of mind is scienter.  *Pugh*, 521 F.3d at 693.  To plead adequately a "strong inference" of scienter, the particularized facts alleged must be such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324.  This inherently comparative exercise obliges a court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.

The PSLRA mandates that when a complaint fails to comply with these heightened pleading requirements, "the court *shall*…dismiss the complaint . . . ." 15 U.S.C. § 78u-4(b)(3)(A) (2007) (emphasis added).

> **B.  The Complaint Fails to State a Claim with Respect to the Purported Failure to Write-Down Certain "Legacy Loans" Prior to January 2009.**

Plaintiffs allege that virtually all of the 10(b) Defendants' statements made from the start of the Class Period through January 2009 were false and misleading because the Officer Defendants supposedly knew "the extent of the problems with the Company's legacy loan portfolio by no later than February 2008" but "waited" until January 2009 to announce a $108.8 million write-down of these legacy loans.  (Compl. ¶¶79-80.)  According to Plaintiffs, the 10(b) Defendants (1) "failed to disclose the deteriorating credit quality problems in their legacy loan portfolio," and particularly in the Atlanta and Michigan regions, prior to this January 2009 announcement (*id.* at ¶97)[8]; (2) misstated PVTB's financial condition, including in its SEC

---

[7]  The Complaint makes clear that all allegations are "based on … information and belief as to all [] matters [other than Lead Plaintiffs' own acts] ."  (Compl. ¶4, p. 1.)
[8]  *See also id*. at ¶¶102, 105, 107, 109, 112, 114, 116, 118, 123.

filings, by not taking the January 2009 write-downs earlier (*id*. at ¶144); and, (3) misstated that problems with the legacy loan portfolio had just been uncovered when they announced the January 2009 write-downs (*id.* at ¶81; *see also id.* ¶129).

As discussed below, these assertions are unsupported by the Complaint's few pleaded "facts." Moreover, much of what Plaintiffs say is demonstrably incorrect, contradicted by PVTB's SEC filings and the Complaint itself. What remains is little more than an inappropriate attempt to second-guess the timing of write-downs, and the judgments utilized in assessing likelihoods of repayment amidst a deteriorating economic environment – a hindsight exercise of the sort that the Seventh Circuit has explicitly condemned. In that regard, not only are Plaintiffs' claims of "falsity" on these legacy loan matters unsupported, the Complaint does not come close to establishing a "strong inference" of scienter as to any of the 10(b) Defendants.

### 1. The Complaint Does Not Adequately Plead Any Misstatements Regarding the Legacy Loans.

**Deterioration of the legacy loan portfolio.** Despite the Complaint's naked assertions to the contrary, PVTB repeatedly informed the market during 2008 that it was experiencing deterioration in its legacy loan portfolio. Every quarter during 2008, its SEC filings set forth increased loan loss provisions. (*See* Appendix at A-1.) And every quarter PVTB's announcement of its increased loan loss provisions explicitly attributed these increases in part to credit quality deterioration in the legacy loan portfolios. (*See, e.g.,* Ex. 5 (1Q08 8-K) at 5; Ex. 6 (2Q08 8-K) at 6; Ex. 7 (3Q08 8-K) at 2, 3, 5.) In particular, PVTB noted that these increases were largely a result of increased non-performing assets ("NPA") related to its residential development loans (i.e., part of its legacy loan portfolio). (*See, e.g.,* Ex. 8 (1Q08 10-Q) at 28 (PVTB experiencing "continued weakening of the housing market and the deterioration of some residential real estate development loans"); Ex. 7 (3Q08 8-K) at 5 (increase in NPAs "is primarily driven from deterioration in residential development loan exposures in various markets"); *see also* Appendix at A-2.) The Complaint itself quotes some of these statements. (*See, e.g.*, Compl., p. 40 (quoting 2Q08 10-Q) ("This sector performance has weakened from

prior periods and is expected to remain weak into 2009"); Compl. ¶113 (quoting October 27, 2008 press release) ("This increase [in non-performing assets] is primarily driven from deterioration in residential loan exposures in various markets.").)

In addition, PVTB's quarterly SEC filings expressly disclosed non-performing loans by region, so that any investor could see where the greatest impact was occurring. (*See* Appendix at A-3.) This included separate quarterly disclosures for the Michigan and Atlanta regions that Plaintiffs single out. (Compl. ¶¶74-76, 80, 129.) Thus, for example, PVTB's 8-K filings disclosed that non-performing loans in the Michigan region had increased during the second quarter 2008 from $7.644 million to $16.481 million, *i.e.*, a 115% increase. (Appendix at A-3.) None of these highly specific disclosures are alleged to have been inaccurate.

In quarterly earnings calls held during 2008, PVTB executives were equally clear about increasing deterioration in residential development loans stemming from its legacy portfolio, as well as about heightened problems in the Atlanta and Michigan regions. For example, in the second quarter 2008 earnings call, held on July 29, 2008, Richman, PVTB's CEO, made clear that "[o]ur weakened credit trends remain disproportionately attributable to the residential development sector…[that sector] is experiencing considerable softness with slow selling of both homes and lots. The market conditions in this segment of our portfolio are expected to remain weak." (Ex. 9 at 3). And in that same call Van Solkema observed that most of the residential development deterioration was occurring in Atlanta, followed by Michigan. (*Id.* at 15). Similar comments were made on October 27, 2008, during PVTB's third quarter earnings call. Mr. Richman stated that "[t]he residential development sector is experiencing considerable softness and has not yet begun to show improvements. Market conditions in this sector of our portfolio are expected to remain weak." (Ex. 10 at 3; *see also id.* at 6, 7 (Klaeser noting that "[w]e continue to experience deterioration of residential development loans and anticipate that this softness will continue" and disclosing that the provision for loan losses would likely continue to increase in the future).) And Van Solkema repeated that problems were greater in

Georgia and Michigan. (*Id.* at 8.) In short, the claim that the 10(b) Defendants failed to disclose deteriorating conditions in the legacy portfolios is unsupported and simply wrong.[9]

**Timing of the $108.8 Million Write-Down.** Plaintiffs next attempt to turn the January 2009 decision to write-down an additional $108.8 million of the legacy loan portfolio into a misrepresentation by claiming that the 10(b) Defendants "knew" that such a write-down was required since February 2008. The pleaded *facts* do not support this assertion either.

Plaintiffs purport to rely primarily on CW 1, who claims to have attended a February 2008 meeting. (Compl. ¶¶75-76.) But what CW 1 allegedly says about that meeting – and, as importantly, what he does not say – is not at all the same as the leaps made by Plaintiffs.

CW 1 claims there was a discussion at this meeting of "problems" with respect to the legacy portfolios in the Michigan and Atlanta regions. What CW 1 does *not* say, however, is whether there was a discussion as to whether these "problem" loans should be "deemed to be uncollectable by management" – *i.e.*, written off – or, if so, to what extent and in what amount at the time. (*See* Compl. ¶214, p. 97 ("Loans are charged-off when deemed to be uncollectable by management.").) Nor does CW 1 (or any other source) say there was any recommendation of loan write-downs, or increases in loss reserves, that was not promptly followed at the time.

---

[9] As part of the rote repetition of their claims, Plaintiffs also attach the charge of failure to disclose deteriorating conditions to a handful of other statements outside of SEC filings and earnings calls. *See* Compl. ¶¶98, 101, 104, 106 117. But there is no obligation endlessly to repeat information already disseminated to the market. And the statements cited in these paragraphs have nothing to do with the performance or quality of PVTB's legacy loan portfolio. For example, in the statement which is the subject of paragraph 106, Defendant Klaeser discussed "the new business brought in *under the Growth Plan*, and denied that there were any non-performing loans *originated under the Growth Plan*." (*Id.* ¶106 (emphasis added).) The statement is explicitly limited to loans originated under the Growth Plan and says nothing whatsoever about the legacy loan portfolio. The same is true of the statements in paragraph 117. (*Id.* at ¶117 (alleging Defendant Richman "continued to falsely assert that the Company was being 'cautious' and 'selective' *with loans made under the Growth Plan*") (emphasis added).) Nor do the statements in paragraphs 101 and 104 (noting the number of new hires and expenses associated with such hires) or paragraph 98 (discussing new loan growth) address the performance or quality of PVTB's legacy loan portfolio. Because none of these statements said or implied anything at all misleading about the supposed deterioration in PVTB's legacy loan portfolio, as a matter of law there was no obligation for the 10(b) Defendants to comment (once again) on these matters. *Backman v. Polaroid Corp.*, 910 F.2d 10, 14-16 (1st Cir. 1990); *St. Lucie County Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*, 2011 U.S. Dist. LEXIS 19788, at *32-33 (N.D. Ill. Feb. 28, 2011).

Much less does CW 1 (or any other source) say that at this meeting there was any discussion of a need to take the $108.8 million in write-downs that were taken approximately a year later. These omissions are telling and they "count." *Tellabs*, 551 U.S. at 326.

Read carefully, CW 1 says nothing more than that the existence of problem loans in Michigan and Atlanta – in an unspecified amount – was discussed in the February 2008 meeting. But that is entirely consistent with the public acknowledgements of such problems that the 10(b) Defendants repeatedly made, as discussed above, including PVTB's quarterly disclosure of non-performing loans in these regions (the accuracy of which Plaintiffs do not challenge).[10] And it is entirely consistent with the fact that PVTB *increased* its loan loss reserves, as well as its loan charge-offs, *each and every quarter during 2008* (*see* Appendix at A-1), disclosing that it was doing do because of the deterioration in these very markets, among others.[11] What Plaintiffs have attempted to do is to conflate knowledge of the existence of (unquantified) "problems" in the legacy loan portfolio with a known need to charge-off the $108.8 million amount that was charged off a year later.[12] The two are not the same.

Nor does an attempt to manufacture a hindsight disagreement with management's commercial judgment not to write off these loans sooner suffice to render earlier financial statements "false" – especially since determinations of this sort *are* exercises in judgment, actionable only if they lacked any reasonable basis and were not genuinely believed. *See* cases

---

[10] CW 6's allegation (Compl. ¶78) that various of the 10(b) Defendants were regularly provided information about PVTB's underperforming loans adds nothing to the mix. CW 6 never says or suggests that these "underperforming" loans were not appropriately included on a quarterly basis in the disclosures of non-performing assets contained in PVTB's SEC filings, or considered in the reserve-setting analysis.

[11] The assertion that an unspecified number of unidentified clients in Atlanta "were coming in and giving them the keys"(Compl. ¶76) is colorful but also of no moment. There are no factual allegations indicating that PVTB's increasing loan loss provisions and charged-off loans in 2008 failed to take these instances into account, much less that any 10(b) Defendant knew of any such failing.

[12] A similar attempt at conflation appears in the allegations regarding the St. Louis loans. CW 1 claims that the "approximately $8-10 million in loans from the St. Louis portfolio that were included in the January 2009 write-down were known when Davis was terminated, months earlier." (Compl. ¶81.) But the fact that the "loans…were known" earlier is *not* the same thing as knowing earlier of a need to write-off those loans. The carefully worded statement attributed to CW 1 addresses only the former, not the latter, and nowhere does CW 1 claim that any such earlier write-off recommendation was made.

cited at p. 38 and n. 37, *infra*. *See also, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S.

1083, 1090 (1991); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315-16 (4th Cir. 2004)

(dismissing claim that management lied to shareholders when it opined that loan loss reserves

were adequate). Yet the Complaint makes no attempt to plead facts demonstrating that any

*particular* collectability or reserve decisions were not reasonably based and made in good faith

at the time. Thus, not one of the confidential witnesses alleges that any of the 10(b) Defendants

was told or knew, either in February 2008 or some other time prior to the January 2009

announcement, that there were any *specific* loans that should be deemed uncollectible or

reserved for but which were not in fact written-off or reserved for at the time. And the

Complaint does not identify any contemporaneous document making any recommendation in

that regard which it claims was provided to the Officer Defendants but then disregarded.

Instead, Plaintiffs simply rely on the fact that PVTB ended up taking a large additional write-off

in January 2009, including for the Michigan and Atlanta portfolios. (Compl. ¶¶81, 127, 129.)

This is an impermissible attempt to allege fraud by hindsight. *See Arazie v. Mullane*, 2 F.3d

1456, 1467-68 (7th Cir. 1993) ("'Fraud by hindsight' is not actionable."); *Zerger v. Midway

Games, Inc.*, 2009 U.S. Dist. LEXIS 96872, at *28 (N.D. Ill. 2009) ("Plaintiffs' inability to cite

a single fact earlier than the announcement in the Form 8-K as support for their hypothesis of an

'undisclosed plan' betrays the fraud-by-hindsight theory that quietly fuels their complaint").

The Seventh's Circuit's decision in *DiLeo v. Ernst & Young* is instructive. In *DiLeo*,

plaintiffs conclusorily alleged that the defendant, an accounting firm, "became aware that a

substantial amount of the receivables reported in [its client bank's] financial statements were

likely to be uncollectible." 901 F.2d 624, 626 (7th Cir. 1990). Like the Complaint here,

however, the complaint in *DiLeo* did not provide even "a single concrete example" of a loan as

to which credit loss reserves were inadequately estimated, or explain the basis for any such

assertion. Instead, as here, the complaint pointed to the fact that the bank ultimately announced

write-offs in much larger amounts. *Id.* at 627. The Seventh Circuit rejected those allegations,

and affirmed dismissal of the claims:

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence. . . .

*Id*. at 627. Here too, where not even a single concrete example has been provided of a "legacy loan" as to which an improper collectability determination was made, much less some systematic irregularity – and Plaintiffs have not pleaded *any* contrary recommendations at any time – the attempt to second-guess the timing of later write-offs is insufficient to state a claim.

**The Fourth Quarter 2008 Loan Review.** Finally, Plaintiffs attempt to manufacture a misstatement in connection with the January 2009 announcement of additional write-offs. First, Plaintiffs suggest that PVTB claimed it had only recently "uncovered" the existence of problems with the legacy loans. (Compl. ¶81 ("In disclosing these writedowns, the Company claims that it had uncovered problems with the legacy loans…."); ¶129, p. 55.) According to Plaintiffs, the existence of " material problems" had been known earlier. (*Id*. at ¶129.) But the statement that the Complaint attempts to attribute to PVTB is not one ever made by any 10(b) Defendant – and the Complaint cites nothing from either the January 26, 2009 8-K or the January 26, 2009 earnings call about problem loans suddenly being "uncovered." Indeed, as described above, PVTB had been disclosing deterioration in its legacy loan portfolio, including problems in the Michigan and Atlanta markets, for many months. As one analyst commented during the earnings call, "It seems to me the problems in Michigan and Atlanta are not anything new, it's been pretty much broadcast what the problems were there." (Ex. 3 at 14.)

What Mr. Richman and Mr. Van Solkema *did* explain was that PVTB made additional write-downs of loans in the fourth quarter of 2008 because the quarter seemed to be a "tipping point" in light of, *inter alia*, "significant drops in the stock market, sharp increases in unemployment and continued dramatic declines in the housing market" – all of which had led performance of the residential development portfolio *to worsen* during the quarter. (*Id.* at 2, 6, 14.) These statements simply reflect the reality of the accelerated market downturn at the time.

Plaintiffs have not alleged that the portfolio did not worsen in the fourth quarter or cited factual allegations contradicting the reality of any of these other factors.

Second, Plaintiffs claim that the 10(b) Defendants "falsely" characterized the January 2009 writedowns as the product of "a 'comprehensive' and 'proactive' review" conducted at the end of 2008. (Compl. ¶127.) The claim here is most peculiar, however. Plaintiffs' sources do not deny that a review was in fact conducted at the end of 2008. To the contrary, CW 1 essentially admits as much. (*See id*. at ¶81 ("the portfolio review at the end of 2008 was the same as reviews conducted throughout that year.").) Instead, the apparent objection here is to the use of the surrounding adjectives, because, in CW 1's view, the 2008 end of year portfolio review was "the same" as others. But regardless whether the review was or was not "the same" as others, there are no particularized facts pleaded that indicate that the end of year review was not itself "comprehensive" and "proactive." To the contrary, other statements relied upon by Plaintiffs make clear that PVTB considered *all* of its loan reviews "comprehensive." (*Id*. at ¶92 (quoting Klaeser as stating that "we are always diligent and do comprehensive loan review….").) And Plaintiffs' own sources acknowledge this was the case, going so far as to allege that during the Class Period "the internal reporting reviewed at the [loan review] meetings was so thorough that 'everyone was buried under risk reporting.'" (*Id*. at ¶70; *see also* ¶73.) The fact that PVTB regularly conducted comprehensive loan reviews hardly suggests that the 10(b) Defendants somehow materially misled investors about the late 2008 review by describing it as comprehensive and proactive.

> **2.    The Complaint's Allegations Do Not Give Rise to a Strong Inference That the 10(b) Defendants Acted with Scienter in Their Statements about and Treatment of the Legacy Loans.**

Plaintiffs have, in any event, failed to allege particularized facts sufficient to give rise to a "strong inference" that any of the 10(b) Defendants acted with scienter with respect to the alleged omissions[13] and misstatements regarding the legacy loan portfolio. This is not a case in

---

[13]  In the case of an omission, it is not sufficient to allege that a defendant was aware of the allegedly undisclosed information. Rather, there must be allegations sufficient to give rise to a strong inference

which any of the 10(b) Defendants is alleged to have engaged in suspicious stock sales or other potential indices of misbehavior. (And, as discussed at pp. 26-28 below, Plaintiffs' attempt to fashion other "motive" inferences is woefully insufficient.) Instead, the core of Plaintiffs' claim in this regard is that the Officer Defendants supposedly "knew" that the legacy loan portfolio was doing worse than disclosed, and failed to take the January 2009 writeoffs earlier than they "knew" such writeoffs should have been taken. (PVTB's alleged "scienter" is, in turn, claimed to be vicariously derived.) *See* p. 15, *infra*.

There are simply no allegations, however, that remotely support an inference, much less a strong one, that the 10(b) Defendants intended to mislead PVTB shareholders in any way with respect to the condition of the legacy loan portfolio. To the contrary, the 10(b) Defendants' repeated disclosures of problems in this portfolio during 2008 (*see* pp. 7-8, *supra*); their detailed quarterly disclosures of non-performing assets on a market-by-market basis (none of which is claimed to have been inaccurately reported with respect to the legacy loans); their quarterly increases in writeoffs and loan loss reserves during 2008; and their eventual voluntary decision to writedown an additional $108.8 million in such loans after the economic downturn reached its nadir in the fourth quarter of 2008 are all far more consistent with a "non-culpable" explanation than with a malevolent one. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 2011 WL 338865, at *20 (S.D. Ind. Jan. 28, 2011) (disclosures that were made weighed against inference that company was attempting to keep the facts away from investors or otherwise possessed scienter); *Spears v. Metro. Life Ins. Co.*, 2009 WL 2408928, at *10 (N.D. Ind. Aug. 4, 2009) (no strong inference of scienter where company disclosed information in prospectus). Put simply, the far more "cogent and compelling" inference here is that the timing of writeoffs was a judgment call responsive to worsening economic conditions, not a matter of some scheme to defraud.

---

that "the non-disclosure was intended to mislead." *Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983). *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989).

Moreover, of particular importance in this regard is that nowhere in the Complaint is there any particularized factual allegation, from any confidential witness or documentary source, indicating that any of the Officer Defendants at some earlier time ever manifested a belief or was told – by any of the confidential witnesses or anyone else – that there should be a write-off of the "problem" loans in the amount that was eventually written off as uncollectible in January 2009. Indeed, there is no particularized allegation that the Officer Defendants *ever* disregarded or failed to follow any recommendations they received at any time about the treatment of any particular legacy loans. That too is fatal to a strong inference of scienter here. *City of Livonia Employees' Ret. Sys. v. The Boeing Co.*, 2010 WL 2169491, at *6 (N.D. Ill. May 26, 2010) ("[t]he court cannot infer that defendants knew or recklessly disregarded the impact of the failed wing stress tests on the first flight and delivery schedule without particularized facts about the testing"); *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (dismissing complaint because, *inter alia*, the "pleading fails to point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants"); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (same).

At bottom, Plaintiffs' purported inference of scienter with respect to the legacy loan writeoffs rests entirely on an unfounded leap: that because the 10(b) Defendants knew there were (unspecified) "problems" with the legacy loans (in unspecified amounts), that means they must have believed that those loans should have been written off. But the two are not the same, and, as Plaintiffs' own source acknowledges, loans "don't go bad overnight." (Compl. ¶81.) It is precisely because the question whether to take a write-off with respect to a non-performing loan, and, if so, how much, is a classic judgment call, that the Seventh Circuit has rejected claims of fraud in similar circumstances involving the timing of write-offs. *DiLeo,* 901 F.2d at 627-28; *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 950-51 (N.D. Ill. 2003). *See also In re Barclays Bank*, 2011 WL 31548, *8 (S.D.N.Y. Jan. 5, 2011) (dismissing claim for failure to write-down assets earlier in absence of facts indicating the bank did not truly believe its previous judgments); cases cited at p. 38 and n.37, *infra*. This Court should do the same here.

**C.** **The Complaint Fails to State a Claim with Respect to Statements About the Status of Growth Plan Loans.**

Plaintiffs allege the falsity of two related categories of statements regarding the status of loans made under the Growth Plan. First, they nakedly assert the inaccuracy of various statements made between July 2008 and July 2009 indicating that no loans originated under the Growth Plan were in the "non-performing loan" category quarterly reported by PVTB. (Compl. ¶¶106, 107, 114, 116, 126, 131, 139.) Second, building on this assertion, Plaintiffs then further assert that the 10(b) Defendants deliberately failed to maintain an allowance for loan losses sufficient "to absorb the known credit losses inherent in the Company's Growth Plan loan portfolio…." (*Id.* ¶97; *see also* ¶¶112, 123, 135, 137, and 143.) These claims too are utterly unsupported, and the relevant allegations are, once again, insufficient to support the charge of falsity, much adequate less to create a "strong inference" of scienter.

**The alleged non-performance of Growth Plan loans.** As PVTB's SEC filings at the time made clear, PVTB classified a loan as "non-performing" if it was delinquent for 90 days or more or if the accrual of interest income on the loan was discontinued. (*See, e.g.*, Ex. 2 (2007 10-K) at 53.) The Complaint repeatedly asserts (¶106) that there were Growth Plan loans that fell into this category earlier than disclosed. For example, the Complaint refers to statements by Klaeser and Van Solkema in a July 29, 2008 earnings call, and asserts that they falsely "denied that there were any non-performing loans originated under the Growth Plan" at that time.

What is astonishing about this naked assertion, and its subsequent repetitions with respect to later statements, is that nowhere in the Complaint is there even a single Growth Plan loan whose non-performing status *at the time* is actually identified with particularity. Instead, the sole purported basis for this claim is a formulaic recitation repeatedly deployed that glosses over the relevant question. With respect to the July 29, 2008 statement mentioned above, for example, this formulaic recitation appears in ¶107, which conclusorily claims that the statement that there were no non-performing Growth Plan loans at the time was false because it "ignored the reality that loans made under the Plan were to high risk clients *whose businesses later*

*failed*…."[14] (Emphasis supplied.)  But this allegation about certain loans purportedly being "high risk" says nothing at all about whether those loans were actually non-performing at the time.  And the addition of the hindsight observation that some of these businesses "later failed" (with the "later" time left entirely unspecified) simply underscores the insufficiency here.

Nor are these fundamental failings in any way remedied by the cross-reference to ¶¶60-66 that occurs at the end of this statement (and all similar ones).  Those paragraphs contain criticisms regarding the alleged "riskiness" of four loans; that "riskiness" allegation will be discussed in greater detail in the next section.  For present purposes, though, what is relevant is that none of the cited paragraphs says anything at all about any of these four loans being "non-performing" at the time of any of the statements regarding no Growth Plan loans being in the "non-performing" category.  (Indeed, ¶¶60-66 do not even allege *when* any of these questioned loans was made *or* even that any of them ended up not being repaid.)

Having failed to identify any such Growth Plan loans that were "non-performing" at the time, the Complaint *a fortiori* also fails to create a "strong inference" that any of the 10(b) Defendants acted with scienter in making any of these statements.  Indeed, the Complaint pleads no facts at all demonstrating that any of the Officer Defendants (much less all of them) were in receipt of contrary information at the time of the various statements on this matter.  *See Higginbotham*, 2005 U.S. Dist. LEXIS 12006, at *18.

**Reserves for known credit losses.**  Plaintiffs' assertions that  PVTB failed to reserve for "known credit losses" among the Growth Plan loans fare no better.[15]  Once again, the Complaint does not identify a single Growth Plan loan as to which there were "known credit

---

[14]  Virtually identical language appears with respect to similar allegations throughout the Complaint. (*See, e.g.,* Compl. ¶¶93, 109, 114, 116, 118, 120, 141.)

[15]  The Complaint does not (and cannot) contend that no reserves at all were taken with respect to loans made pursuant to the Growth Plan.  In fact, PVTB made repeated public statements during the class period acknowledging that it was generally increasing its reserves due to growth in its volume of loans. (*See* Ex. 11 (4Q07 8-K) at 3; Ex. 5 (1Q08 8-K) at 5; Ex. 6 (2Q08 8-K) at 6; Ex. 7 (3Q08 8-K) at 2-3, 5.)

losses" prior to the third quarter of 2009, but as to which no loss allowance was taken.[16] That alone is fatal. *See, e.g., DiLeo*, 901 F.2d at 626-27; *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433-34 (S.D.N.Y. 2010); *Adam v. Silicon Valley Bancshares*, 1994 WL 619300, at *3 (N.D. Cal. Feb. 8, 1994) (allegations were insufficient where they did not give any specific examples of what loans were improperly recognized).[17] Nor, concomitantly, does the Complaint quantify the amount of additional "credit losses" it claims should have been taken at any given earlier period, much less provide a factual basis for any such claim. *See Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, *13-16 (E.D. Wis. 2010) (dismissing "bundled" general claim that impairments should have been taken earlier which failed to specify what information was known each quarter and how that allegedly affected the financial statements at the time); *DiLeo*, 901 F.2d at 626-27; *In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 83443 at *13; *In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092, at * 5 (N.D. Ill. Mar. 29, 2007) (dismissing complaint that failed to say what defendant's bad debt numbers should have been in any particular financial statement).

Instead, the Complaint's contentions in this regard appear to be based on the premise that a substantial (but unquantified) number of non-performing Growth Plan loans had already existed prior to the third quarter of 2009, and that the 10(b) Defendants not only "knew" of these non-performing loans earlier but "knew" that these non-performing loans should be written down at some earlier time. (*See, e.g.,* Compl. ¶145 (after "continuously asserting"

---

[16] Plaintiffs cite a purported statement of CW 9, an employee at a branch office (Compl. ¶48), indicating that he saw "numerous 'questionable' files" in unspecified "portions" of the loan database in April 2008. (Compl. ¶67.) However, neither Plaintiffs nor CW 9 describe with any particularity any of these supposed "questionable" loans. And, tellingly, Plaintiffs do *not* allege that any of the unidentified supposedly delinquent or "questionable" loans were non-performing, or, equally important, that they were even initiated under the Growth Plan. Once again, all pertinent specifics are simply omitted.

[17] *See also In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 83443, at *13 (C.D. Cal. 2009) (dismissing complaint which provided no 'details about when and to what level the [loans] should have been written down" and "to what level the allowances should have been changed"), *citing Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006); *Zimmerman v. Shawmut Nat'l Corp.*, 1991 WL 274342, at *6 (D. Conn. Dec. 13, 1991); *Wilkes v. Heritage Bancorp, Inc.*, 1990 WL 263612, at *10-11 (D. Mass. Nov. 21, 1990) (allegations of inadequate loan loss reserves and understating non-performing loans were insufficient because they "failed to provide 'a single concrete example'").

otherwise, "the Exchange Act Defendants admitted that a large portion of those loans were nonperforming loans and needed to be written down").)  The initial step in this string of conclusory assumptions is itself entirely unsupported, however; as discussed in the preceding section, there are no particularized factual allegations demonstrating that any Growth Plan loan (much less a material number) was "non-performing" prior to the third quarter of 2009.

Moreover, the Complaint itself reveals that when some of the Growth Plan loans *did* become non-performing,[18] PVTB promptly took credit losses at the time in light of that development.  The Complaint itself characterizes PVTB's October 26, 2009 disclosures as "the whole truth."  (*Id*. at p. 70.)  Yet what PVTB disclosed on October 26 was that  non-performing loans had *increased* from $183 million to $360 million in the period *after June 30, 2009*.  (*Id.* ¶145.)  Nowhere does the Complaint dispute the accuracy of that fact (or dispute that most of the increase in non-performing loans consisted of "legacy loans"[19]).  Nor does the Complaint contain any particularized facts contradicting Van Solkema's explanations – as part of "the whole truth" – that it was these third quarter developments which caused PVTB to increase its credit loss reserves at that time, including taking some losses on Growth Plan loans which had recently become non-performing.  (Ex. 12 (3Q09 earnings call transcript) at 5-6, 8.)  Plaintiffs cannot simultaneously claim that what was said on October 26, 2009 was "the whole truth" and then proceed to ignore the contents of those statements.

Finally, the allegations of scienter with regard to allowances for "known credit losses" are particularly deficient.  Once again, Plaintiffs' claim here is essentially an illegitimate hindsight dispute regarding the timing of loss provisions that were taken.  *See DiLeo*, 901 F.2d at 627-28;  *In re E.spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 748 (D. Md. 2001)

---

[18]  The Complaint, ¶69, cites CW 2 for the proposition that it was "these failing [Growth Plan] loans that caused PrivateBancorp's non-performing assets to 'shoot up.'"  However, this statement fully accords with PVTB's own description of what happened: some Growth Plan loans became "non-performing" in the third quarter of 2009, causing an increase in "non-performing" assets at that time.

[19]  Van Solkema told analysts that approximately 90% of the accounts moved to non-performing status during the quarter were from the legacy portfolio, representing approximately 60% of the dollar increase to NPA.  (Compl. ¶145, p. 71.)

("The fact that a company did not increase its reserves fast enough is not evidence of fraud."); *In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. 1444, 1449 (N.D. Ill. 1991) ("Allegations that a defendant failed to maintain adequate loan loss reserves or invested in unduly risky or speculative loans, without more, seem to claim merely that the corporation was mismanaged."). Yet, here, the inference of some deliberate fraud is even more strained, because Plaintiffs' claim amounts to a contention that "credit losses" should have been taken long before the loans even became "non-performing." Not surprisingly, the Complaint has not alleged any facts with particularity showing that any of the Officer Defendants were ever advised to follow such a course. Nor does the Complaint contain any factual allegations demonstrating that any of the Officer Defendants "knew" of the purported "credit losses" on some Growth Plan loans before those loans became "non-performing," much less provide a factual basis for *how* any such knowledge was purportedly obtained by any given defendant; no "confidential witness" communication or contemporaneous document to that effect is cited. Far from being "strong," the purported inference of scienter here is virtually nonexistent.

**D.      The Complaint Fails Adequately to State a Claim of Misrepresentations Arising from an Alleged Deliberate Strategy of Generating High-Risk, Low Quality Loans.**

The Complaint is replete with allegations that amount to little more than contentions of corporate mismanagement. These include such assertions as, among others, that "the execution of the Plan 'was nebulous….'" (Compl. ¶55), that underwriting was "performed by entry-level, inexperienced employees" (*id.* ¶59), that Richman "'had a deer in the headlights look'" (*id.* ¶58), and the vindictive characterizations of "former LaSalle bankers hired under the Growth Plan" as bad hires who were "'the stereotype of the fast-talking, bad banker'" (*id.* ¶56). Mismanagement contentions of this sort are matters beyond the securities laws, however, and are insufficient to give rise to any claim. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977); *Kademian v. Ladish Co.*, 792 F.2d 614, 621-24 (7th Cir. 1986).

The Complaint goes a step beyond these claims of mismanagement, though, in its

suggestion that the 10(b) Defendants *deliberately* instituted a plan to abandon sound lending practices so as "to initiate as many loans as possible, regardless of the credit quality or long-term risk to the Company." (Compl. ¶8.[20]) Accordingly, to the Complaint, the 10(b) Defendants undertook this purported plan knowing that the loans being made "would need to be written down in the near future." (*Id.* ¶17.) In short, Plaintiffs allege that the 10(b) Defendants deliberately allowed poor quality commercial loans to be made – knowing that these loans would be kept on PVTB's books[21] and would go bad in short order. Based on the purported existence of this undisclosed deliberate strategy, Plaintiffs allege that numerous statements made during the Class Period – touching on such disparate matters as loan growth and performance, risk management practices and client selection – were false or misleading. (*Id.* ¶¶92-93, 98-99, 101-02, 104-09, 112-20, 122-23, 127-31, 134-37, 140-44.)

The Complaint does not come close to alleging a particularized factual basis that supports these conclusory assertions, which defy logic.

**The Alleged Plan to Sacrifice Quality.** Despite the Complaint's inflammatory rhetoric, it contains no particularized facts evidencing the existence of a deliberate plan concocted by the 10(b) Defendants for PVTB systematically to engage in high-risk lending, sacrificing "quality for quantity." None of the purported confidential witnesses is alleged to have heard any of the Officer Defendants (or anyone else) describe or acknowledge any such "plan." Nor is any document to that effect cited in the Complaint. Instead, the Complaint apparently attempts to *imply* the existence of such a deliberate strategy from conclusory and ambiguous characterizations rendered by ex-employees (who evidently resented the new hirings of former LaSalle bankers). These conclusory characterizations consist of such unspecific assertions as that "loans originated by former LaSalle personnel received little scrutiny" or were made with "a 'wink and nod.'" (Compl. ¶59.)[22] Generalized assertions of this sort are entirely

---

[20] *See also, e.g., id.* ¶¶89, 91, 93, 99, 105, 112, 114, 123, 128, 135, 137, 141, 143, 144.

[21] Compl. ¶134, p. 60 (PVTB "do[es] not securitize [its] loans for sale.").

[22] The Complaint also cites CW 2 to the effect that LaSalle personnel had "carte blanche." (Compl. ¶59.) Once again, this is little more than contentless rhetoric. CW 2 does not, for example, cite even a

insufficient under the PSLRA. *See Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d
951, 964 (S.D. Ohio 2009) ("a shared opinion among confidential witnesses does not
necessarily indicate ... falsity ... if the allegations themselves are not specific enough") (citations
omitted); *Nat'l Junior Baseball League v. Pharmanet Dev. Group, Inc.*, 720 F. Supp. 2d 517,
528, 538-546 (D.N.J. 2010) (rejecting confidential witnesses' conclusory assertions that failed
to set forth with particularity all facts on which those assertions were based).[23]

Yet even if they were credited, these allegations about degree of "scrutiny" would not
indicate some deliberate plan by the 10(b) Defendants to sacrifice quality and abandon risk
concerns. The point is simply underscored by CW7's admission that "the former LaSalle
bankers 'felt like they knew the clients they'd done business with before [at LaSalle], and so
they had a willingness to lend to those people again. *They thought  they knew what they were
getting* . . . but then with a lot of those [client] companies, they started to notice issues.'"
(Compl. ¶67 (emphasis added).)  This is a far cry from suggesting any deliberate plan even on
the part of former LaSalle employees, much less by the 10(b) Defendants, to sacrifice quality
and make bad loans.

**The Insufficiency of the Complaint's Few "Examples."**  In the absence of any
particularized factual allegations demonstrating the existence of a plan to abandon quality, the
Complaint attempts to create an inference to that effect by citing a mere handful of "examples"
of allegedly poor quality loans.  The "examples" are (1) a $10 million loan to Vienna Beef, (2) a
$2-3 million loan to Harlan Furniture, (3) an unspecified amount of loans to Bower & Bailey
(which allegedly later failed); and (4) a $20-30 million loan to General Growth Properties
(which entered bankruptcy some time thereafter).  (Compl. ¶¶60-66.)  These few loans are the

---

single example of a loan approved for a former LaSalle banker's customer that did not meet prudent
lending standards.  Nor is this lack of specificity surprising.  CW 2 was located in Georgia (Compl. ¶41),
not in PVTB's Chicago home office.

[23] Plaintiffs' reliance on multiple confidential witnesses "cannot compensate for these inadequacies....
Cobbling together a litany of inadequate allegations does not render those allegations particularized in
accordance with Rule 9(b) or the PSLRA."  *Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155
(3d Cir. 2004).

*only* specific facts alleged in an effort to support Plaintiffs' claim, and the Complaint refers to them repeatedly.[24]  (*Id.* at ¶¶93, 105, 107, 114, 118, 120, 128, 139, 141.)

But these few "examples" do not remotely suffice to indicate the existence of some deliberate plan by the 10(b) Defendants to abandon quality concerns and underwriting standards.  To begin with, these few "examples" represent a sum total of only $32-43 million out of PVTB's total loan portfolio of between $4 billion and $9 billion during the Class Period. (Appendix at A-1.)  And the attempt to suggest that this paucity of "examples" should pass for what was "typical" is itself nothing more than a conclusory assertion, which does not pass muster under the PSLRA.  *See, e.g., Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 332 (S.D.N.Y. 2009) (rejecting allegations about total value of real estate portfolio based only on a few real estate sales); *In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. at 1454 (rejecting adequacy of $200 million loan "example" where defendants' overall real estate portfolio was $4.4 billion); *In re Allscripts, Inc. Sec. Lit.*, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) ("We cannot reasonably infer from two instances the existence of 'widespread problems.'").

Moreover, these few "examples" say little or nothing about any of the 10(b) Defendants and their purported broad-scale "plans."  In fact, the only Defendant alleged to have had anything to do with any of these loans is Van Solkema.  And his only involvement is alleged to have been with the single Vienna Beef loan, which he was "not thrilled with" but approved "even though it had problems" because "*it was being priced accordingly*."  (Compl. ¶63 (emphasis supplied).) Nothing about these alleged facts way indicates some generalized decision to abandon lending standards and throw quality concerns to the wind.  If anything, the alleged facts indicate that the loan was subject to close scrutiny and priced to reflect the relevant risk.[25]  And, tellingly, the Complaint does not allege that this loan ever became non-performing.

---

[24]  The Complaint also contains the vague allegation that CW 9 noticed "numerous 'questionable' files" in PVTB's loan database and clients with multiple delinquent loans.  (Compl. ¶67.)  But those assertions say nothing about the underwriting standards utilized at the time those loans were made, or indicate that any of them was considered "high-risk" *at the time they were made.*

[25]  While CW 1 asserts that there were other (allegedly) "substandard" loans that were also made (Compl. ¶62), no others are identified in the Complaint.  Similarly unsupported is CW1's unilateral

The Complaint's allegations about the three other loans – as to which none of the Officer Defendants is alleged to have had knowledge or been involved – fare no better, and are likewise conspicuous in what they omit to say (including a failure to allege that any of these loans did not end up being repaid). In fact, none of the allegations about these three other loans indicates that any was made without adequate underwriting. For example, while CWs 1 and 9 note that Bower and Bailey and General Growth failed *after* loans were made to them, the Complaint contains no factual allegations at all regarding the underwriting processes for either of those loans, or any facts at all indicating that these loans were determined to be low quality/high-risk loans *at the time they were made*. (*Id.* ¶66.) And while CW 1 notes that Harlan had had *prior* bankruptcies, he once again provides no specifics at all regarding the underwriting process and determinations made at the time of the $2-3 million loan made to it, *e.g.*, the quality of the collateral securing the loan. (*Id.* ¶65.) Instead the Complaint asserts CW 1's *personal* and unexplained characterization of the loan as being "high risk" – notwithstanding the fact that, according to the Complaint, PVTB would be holding $10 million in Harlan's cash deposits.

In short, the Complaint's "examples" do not give rise to any broader inference of a general policy of abandoning lending quality requirements, and do not even indicate inadequate underwriting in these few instances.

**The Alleged Abandonment of Risk-Management.** At various points, the Complaint appears to contend that PVTB did not have any of the risk management and underwriting policies it disclosed during the Class Period. For example, ¶105 nakedly asserts that PVTB

---

attempt to transform "substandard" into "subprime" – a usage that he acknowledges did not accord with Van Solkema's. (*Id.* ¶63.) Finally, while CW 1 attempts to characterize a loan rating of "6" as being "substandard" (*id.* ¶62), he does not state that his personal terminology is the actual categorization used by PVTB for a "6" rating. In fact, PVTB's public disclosures explain that a rating of 6 means "special mention." (Ex. 13 (2010 10-K) at 55.) As made clear in the FDIC's Risk Management Manual of Examination Policies (available at http://www.fdic.gov/regulations/safety/manual/section3-2.html) , which sets forth guidelines on loan classification, "Special Mention" loans are distinct from "Substandard Loans." (Ex. 14, at pp. 40-41) (noting that "adversely classified loans are allocated on the basis of risk to three categories: Substandard; Doubtful; and Loss. Other loans of questionable quality but involving insufficient risk to warrant classification, are designated as Special Mention loans.")

"had no risk-management 'infrastructure.'" In the same paragraph, Plaintiffs dispute the truth of a statement that management had adopted "policies to strengthen our credit review and underwriting standards." But these conclusory assertions of falsity are unsupported by any particularized facts and contradicted by the Complaint's own allegations.

For example, on February 29, 2008, PVTB disclosed that its risk management team had implemented a "biweekly loan committee review process." (Ex. 2 (2007 10-K) at 8.) The Complaint cites no facts to the contrary. And the Complaint itself alleges that, shortly after arriving at PVTB in March 2008, Van Solkema formed "a Credit Risk Committee" which "held regular meetings" at which the internal reporting "was so thorough that '*everyone was buried under risk reporting*.'" (Compl. ¶70 (emphasis supplied).) According to the Complaint, "Van Solkema [] 'drill[ed] down' on loans and [held] weekly "come to Jesus" meetings." (*Id.* ¶73.) On August 11, 2008, PVTB further reported that, in order to improve risk assessments, it had instituted "a market area specific reserve model that includes the quantification of external and internal factors impacting each one of our different market areas." (*Id.* at ¶111, p. 41.) Again, the Complaint contains no facts at all indicating that this was not actually done. And in September 2008, PVTB announced that it had implemented "a robust enterprise risk management ("ERM") process," which encompasse[d] all aspects of PVTB's business. (*Id.* ¶134.) Once again, the Complaint contains no facts to the contrary. While Plaintiffs may quarrel with the efficacy of some of these steps as they relate to particular loans, the notion that PVTB deliberately abandoned risk-management is simply unsupported.[26]

---

[26] Similarly unsupported is the Complaint's attempt to take issue with the "rigorous stress testing" that PVTB adopted in 2008 for new loan issuance. (*Id.* ¶127-128.) Nowhere does the Complaint describe any specifics regarding these required processes for new loan issuances; nor does it attempt to identify any specific deficiencies in those processes (much less provide facts showing that any such deficiencies were made known to any of the Officer Defendants). This absence of a basic "who, what, when, where and how" is itself fatal. *See, e.g., Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at * 12 (S.D.N.Y. Sept. 28, 2010) (dismissing claims regarding adherence to underwriting guidelines where complaint did not allege "which 'practices' [defendant] represented that it would use or which practices were 'effectively abandoned,' nor [did] it describe the extent to which such practices were 'effectively abandoned.'); *Arazie*, 2 F.3d at 1465. Instead, the Complaint purports to contest the existence of this pre-loan "stress testing" based on CW 9's "wondering" after the fact why certain (unspecified) loans he allegedly observed in the data base had been made. This is not a contrary "fact"

**The Absence of a "Strong Inference" of Scienter.**  As discussed above, the Complaint contains no allegations at all directly evidencing the existence of a deliberate strategy by the 10(b) Defendants  "to initiate as many loans as possible, *regardless of the credit quality or long-term risk to the Company*."  (Compl. ¶8 (emphasis added).)  Nor is the Complaint successful in its attempt to imply such a deliberately concealed strategy from a mere handful of loans in which the Officer Defendants had no involvement (other than the modest Vienna Beef loan, as to which only Van Solkema was involved).[27]  There is no "cogent and compelling" inference of such a hidden strategy here, or "strong inference" that the 10(b) Defendants lied whenever they discussed lending standards.  *Tellabs*, 551 U.S. at 324.

To the contrary, the purported strategy is a patently absurd one.  And it is hard to imagine a situation where it would be in the interests of bank executives to intentionally embark on a strategy that would result in their bank deliberately making loans they knew were likely to be written down "in the near future."  (*Id.* ¶17.)  "People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud.  One who believes that another has behaved irrationally has to make a strong case."  *DiLeo*, 901 F.2d at 629.  Plaintiffs have made no such case here.

As an initial matter, Plaintiffs' attempts to concoct a motive are nonsensical.  Plaintiffs assert that the 10(b) Defendants were motivated to mislead the market about their plan so that PVTB could conduct the Offerings in order to raise money to "potentially off-set the huge write-downs the Company was eventually forced to take" on loans under the Plan.  (Compl. ¶83.)  Put differently, the 10(b) Defendants allegedly adopted a strategy they knew would result in losses so that they could conduct offerings to cover those losses.  This purported motive not

---

disproving the occurrence of stress testing, however, much less one from a knowledgeable witness.  It is nothing more than anecdotal, *post hoc* speculation.

[27]  Likewise, although CWs 1, 3, 4, and 9 go to great lengths to disparage the former LaSalle employees hired under the Growth Plan (Compl. ¶¶56, 57), they do not allege that a single 10(b) Defendant ever manifested an intent or belief that those new hires would engage in risky lending practices, much less that they instructed them to do so as part of a deliberate strategy to sacrifice high quality loans.

only fails to allege any personal, concrete benefit that any Officer Defendant could realize from such a deception,[28] it is wholly circular.

What remains is the Complaint's attempt to extract an inference of the 10(b) Defendants' allegedly concealed plan from their adoption of a Performance Award program for employees. In particular, the Complaint cites CW 5 for the proposition that the Performance Award program "was designed to promote quantity over quality." (Compl. ¶68.) It is clear, however, that this is merely CW 5's speculative opinion, not something that any of the Officer Defendants said to him (or anyone else). Indeed, there is no allegation that CW 5 (a former employee in Michigan) ever met with any of the 10(b) Defendants, much less was privy to their internal deliberations regarding the Performance Award program. In short, there is nothing in the description of CW 5 that indicates he was "in a position to know at first hand" that the program was "designed" to sacrifice quality for quantity. *Tellabs*, 513 F.3d at 712. *See Higginbotham*, 495 F.3d at 757; *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831-32 (N.D. Ill. 2006) (no adequate indications of how the confidential witnesses learned their information); *Ley*, 543 F.3d at 811.

Moreover, not only is CW 5's assertion entirely speculative, the notion that the Performance Awards program itself somehow creates a "strong inference" of scienter also makes no sense. To begin with, incentive compensation programs are commonplace, and not in the least bit indicative of some scheme to defraud. *See, e.g., Allscripts*, 2001 WL 743411, at *11; *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Davis*, 431 F. Supp. 2d at 830 (recognizing that allegations of increased compensation "were insufficient to establish scienter"). Even more fundamentally, though, Plaintiffs have ignored the specific nature of the Performance Awards program here.

---

[28] *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (motive allegations must allege "concrete benefits that could be realized by one or more of the [alleged] false statements and wrongful disclosures") (internal quotation marks omitted); *Ley v. Visteon Corp.*, 543 F.3d 801, 813 (6th Cir. 2008) (rejecting motive allegation with respect to a note offering to raise additional capital); *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 918 (N.D. Tex. 1998).

Awards were not provided merely for writing loans. Instead, the incentives created were tied to long-term growth in stock price and earnings – *to be measured over a five-year period ending December 31, 2012*, against a stock price of $27.91 and earnings per share of $1.65. (Compl. ¶68.) Thus, rather than creating an incentive to make loans that would likely go bad in the near future, thereby damaging PVTB's financial results, the structure of the program did the opposite, with the vast majority of the available awards dependent on PVTB's longer term success. In short, while the Performance Awards program is largely irrelevant to the issue of scienter here, to the extent it is relevant at all it is far more supportive of a non-culpable inference than of a "strong inference" of scienter – thereby underscoring just how weak Plaintiffs' claims of scienter are here.

**E.     The Complaint's Remaining Allegations of False Statements Are Insufficient.**

**The statement regarding continuation of PVTB's prior business model.** A press release issued by PVTB on November 2, 2007 contained statements that its Growth Plan would be built upon the "unique approach to private banking that we have successfully fostered" and based "on the continuation of the Company's business model with a goal of substantially increasing its commercial market share." (Compl. ¶84.) Plaintiffs conclusorily allege that this statement was false, claiming that the Plan was not a continuation of PVTB's prior business model. (*Id.* ¶¶54, 85.) However, the Complaint never identifies what the components of the prior "business model" were, even though PVTB itself explicitly did so in public filings. As those public filings make clear, there were five key components of PVTB's business model (referred to as "The PrivateBank Approach"): personal relationships, affluent target clients, customized financial services, streamlined decision-making process, and a network of comprehensive financial services. (Ex. 15 (2006 10-K ) at 4-6.) The only one of those five components revised under the Plan was the focus on affluent target clients (Ex. 2 (2007 10-K) at 5-6), which was modified by an increased emphasis on commercial clients and a "shift in [PVTB's] lending strategy to emphasize commercial lending" (*id.* at 4-5).

28

The Complaint does not allege that any of the other components of "The PrivateBank Approach" was discontinued under the Plan. Instead, its focus is on an entirely different subject matter – *i.e.*, PVTB's alleged abandonment of its *underwriting practices* under the Plan. This is merely a variant of the insufficient allegations discussed in section I.D. above. In any event, the components of its unique "business model" that PVTB had previously disclosed said nothing about the subject of lending standards, and the Complaint alleges no facts to the contrary.[29]

**The statements regarding PVTB's progress in implementing the Growth Plan.** The Complaint alleges that two statements regarding progress in implementing the Growth Plan, made, respectively, on November 27, 2007 and January 28, 2008, were "false and misleading" because, *inter alia*, the Company was just "'shoot[ing] from the hip'" and allegedly not following its prior business model. (Compl. ¶¶86-87, 90-91.) Once again, this is merely a variant of the insufficient allegations discussed in section I.D. above. But, read in context, it is also clear that each of these statements was referring specifically to "progress" in executing the previously announced goal of recruiting "a significant number of senior commercial banking and other officers." *See* p. 2, *supra*; Ex. 2 (2007 10-K) at 3. Thus, the only specific information about progress implementing the Plan contained in the November 27, 2007 statement relates to the number of new hires since the end of the third quarter. (Compl. ¶86.) Similarly, while the Complaint highlights a *portion* of a sentence from the January 28, 2008 8-K which refers to "progress," the remainder of the sentence refers to "the hiring of Larry Richman as our new President and CEO as well as a substantial number of senior commercial bankers and other new employees." (*Id.* ¶90.)

The Complaint does not allege a single fact indicating that PVTB had not made the new hires to which it specifically referred in these statements. Instead, Plaintiffs attempt to transform the subject matter of these statements into something they were not, *e.g.*, a comment

---

[29] Revealing one fact "does not mean that . . . one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'" *Backman*, 910 F.2d at 14, 16; *St. Lucie County Fire Dist. Firefighters' Pension Trust Fund*, 2011 U.S. Dist. LEXIS 19788 at *32-33.

about whether PVTB's prior "business model" was being followed. (*Id.* ¶91.) This is illegitimate. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2008); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *9-10 (E.D. Mich. 2007).

**The failure to disparage employees being hired.** The Complaint also alleges that PVTB's statements about hiring "experienced" and "high-quality" new employees under the Plan were misleading because the 10(b) Defendants supposedly failed to disclose that those bankers "came largely from LaSalle, which had a history of poor underwriting practices and aggressive bankers accustomed to a culture that was 'all about big salaries.'" (¶¶101-102; ¶¶104-105.) But PVTB was fully forthcoming about the fact that its new hires included many former LaSalle employees. (*See, e.g.,* Ex. 16 (Nov. 2, 2007 8-K) at 2) (touting "PrivateBancorp's recent success in recruiting a number of key middle market commercial bankers from LaSalle Bank" and specifying the hiring of 27 bankers from LaSalle in the past two weeks); Ex. 17 (11-27-07 Business Update Call Transcript) at 4 .)

What the Complaint is really complaining about is that when announcing these new hires, PVTB did not disparage the very employees it was hiring, using pejorative descriptions of the type appearing throughout the Complaint. The Company was under no obligation to undertake such a self-defeating act, nor does any case impose such a perverse requirement. To the contrary, the courts have repeatedly recognized that a company and its officers are "under no duty to cast [their] business in a pejorative, rather than a positive, light." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 (D.D.C. 2007) (failure to employ "the negative terms plaintiffs use in their complaint does not constitute an actionable material omission").[30] And the Seventh

---

[30] *See also In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) (no obligation to use pejorative adjectives to characterize facts disclosed in prospectus); *Wright v. Int'l Bus. Machs. Corp.*, 796 F. Supp. 1120, 1126 (N.D. Ill. 1992) ("editorial semantics [] are not a concern of the securities laws" because "[w]hether or not a company employs the adjectorial characterizations that a plaintiff would have chosen should not be the focus of the court's inquiry"); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) ("[s]ince the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, such statements are immaterial as a matter of law and cannot serve as the basis of a 10b-5 action under any theory.").

Circuit has rejected this kind of bootstrap attempt to turn claims of mismanagement into securities disclosure violations. *Panter v. Field,* 646 F.2d 271, 288 (7th Cir. 1981).

> **F.      The Complaint's Allegations as to Individual Officer Defendants Are Insufficient, and Its Group Pleading Approach Is Impermissible.**

Plaintiffs' allegations of falsity and scienter fail for the reasons discussed above, reasons that are generally applicable to all of the 10(b) Defendants.  However, not only are those allegations generally insufficient, there are also additional pleading deficiencies as to various of the individual Officer Defendants.

To begin with, while the Complaint attempts to lump all the of the Officer Defendants together for purposes of all the challenged statements, there are no allegations tying *each* of the Officer Defendants to the "making" of *each* such statement.  Thus, for example, there are various oral statements quoted in the Complaint made by a single Officer Defendant which the Complaint nonetheless attempts to attribute to all.  (*See, e.g.,* Compl. ¶¶86-87, 92-93, 104-109, 115-120, 127-131.)  This is impermissible.  As the Seventh Circuit has made clear, a defendant can be held liable with respect to a statement only if he is a "maker" of that statement (and acts with scienter in the "making").  *Pugh*, 521 F.3d at 697, *citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).  The Complaint simply ignores these distinctions, and makes no attempt to link Officer Defendants to statements not attributed to them.

The Complaint similarly inappropriately attempts to lump the Officer Defendants together for purposes of scienter, even though that is a highly individualized inquiry.  The Complaint conclusorily alleges that they all had access to unspecified information and knew of the alleged misrepresentations by virtue of their high-level positions.  (Compl. ¶¶32-34.)  But allegations lumping all defendants together constitute "impermissible group pleading," which "fails to meet the heightened PSLRA pleading requirements." *City of Livonia,* 2010 WL 2169491, at *6;  *Pugh*, 521 F.3d at 693.

In addition, vague allegations that Officer Defendants had "access to undisclosed information" have routinely been rejected under the PSLRA.  Courts have consistently held that

31

"[s]cienter…may not rest on the inference that defendants must have been aware of a misstatement based simply on their positions within the company." *In re Bally Total Fitness Sec. Litig.*, 2006 U.S. Dist. LEXIS 93986, at *26 (N.D. Ill. July 12, 2006). *See also Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (dismissing claims against the company's chairman and CFO because "[a] pleading of scienter may not rest on the inference that defendants must have been aware of [a false statement] based on their positions within the company."); *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000) ("[g]eneralized imputations of knowledge do not suffice regardless of the defendants' position within the company"); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008). Likewise, allegations regarding unspecified reports, conversations and meetings fall far short of the particularity requirements of the PSLRA and Rule 9(b) which require a plaintiff to "specifically identify the reports or statements containing this information." *See Higginbotham*, 2005 U.S. Dist. LEXIS 12006, at *18 (refusing to infer strong inference of scienter without "some details as to the contents of the reports [allegedly provided to defendants], as well as when and how reported."); *Arazie*, 2 F.3d at 1467; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

Here, the Complaint's allegations with respect to particular Officer Defendants are subject to the following additional deficiencies.

**Defendant Klaeser.** Klaeser left PVTB in March 2009. (Compl. ¶29.) Accordingly, he cannot be claimed to be liable for statements after that time (*see, e.g., id.* ¶¶134-143).[31] Moreover, many of the statements claimed to be false prior to his departure are not alleged to have been made by him. (*See, e.g., id.* at ¶86 (11-27-07 earnings call), ¶90 (4Q07 8-K), ¶104 (2Q08 earnings call), ¶108 (same), ¶117 (3Q08 earnings call), ¶119 (same), ¶127 (4Q08 earnings call).)

---

[31] Klaeser did not sign, and is not alleged to have signed, the 10-K filed on March 2, 2009. (*See* Ex. 4 at 145-147 and exhibits 31.1, 31.2, and 32.1 thereto.)

Even more fundamentally, the Complaint contains no particularized factual allegations at all regarding Klaeser's purported scienter. None of the CWs mention him, nor are there any other particularized allegations attempting to allege his knowledge of false statements.

**Defendant Killips.** Killips joined PVTB in March 2009, nearly a year and a half into the Class Period. The Complaint nonetheless impermissibly seeks to hold him liable for misrepresentations that pre-date his arrival. (Compl. ¶170.)

Moreover, the Complaint does not allege any particularized facts giving rise to a "strong inference" of Killips' scienter with respect to the few statements in which he had any involvement.[32] Instead, the only allegation about Killips' supposed knowledge is the generic assertion that he (along with Richman and Van Solkema) received "biweekly reports" about "underperforming" loans. (Compl. ¶78.) Yet Plaintiffs do not even conclusorily allege the contents of any of those reports *at the time* of any statements made by Killips, much less allege with particularity how any of those reports indicate he knew his statements were false.

**Defendant Mandell.** The only statements by Mandell mentioned in the Complaint are from November 2007 and January 2008. (¶¶84, 90, 92.) These allegations are, in turn, entirely disconnected from the Complaint's attempt to attribute scienter to him. In that regard, the Complaint's only specific references to Mandell's knowledge is its allegations that he (i) attended the February 2008 meeting, and (ii) "would have known" of the reasons for the departure of a St. Louis credit officer. (Compl. ¶¶75, 77.)[33] But each of these events occurred *after* the only statements attributed to Mandell and have nothing to do with those statements (which are alleged to have been misleading with respect to the Growth Plan). Moreover, as to

---

[32] Killips allegedly made one statement on one earnings call and signed two 10-Qs and one 8-K. These statements are allegedly misleading for not disclosing PVTB's purported failure to maintain adequate loan loss reserves and high-risk loan strategy. (Compl. ¶¶136-39, 140-43.)

[33] While Mandell is not alleged to have made any statements after the time of these events, for reasons previously discussed, the allegations about what occurred at the February 2008 meeting do not in any event give rise to a "strong inference" of knowledge that the $108.8 million write-off should have occurred earlier than January 2009. *See* pp. 9-12, *supra*. The same is true with respect to the departure of the St. Louis credit officer. *See* p. 10, n.12, *supra*.

the Growth Plan, the Complaint contains no particularized factual allegations at all regarding Mandell's knowledge of a purported plan to sacrifice quality for quantity.

**Defendant Richman.**  The Complaint's only particularized attempts to allege Defendant Richman's scienter are based on the allegations that he (i) attended the February 2008 meeting, and (ii) received the same unspecified biweekly reports that Defendant Killips received. (Compl. ¶¶75, 78.)  These allegations fail for reasons already discussed at pp. 9-12, 33, *supra*.

**Defendant Van Solkema.**  The only allegedly false statements that the Complaint attributes to Defendant Van Solkema occurred on four earnings calls.  (Compl. ¶¶108, 119, 130, 140.)  His statements concerned the institution of credit procedures (¶108), and the fact that there were no non-performing loans in the Growth Plan portfolio as of October 27, 2008 (¶119), January 26, 2009 (¶130), or the end of the second quarter of 2009 (¶140).  There are no particularized factual allegations showing that Van Solkema had knowledge to the contrary at the time of any of these statements.  Instead, the only *factual* allegations with respect to what Van Solkema did or knew boil down to the following: (i) he intensely monitored loan performance (and increased his scrutiny of such performance over the course of the Class Period) and thus had an in-depth understanding of problem loans throughout the Class Period (*id.* ¶¶70-73); and (ii) he approved the loan to Vienna Beef after careful scrutiny and determination that it had been "priced accordingly" (*id.* ¶¶61-63).  These allegations indicate nothing more than a good faith effort to manage risk.  They do not give rise to a "strong inference" of some gratuitous intent to defraud.

\* \* \*

In short, Plaintiffs have not alleged any particularized facts giving rise to a strong inference that any of the Officer Defendants made any false statements with scienter. [34] Plaintiffs' failure to do so is not only fatal to their claims against these individuals but also to their claims against PVTB.  As the Seventh Circuit has explained:

---

[34] Plaintiffs' Section 20 claims against the Officer Defendants must also be dismissed because they have not adequately alleged an underlying violation of Section 10(b).  *Davis*, 431 F. Supp. 2d at 833.

> [T]he corporate scienter inquiry must focus on the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

*Pugh*, 521 F.3d at 697 (citations omitted).  Thus, to plead scienter against PVTB, Plaintiffs must either successfully plead that scienter is "held by the corporate employee responsible for issuing the alleged misrepresentations" or that "at least [] a senior officer or director of the corporation [has] the pertinent scienter." *Higgenbotham*, 2005 U.S. Dist. LEXIS 12006 at *26.  Having failed to do so with respect to any Officer Defendant and having failed to identify anyone else who allegedly made false statements with scienter, Plaintiffs' allegations against PVTB must also be dismissed.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR A VIOLATION OF EITHER SECTION 11 OR 12 OF THE SECURITIES ACT.

As another court recently observed in considering allegations similar to those at issue here, "Sections 11 and 12(a)(2) are Securities Act siblings with roughly parallel elements." *Barclays*, 2011 WL 31548 at *5; *Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 120 (S.D.N.Y. 2010) (same).  Section 11 governs registration statements, and Section 12 governs prospectuses and oral communications.  15 U.S.C. §§77k(a), 77l(a)(2).  "The test for determining whether the prospectus contained a material misstatement or omission is whether the defendants' representations in the prospectus, taken together and in context, would have misled a reasonable investor."  *Barclays*, 2011 WL 31548 at *5 (internal quotation and citation omitted). To be actionable, a statement must be false or misleading *at the time it was made*; how things "turn out ex post do not matter to liability."  *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995).

In an attempt to insulate the Securities Act claims from the deficiencies of the Exchange Act claims, the Complaint purports to sever the two and deliberately avoids incorporating by reference the previous allegations.  (Compl. ¶175.)  As a result, however, all conceivable

specifics have been removed from the Securities Act allegations – *e.g.*, no specific loans have been identified, no internal warnings or communications of any sort are alleged, and no "confidential witness" averments are included. What remains are nothing more than conclusory assertions that do not suffice to pass master even under the less rigorous pleading standards applicable to Securities Act claims.[35] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Pugh*, 521 F.3d at 699.

### A. The Claims Regarding the 2008 Offering Are Insufficient.

Plaintiffs do not allege that any of the statements contained in the registration statement or prospectus supplement for the 2008 Offering were false or misleading. Instead, they allege that certain statements included in documents incorporated by reference in the offering materials were misleading, in three respects. None of these claims is adequately pleaded.

*First*, the Complaint alleges that PVTB's incorporated 2007 10-K and April 28, 2008 8-K were misleading because they "failed to disclose the deteriorating credit quality problems in their legacy loan portfolio." (Compl. ¶¶217, 213.) However, as discussed at length above (*see* pp. 7-8), PVTB *repeatedly* did disclose deterioration in its legacy loan portfolio. And it did so in documents incorporated by reference into the 2008 Offering documents. (*See* Ex. 2 (2007 10-K) at 54; Ex. 5 (1Q08 8-K) at 5, 10.) PVTB reported allowances for loan losses that, on a dollar basis and as a percentage of outstanding loans, continued to grow each quarter, and also quarterly disclosed region-by-region increases in its non-performing loans. *See* Appendix at A-1, A-3. The disclosures accompanying these increases made clear that they were attributable to deterioration in the legacy loan portfolio. (*See, e.g.,* Ex. 2 (2007 10-K) at 54 (attributing growth in NPAs to "general weakening of the housing market and the deterioration of many residential real estate development loans"); Ex. 5 (1Q08 8-K) at 5 (attributing 65% of NPAs to residential development loans); *see also* pp. 7-8, *supra*.) Accordingly, these allegations must be dismissed.

---

[35] Plaintiffs' Section 15 claims against the Officer Defendants must also be dismissed because they have not alleged an underlying violation of Section 11 or 12. *In re Newell Rubbermaid Sec. Litig.*, 2000 U.S. Dist. LEXIS 15190, at *31 (N.D. Ill. Oct. 4, 2000).

*See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991) (dismissing Section 11 claim where "the prospectus states exactly the 'fact' that [plaintiff] contends has been covered up"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) (dismissing Section 11 and 12 claims where "contradicted by the disclosure of risk made on the face of each prospectus"); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) (dismissing Section 11 claim "because the Prospectus disclosed the fact plaintiffs charge to have been omitted").

*Second,* the Complaint claims that the incorporated 2007 10-K and first quarter 2008 10-Q were each misleading because they "failed to maintain an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio." (Compl. ¶¶215, 213.) But in an attempt to avoid a suggestion of deliberate fraud (which would require a greater factual showing), the Complaint carefully avoids alleging in the Securities Claims that any of the Defendants were *aware* that the loss allowance was insufficient *at the time* (or, for that matter, prior to shortly before the time of the October 26, 2009 announcement of losses with respect to some Growth Plan loans, *id.* ¶225). In short, the allegation that the allowance was insufficient to absorb "the credit losses inherent" in the loans, is nothing more than a thinly veiled hindsight claim.[36] However, "[a] plaintiff may not plead Section 11 or 12(a)(2) claims with the benefit of 20/20 hindsight." *Barclays*, 2011 WL 31548, at *5. *See also Freidus v. ING Groep .N.V.*, --- F. Supp. 2d ----, 2010 WL 3554097, *5 (S.D.N.Y. Sept. 14, 2010).

That is particularly true in matters pertaining to the adequacy of reserves and loss allowances, which are in the nature of judgmental estimates. *See United States v. Morris*, 80 F.3d 1151, 1163 (7th Cir. 1996) (holding that statements regarding the adequacy of loan loss reserves are matters of "opinion or belief," and that claims as to their falsity are therefore

---

[36] The same is true of the conclusory allegation that "[a]s a result" of the Growth Plan "the Company was saddled with large amounts of nonperforming loans issued under the Growth Plan." (Compl. ¶206.) This portion of the Complaint conspicuously does not allege *when* the Growth Plan loans became "nonperforming," including whether it was prior to or after either of the Offerings.

subject to the requirements of *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)).

Accordingly, statements by defendants regarding the adequacy of loan loss reserves can only be

actionable under the Securities Act "if it is alleged that defendants did not actually believe that

loan loss reserves were adequate, or if defendants had no reasonable factual basis for their

belief." *Fait*, 712 F. Supp. 2d at 125 n.55 (internal citations omitted); *In re CIT Group, Inc. Sec.

Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y.2004). *Cf. Morris*, 80 F.3d at 1164-65 (requiring a

showing that "bank management did not truly believe in the adequacy of Germania's loss

reserves and that its statement to the contrary was not supported by the available facts.").[37] Yet

here, the stripped down Securities Act claims contain no allegations at all indicating *either* that

Defendants did not actually believe that loan loss allowances were adequate at the time of the

2008 Offering *or* that they lacked a reasonable basis for their beliefs at the time.[38] In that

regard, it bears repeating that nowhere in the Complaint, much less in the Securities Act

allegations, is there any allegation that any of the Defendants was ever provided with a

recommendation or otherwise informed that additional loss reserves or allowances should be

---

[37] *See also Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at*6 (N.D. Cal. June 8, 1994) ("Because reserves are meant to be estimates or predictions of collectability, they are fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.") (internal quotation and citation omitted); *see also Christidis v. First Pennsylvania Mortg. Tr.*, 717 F.2d 96, 100 (3d Cir. 1983) (same); *Barclays*, 2011 WL 31548, at *8 ("Subjective opinions are only actionable under the Securities Act if a complaint alleges that the speaker did not truly have the opinion at the time it was made public.") (internal quotation and citation omitted); *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998).

[38] The same is true of the allegation in ¶208 regarding the legacy loan write-offs that were announced in January 2009. Plaintiffs try to enhance their allegation on that subject by selectively incorporating a single earlier paragraph, ¶75, which describes the February 2008 meeting at which problems in the Michigan and Atlanta regions were discussed. But, as pointed out earlier (*see* p. 9, *supra*), the allegation regarding that meeting does *not* say that there was any mention or recommendation of taking at that time the $108.8 million in write-offs announced almost a year later. Nor is there any allegation in that paragraph (or in any other included within the Securities Act claims) that any losses identified in the February 2008 meeting were not among those that the Company took provision for in the very next quarter (when it increased its loss reserves). Instead, all Plaintiffs have alleged is that there was some discussion in February 2008 that certain unspecified loans had "problems" in unspecified amounts. In short, while Plaintiffs attempt to *imply* actual knowledge by the Defendants that the $108.8 million write-off should have been taken earlier – an accusation that would sound in fraud – the allegations in the Securities Act claims say no such thing.

taken that were not in fact promptly taken.  Nor does the Complaint contain even a single allegation regarding the methodologies utilized by PVTB to estimate loan loss allowances and reserves, much less attempt to identify any known deficiency.

*Third,* the Complaint asserts that two of the incorporated documents, a January 28, 2008 8-K (Compl. ¶210) and an April 28, 2008 8-K (*id.* ¶216) – which each did little more than provide quarterly statistics regarding increases in loan amounts – were "false and misleading" because they did not go on to state that "the increase in the loan portfolio was due to risky lending under the Growth Plan, resulting in a rapidly increasing number of bad loans."  (*Id.* at ¶¶211, 217.)  As an initial matter, however, companies are under *no* obligation to characterize their operations in a pejorative manner. *See* p. 30, *supra*, and n.30.  And that is especially true here, where the statements in question did not say anything about lending standards; the self-disparagement suggested by Plaintiffs is entirely gratuitous.

In any event, Plaintiffs have simply not alleged in their Securities Act claims any "plausible grounds to infer" (*Twombly*, 550 U.S. at 556) the systemic existence of "risky lending…resulting in a rapidly increasing number of bad loans" at the time.  Not a single "risky loan" made at the time is identified in the Securities Act claims,[39] nor is the conclusory allegation "risky" defined in any way.  Similarly, while conclusorily referring to "resulting…bad loans," the Securities Act allegation does not identify even a single Growth Plan loan that was non-performing *at the time* of the 2008 Offering.  Instead, the Securities Act claims in this regard are based on nothing more than a series of conclusory and vague assertions containing nothing more than pejorative adjectives (*e.g.,* no "meaningful" standards (¶204), "high-risk" (¶213)).  Conclusory characterizations of this sort are not credited on a motion to dismiss, and do not suffice to state a claim here.  *Garnett v. Millennium Med. Mgmt. Res.*, 2010 U.S. Dist. LEXIS 131035, at *4 (N.D. Ill. Dec. 9, 2010) (pleading that offers "labels and conclusions…will not do") (internal quotation and citations omitted).

---

[39]  Even the few loans identified in the Exchange Act allegations, which are not incorporated in the Securities Act claims, lack any accompanying specific allegations as to *when* they were made.

39

### B.     The Claims Regarding the 2009 Offering Are Insufficient.

The Complaint's allegations regarding the May 14, 2009 Offering are to the same effect and share the same deficiencies.

*First,* the Complaint alleges that two documents incorporated by reference in the 2009 Offering materials – PVTB's 2008 10-K (Compl. ¶221) and first quarter 2009 10-Q (*id.* ¶223) – were each false because they "did not provide an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio" (*id.* ¶¶222, 224). These allegations are identical to those discussed with respect to the 2008 Offering and have the same failings.  Once again, there are simply no allegations at all about how loan losses were estimated at the time.  Nor are there any allegations indicating *either* that Defendants did not actually believe that loan loss allowances were adequate at the time of the 2009 Offering *or* that they lacked a reasonable basis for their beliefs at that time.

*Second*, the Complaint further alleges that each of these incorporated documents was also "false" by failing to disclose "the high-risk loans originated under the Growth Plan."  (*Id.*) These conclusory allegations are insufficient for reasons discussed above (pp. 16-17, *supra*). Moreover, to the extent Plaintiffs seek to suggest the existence of some purported deliberate *policy* that allegedly should have been disclosed, *e.g.*, one of allegedly sacrificing "quality" and making "high-risk loans" to achieve "quantity," not a single factual allegation in the Securities Act claims indicates the existence of any such deliberate policy.  *See also* pp. 21-22, *supra*. Plaintiffs are required to allege "enough factual matter" as a basis for their claims to "nudge[] their claims across the line from conceivable to plausible . . . ."  *Twombly*, 550 U.S. at 570**.** They have not done so with respect to the Securities Act claims here.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the entirety of the Complaint with prejudice.

Dated:  March 25, 2011

Respectfully submitted,

By:     s/ Julie M. Weber
David F. Graham
Rachel B. Niewoehner
Julie M. Weber
Matthew D. Taksin
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Fax:  (312) 853-7036

*Attorneys for PrivateBancorp, Inc., the Officer Defendants, and the Director Defendants*

Charles F. Smith, Jr.
Michael Y. Scudder, Jr.
Nick D. Campanario
SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone:  (312) 407-0974
Fax:  (312) 407-0411

*Attorneys for J.P. Morgan Securities Inc., Keefe, Bruyette & Woods, Inc., Robert W. Baird & Co. Inc., Suntrust Robinson Humphrey, Inc., and William Blair & Co., L.L.C.*

# APPENDIX

## LOAN LOSS, LOAN BALANCE, AND CHARGE-OFF DISCLOSURES

| Quarter End (Source: 8-K) | Provision for Loan Losses Added In Quarter (in thousands) | Allowance for Loan Losses - Ending Balance (in thousands) | Total Loan Balance (in thousands) | Allowance for Loan Losses / Total Loans | Loans Charged-Off (in thousands) |
|---|---|---|---|---|---|
| 3Q07[1] | $2,399 | $42,113 | $3,737,523 | 1.13% | $1,648 |
| 4Q07[2] | $10,171 | $48,891 | $4,177,795[3] | 1.17% | $3,435 |
| 1Q08[4] | $17,133 | $61,974 | $5,136,066 | 1.21% | $4,114 |
| 2Q08[5] | $23,024 | $79,021 | $6,417,026 | 1.23% | $6,097 |
| 3Q08[6] | $30,173 | $102,223 | $7,441,137 | 1.37% | $7,017 |
| 4Q08[7] | $119,250 | **$112,672** | $8,036,807 | 1.40% | $109,459[8] |
| 1Q09[9] | $17,805 | $127,011 | $8,483,641 | 1.50% | $7,037 |
| 2Q09[10] | $21,521 | $140,088 | $8,728,926 | 1.60% | $12,580 |
| 3Q09[11] | $90,016 | $192,791 | $9,028,456 | 2.14% | $40,142 |

[1] Ex. 18 at 10 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 13 (Total Loan Balance).

[2] Ex. 11 at 10 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 13 (Total Loan Balance).

[3] The total loan balance as of December 31, 2007 was refined after filing the 8-K announcing the 4Q07 results. This figure is therefore taken from the 2007 10-K (Ex. 2 at 9). The allowance for loan losses as a percentage of total loans did not change with the change in the total loan balance.

[4] Ex. 5 at 12 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 13 (Total Loan Balance).

[5] Ex. 6 at 14 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 11 (Total Loan Balance).

[6] Ex. 7 at 13 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 11 (Total Loan Balance).

[7] Ex 19 at 13 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 11 (Total Loan Balance).

[8] Note, the $108.8 million charge-off reported by PVTB in January 2009 is a net charge-off that reflects an offset of 658,000 in recoveries during the quarter. *See* Ex. 19 at 13.

[9] Ex. 20 at 10 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 12 (Total Loan Balance).

[10] Ex. 21 at 10 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 11 (Total Loan Balance).

[11] Ex. 22 at 11 (Provision for Loan Losses Added in Quarter, Allowance for Loan Losses – Ending Balance, Allowance for Loan Losses/Total Loans, and Total Loan Charge-Offs); 12 (Total Loan Balance).

## NON-PERFORMING ASSETS DISCLOSURES

| Quarter End (Source: 8-K) | Non-Performing Assets (in thousands) | % Change[1] | $ NPAs Explicitly Attributed to Residential Development Loans (in thousands) | % NPAs Explicitly Attributed to Residential Development Loans |
|---|---|---|---|---|
| 3Q07[2] | $35,995 | -- | -- | -- |
| 4Q07[3] | $48,301 | 34.19% | -- | -- |
| 1Q08[4] | $65,886 | 36.41% | $42,700 | 65% |
| 2Q08[5] | $73,107 | 10.96% | $49,100 | 67% |
| 3Q08[6] | $106,522 | 45.71% | $80,000 | 75% |
| 4Q08[7] | $155,742 | 46.21% | $105,700 | 68% |
| 1Q09[8] | $191,599 | 23.02% | -- | -- |
| 2Q09[9] | $212,762 | 11.05% | -- | -- |
| 3Q09[10] | $396,623 | 86.42% | -- | -- |

---

[1] The % Change is calculated as follows: (current quarter Non-Performing Assets - previous quarter Non-Performing Assets) / (previous quarter Non-Performing Assets).

[2] Ex. 18 at 10.

[3] Ex. 11 at 10.

[4] Ex. 5 at 12 (Non-Performing Assets), 5 ($ and % NPAs Attributed to Residential Development Loans).

[5] Ex. 6 at 14 (Non-Performing Assets), 6 ($ and % NPAs Attributed to Residential Development Loans)..

[6] Ex. 7 at 13 (Non-Performing Assets), 6 ($ and % NPAs Attributed to Residential Development Loans).

[7] Ex. 19 at 13 (Non-Performing Assets), 4 ($ and % NPAs Attributed to Residential Development Loans).

[8] Ex. 20 at 10.

[9] Ex. 21 at 10.

[10] Ex. 22 at 11.

## SELECTED REGIONAL NON-PERFORMING LOAN ("NPL") DISCLOSURES

| MICHIGAN DISCLOSURES | | | |
|---|---|---|---|
| Quarter End (Source: 8-K) | Michigan NPLs (in thousands) | Consolidated NPLs | Michigan NPLs / Consolidated NPLs[1] |
| 3Q07[2] | $6,878 | $28,951 | 24% |
| 4Q07[3] | $5,266 | $39,036 | 13% |
| 1Q08[4] | $7,644 | $46,540 | 16% |
| 2Q08[5] | $16,481 | $58,528 | 28% |
| 3Q08[6] | $22,051 | $88,057 | 25% |
| 4Q08[7] | $24,738 | $131,919 | 19% |

| GEORGIA DISCLOSURES | | | |
|---|---|---|---|
| Quarter End (Source: 8-K) | Georgia NPLs (in thousands) | Consolidated NPLs | Georgia NPLs / Consolidated NPLs[1] |
| 3Q07[2] | $6,103 | $28,951 | 21% |
| 4Q07[3] | $10,345 | $39,036 | 27% |
| 1Q08[4] | $16,251 | $46,540 | 35% |
| 2Q08[5] | $13,506 | $58,528 | 23% |
| 3Q08[6] | $21,980 | $88,057 | 25% |
| 4Q08[7] | $25,635 | $131,919 | 19% |

---

[1] This field is calculated by dividing the region-specific NPLs by the Consolidated NPLs.
[2] Ex. 18 at 11.
[3] Ex. 11 at 11.
[4] Ex. 5 at 12.
[5] Ex. 6 at 15.
[6] Ex. 7 at 14.
[7] Ex. 19 at 14.

## CERTIFICATE OF SERVICE

I hereby certify that on this day, March 25, 2011, I electronically filed the above MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

s/ Julie M. Weber