IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CITY OF NEW ORLEANS EMPLOYEES'    )
RETIREMENT SYSTEM, on behalf of itself    )
and all others similarly situated,    )
   )
       Plaintiff,    )
   )
      v.    )   No. 10 C 6826
   )
PRIVATEBANCORP, INC., LARRY D.    )
RICHMAN, DENNIS L. KLAESER,    )
KEVIN M. KILLIPS, RALPH B. MANDELL,    )
KEVIN VAN SOLKEMA, DONALD L.    )
BEAL, WILLIAM A. CASTELLANO,    )
ROBERT F. COLEMAN, PATRICK F.    )
DALY, WILLIAM A. GOLDSTEIN,    )
JAMES M. GUYETTE, RICHARD C.    )
JENSEN, PHILIP M. KAYMAN, CHERYL    )
MAYERRY McKISSACK, WILLIAM J.    )
RYBAK, ALEJANDRO SILVA,    )
JOHN B. WILLIAMS, NORMAN R.    )
BOBINS, KEEFE, BRUYETTE & WOODS,    )
INC., ROBERT W. BAIRD & CO.    )
INCORPORATED, WILLIAM BLAIR &    )
COMPANY, L.L.C., SUNTRUST    )
ROBINSON HUMPHREY, INC., and    )
J.P. MORGAN SECURITIES, INC.    )
   )
       Defendants.    )

# OPINION

Lead plaintiffs City of New Orleans Employees Retirement System and

State-Boston Retirement System bring this putative class action for violations of

the Federal Securities Laws. Pursuant to Fed. R. Civ. P. 12(b)(6) and the Private

Securities Litigation Reform At of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(A),

defendants PrivateBancorp, Inc.; Larry D. Richman, Dennis L. Klaeser, Kevin M.

Killips, Ralph B. Mandell, Kevin Van Solkema, Donald L. Beal, William A.

Castellano, Robert F. Coleman, Patrick F. Daly, William A. Goldstein, and James

M. Guyette ("officer defendants"); Richard C. Jensen, Philip M. Kayman, Cheryl

Mayerry McKissack, William J. Rybak, Alejandro Silva, James C. Tyree, John B.

Williams, Norman R. Bobins ("director defendants");[1] and Keefe, Bruyette &

Woods, Inc., Robert W. Baird & Co. Incorporated, William Blair & Company,

L.L.C., Suntrust Robinson Humphrey, Inc., and J.P. Morgan Securities, Inc.

("underwriter defendants") move to dismiss plaintiffs' amended class action

complaint (the "complaint").

## I.

## Nature of the Claims

PrivateBancorp, Inc. ("PVTB") is a Chicago-based regional bank with

branches in other cities. As of December 31, 2010, it had assets of $12.5 billion.

PVTB had expanded its lending efforts in 2007 and initiated a growth plan (the

"growth plan"), the stated goal of which was to "becom[e] the premier

---

[1]Plaintiffs also refer to the officer defendants and the director defendants
collectively as the "10(b) defendants."

middle-market commercial, commercial real estate, private, and wealth management bank in [its] chosen markets."

As real estate values declined, PVTB took write-downs of loans. After a series of quarter-by-quarter increases in loss provisions recorded during 2008, in January 2009, PVTB took a $108.8 million write-down. PVTB's non-performing loans almost doubled during the third quarter of 2009. PVTB announced additional write-downs in October 2009.

Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") are focused on three categories of alleged misrepresentations. First, that PVTB concealed the deterioration in its "legacy loan"[2] portfolio during 2008 and falsely represented its condition by not earlier writing off $108.8 million in legacy loans announced in January 2009. It is alleged in the complaint that the 10(b) defendants knew by February 2008 of the need for the later $108.8 million write-off. Second, the complaint alleges improper timing and misrepresentations with respect to the write-offs taken in October 2009 with respect to certain loans that were part of the growth plan. Third, the complaint alleges that the 10(b) defendants deliberately abandoned risk concerns and instead sought to issue poor quality loans that they knew would be

---

[2] Legacy loans are those made prior to the growth plan loans.

written down in the future. The complaint contains assertions from various "confidential witnesses," and some details with respect to four loans.

The alleged misrepresentations are also claimed to violate Sections 11 and 12 of the Securities Act of 1933 (the "Securities Act") in connection with two public offerings of PVTB's common stock, one on June 11, 2008 (the "2008 offering") and one on May 14, 2009 (the "2009 offering"). The offerings were made pursuant to registration statements and supplemental prospectuses signed by officer and director defendants. All underwriter defendants served as underwriters for the 2009 offering and all except J.P. Morgan Securities served as underwriters for the 2008 offering.

On or about June 11, 2008, PVTB sold approximately 4 million shares of newly issued common stock at $34 per share, and 522,963 shares of the company's Series A convertible preferred stock at $32.64 per share, resulting in proceeds to the Company of $147.6 million.

On January 8, 2009, PVTB's stock price dropped from $28.12 per share to $25.62 per share. On January 26, 2009, PVTB announced a loss of $62 million for the fourth quarter 2008 and a loss of $91.5 million for the year ended December 31, 2008, compared to a net loss of $15.1 for the fourth quarter 2007

and net income of $11.8 million for the year ended December 31, 2007. PVTB stock dropped from $19.70 per share to $15.32.

PVTB conducted a second public offering of 11.87 million shares of company stock on May 14, 2009, at $19.15 per share, raising $217 million.

The company allegedly raised capital to cushion the effect of the write-downs on nonperforming loans.

Lead plaintiffs seek to represent a class of purchasers of PVTB stock who made their purchases between November 2, 2007 and October 23, 2009 (the "class period").

## II.
## Exchange Act Claims

Plaintiffs allege that, beginning November 2007, PVTB decided to aggressively grow the company's loans. The key components of the growth plan were (1) the recruitment and retention of experienced middle market commercial bankers, and (2) a new incentive program to reward high-performing PVTB employees for increasing the price of the company's stock. PVTB's statements are alleged to have materially misled investors about the success of the growth plan; the strength of PVTB's loan portfolio; PVTB's exposure to delinquent and/or nonperforming loans; the adequacy of PVTB's loan loss provisions and reserves; and the amount of write-offs necessary to address the company's growing credit-

quality concerns. Defendants are also alleged to have been aware, by no later than February 2008, of the extent of the problems in the company's legacy loan portfolio that would ultimately require write-downs of $108.8 million.

Violations of Section 10(b) of the Exchange Act are considered with reference to the PSLRA's pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Plaintiffs must plead the circumstances establishing the falsity of the alleged misrepresentations with particularity. 15 U.S.C. § 78u-4(b)(1); *Tellabs*, 551 U.S. at 308; *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1194 (N.D. Ill. 2009). Allegations that are based on "information and belief," must set forth "with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). The complaint makes clear that all allegations are "based on . . . information and belief as to all [ ] matters [other that Lead Plaintiffs' own acts]." The PSLRA provides that, with respect to each alleged act or omission, a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The required state of mind is scienter. *Pugh*, 521 F.3d at 693. To plead adequately a "strong inference" of scienter, the

particularized facts alleged must be such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011). This inherently comparative exercise obliges a court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. When a complaint fails to comply with these heightened pleading requirements, "the court shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

## A. Legacy Loans

Plaintiffs allege that defendants' statements made from the start of the class period through January 2009 were false and misleading because the officer defendants supposedly knew "the extent of the problems with the company's legacy loan portfolio by no later than February 2008" but "waited" until January 2009 to announce a $108.8 million write-down for these legacy loans. Defendants allegedly "failed to disclose the deteriorating credit quality problems in their legacy loan portfolio," particularly in the Atlanta and Michigan regions prior to January 2009; misstated PVTB's financial condition, included in its SEC filings, by not taking the January 2009 write-downs earlier; and misstated that problems

with the loan portfolio had only been uncovered when they announced the January 2009 write-downs.

During the class period, PVTB's SEC filings set forth the following loss information:

| Quarter End Source: 8-K | Provisions for Loan Losses Added in Quarter (in thousands) | Allowance for Loan Losses - Ending Balance (in thousands) | Total Loan Balance (in thousands) | Allowance for Loan Losses/ Total Loans | Loans Charged-Off (in thousands) |
|---|---|---|---|---|---|
| 3Q07 | $2,399 | $42,113 | $3,737,523 | 1.13% | $1,648 |
| 4Q07 | $10,171 | $48,891 | $4,177,795 | 1.17% | $3,435 |
| 1Q08 | $17,133 | $61,974 | $5,136,066 | 1.21% | $4,114 |
| 2Q08 | $23,024 | $79,021 | $6,417,026 | 1.23% | $6,097 |
| 3Q08 | $30,173 | $102,223 | $7,441,137 | 1.37% | $7,017 |
| 4Q08 | $119,250 | $112,672 | $8,036,807 | 1.40% | $109,459 |
| 1Q09 | $17,805 | $127,011 | $8,483,641 | 1.50% | $7,037 |
| 2Q09 | $21,521 | $140,088 | $8,728,926 | 1.60% | $12,580 |
| 3Q09 | $90,016 | $192,791 | $9,028,456 | 2.14% | $40,142 |

PVTB's announcement of its increased loan loss provisions attributed the increases in part to credit quality deterioration in the legacy loan portfolios, largely a result of increased non-performing assets related to its residential development loans--primarily driven by deterioration in residential development loan exposures. The complaint quotes some of these statements. PVTB's quarterly SEC filings disclosed non-performing loans by region. Any investor could learn

where the greatest impact was occurring. The filings included separate quarterly disclosures for the Michigan and Atlanta regions that plaintiffs single out. PVTB's 8-K filings disclosed that non-performing loans in the Michigan region had increased during second quarter 2008 from $7.644 million to $16.481 million. None of these specific disclosures are alleged to have been inaccurate. Plaintiffs interpret the January 2009 decision to write down an additional $108.8 million of the legacy loan portfolio as a misrepresentation by claiming that the 10(b) defendants had known since February 2008 that such a write-down was required.

Plaintiffs rely primarily on Confidential Witness ("CW") 1, who claims to have attended a February 2008 meeting. CW 1 claims there was a discussion at this meeting of "problems" with respect to the legacy portfolios in the Michigan and Atlanta regions. CW 1 does not say, however, whether these "problem" loans should be or were "deemed to be uncollectible by management." Nor does CW 1 or any other source say there was any recommendation of loan write-downs, or increases in loss reserves, that was not undertaken at that time. CW 1 does not say that at this meeting there was any discussion of a need to take the $108.8 million in write-downs that were taken approximately a year later. CW 1 says nothing more than that the existence of problem loans in Michigan and Atlanta was

discussed in the February 2008 meeting. However, that is entirely consistent with the public statements of such problems that the 10(b) defendants made, including PVTB's quarterly disclosure of non-performing loans in these regions, the accuracy of which plaintiffs do not directly challenge. And it is entirely consistent with the fact that PVTB increased its loan loss reserves, as well as its loan charge-offs, each quarter during 2008, disclosing that it was doing it because of the deterioration of these markets.

A hindsight disagreement with management's commercial judgment not to write off loans earlier does not render earlier financial statements false. Determinations of this sort are exercises in judgment, actionable only if they lacked any reasonable basis and were not genuinely believed. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090-93 (1991); *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315-16 (4th Cir. 2004) (dismissing claim that management lied to shareholders when it opined that loan loss reserves were adequate); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112-13 (2d Cir. 2011) (same); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) (same).

The complaint does not plead facts demonstrating than any particular collectability or reserve decisions were not reasonably based and believed in good faith at the time. No confidential witness supports that any of the 10(b) defendants

was told or knew, either in February 2008 or some other time prior to the
January 2009 announcement, that there were any specific loans that should be
deemed uncollectible or reserved for, but which were not in fact written off or
reserved for at the time. And the complaint does not identify any
contemporaneous document making any recommendation in that regard which it
claims was provided to any officer defendants but then disregarded. Plaintiffs rely
on the fact that PVTB ended up taking a large additional write-off in January
2009, including for the Michigan and Atlanta portfolios. In *DiLeo*, plaintiffs
alleged that the defendant, an accounting firm, "became aware that a substantial
amount of the receivables reported in financial statements were likely to be
uncollectible." 901 F.2d at 626. As here, the complaint pointed to the fact that the
bank ultimately announced write-offs in much larger amounts. *Id.* at 627-28. The
Seventh Circuit rejected those allegations and affirmed dismissal of the claims:

> For any bad loan the time comes when the debtor's failure is
> so plain that the loan is written down or written off. No
> matter when a bank does this, someone may say that it should
> have acted sooner. If all that is involved is a dispute about the
> timing of the writeoff, based on estimates of the probability
> that a particular debtor will pay, we do not have fraud; we
> may not even have negligence.

*Id.* at 627.

PVTB announced that it made additional write-downs of loans in the fourth quarter of 2008 because it said the quarter seemed to be a "tipping point" in light of "significant drops in the stock market, sharp increases in unemployment and continued dramatic declines in the housing markets"--all of which had led performance of the residential development portfolio to worsen during the quarter. These statements were accompanied by the accelerated market downturn at the time.

Plaintiffs have failed to allege particularized facts sufficient to give rise to a "strong inference" that any of the 10(b) defendants acted with scienter with respect to the alleged omissions and misstatements regarding the legacy loan portfolio. It is not sufficient to allege that a defendant was aware of the allegedly undisclosed information. There must be allegations sufficient to give rise to a strong inference that the non-disclosure was intended to mislead. **Matrixx,** 131 S. Ct. at 1324-25.

It is not alleged that defendants have engaged in stock sales or other potential indices of misbehavior. Instead, the claim is that the officer defendants supposedly "knew" that the legacy loan portfolio was doing worse than disclosed, and failed to take the January 2009 writeoffs earlier than they "knew" such write-offs should have been taken. Nowhere in the complaint is there any factual

allegation, from any confidential witness or documentary source, indicating than any of the officer defendants at some earlier time ever manifested a belief or was told by any of the confidential witnesses that there would be a write-off of the "problem" loans in the amount that was eventually written off as uncollectible in January 2009. Indeed, there is no particularized allegations that the officer defendants ever disregarded or failed to follow any recommendations they received at any time about the treatment of any particular legacy loans.

## B. Growth Plan Loans

Plaintiffs allege the falsity of two categories of statements regarding the status of loans made under the growth plan. First, they assert the inaccuracy of various statements made between January 2008 and July 2009 indicating that no loans originated under the growth plan were in the "non-performing loan" category quarterly reported by PVTB. Second, plaintiffs further assert that the 10(b) defendants deliberately failed to maintain an allowance for loan losses sufficient "to absorb the known credit losses inherent in the company's growth plan loan portfolio." According to PVTB's SEC filings, PVTB classified a loan as "non-performing" if it was delinquent for 90 days or more or if the accrual of interest income on the loan was discontinued. The complaint repeatedly asserts that there were growth plan loans that fell into this category earlier than disclosed.

Nowhere in the Complaint is there any growth plan loan specified for which non-performing status at the time is identified with particularity.

Having failed to identify any growth plan loans that were "non-performing" at the time of any particular statement, the complaint also fails to create a strong inference that any of the 10(b) defendants acted with scienter in making any of these statements. Indeed, the complaint pleads no facts at all demonstrating than any of the officer defendants were in receipt of contrary information at the time of the various public statements on this matter.

The complaint does not identify any growth plan loan as to which there were "know credit losses" prior to the third quarrier of 2009, but as to which no loss allowance was taken. *See DiLeo*, 901 F.2d at 626-27; *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433-34 (S.D.N.Y. 2010); *Adam v. Silicon Valley Bancshares*, 1994 WL 619300 *3 (N.D. Cal. Feb. 8, 1994) (allegations were insufficient where they did not give any specific examples of what loans were improperly recognized). Nor does the complaint quantify the amount of additional "credit losses" it claims should have been taken at any given earlier period, much less provide a factual basis for any such claim. The complaint is based on the premise that an unquantified number of non-performing growth plan loans had already existed prior to the third quarter of 2009, and that

10(b) defendants not only "knew" of these non-performing loans earlier but "knew" that these non-performing loans should be written down at some earlier time. The complaint reveals that when some of the growth plan loans did become non-performing, PVTB took credit losses at the time in light of that development.

The complaint characterizes PVTB's October 26, 2009 disclosures as "the whole truth." What PVTB disclosed on October 26 was that non-performing loans had increased from $183 million to $360 million in the period after June 30, 2009. Nowhere does the complaint dispute the accuracy of that fact or dispute that most of the increase in non-performing loans consisted of "legacy loans." The allegations of scienter with regard to allowances for "known credit losses" are deficient. Plaintiffs' claim here is essentially a hindsight dispute regarding the timing of loss provisions that were taken. *See DiLeo*, 901 F.2d at 627-28; *In re E.spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 748 (D. Md. 2001) ("The fact that a company did not increase its reserves fast enough is not evidence of fraud."); *In re First Chicago Corp. Sec. Litig.*, 769 F. Supp 1444, 1449 (N.D. Ill. 1991) ("Allegations that a defendant failed to maintain adequate loan loss reserves or invested in unduly risky or speculative loans, without more, seem to claim merely that the corporation was mismanaged.").

Plaintiffs' claims amount to a contention that "credit losses" should have been taken long before the loans even became "non-performing." The complaint does not contain any factual allegations demonstrating that any of the officer defendants "knew" of the purported "credit losses" on some growth plan loans before those loans became "non-performing," nor does it provide a factual basis for how any such knowledge was purportedly obtained by any given defendant. No "confidential witness" communication or contemporaneous document to that effect is cited.

## C. Loan Standards

It is alleged that the 10(b) defendants instituted a plan to abandon sound lending practices so as "to initiate as many loans as possible, regardless of the credit quality or long-term risk to the Company." Plaintiffs allege that the 10(b) defendants deliberately allowed poor quality commercial loans to be made-- knowing that these loans would go bad. Based on the purported existence of this undisclosed destructive strategy, plaintiffs allege that statements made during the Class Period--touching on such matter as loan growth and performance, risk management practices, and client selection--were false and misleading. The complaint does not set forth a particularized factual basis that supports these assertions. None of the confidential witnesses is alleged to have heard any of the

officer defendants or anyone else describe or acknowledge a plan to sacrifice

quality for quantity of loans. No document to that effect was cited in the

complaint. The complaint implies the existence of such a strategy from

conclusory and ambiguous characterizations rendered by ex-employees.

Generalized assertions are entirely insufficient under the PSLRA. *See **Huntington***

***Bancshares Inc. Sec. Litig.***, 674 F. Supp 2d 951, 964 (S.D. Ohio 2009) ("a shared

opinion among confidential witnesses does not necessarily indicate . . . falsity . . .

if the allegations themselves are not specific enough") (citations omitted); ***Nat'l***

***Junior Baseball League v. Pharmanet Dev. Group Inc.***, 720 F. Supp. 2d 517,

528-29, 538-46 (D.N.J. 2010) (rejecting confidential witnesses' conclusory

assertions that failed to set forth with particularity all facts on which those

assertions were based).

The complaint contains only four examples of allegedly poor quality

loans. They are (1) a $10 million loan to Vienna Beef, (2) a $2-3 million loan to

Harlan Furniture; (3) an unspecified amount of loans to Bower & Bailey which

allegedly later failed; and (4) a $20-30 million loan to General Growth Properties

which entered bankruptcy. The loans represent a total of $32-43 million, less than

1% of PVTB's total loan portfolio of between $4 billion and $9 billion during the

class period. That these loans should pass for what was "typical" is a conclusory

assertion. *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 332 (S.D.N.Y. 2009), *aff'd by unpublished order*, 371 F. App'x 212 (2d Cir. 2010) (rejecting allegations about total value of real estate portfolio based only on a few real estate sales); *First Chicago*, 769 F. Supp. at 1454 (rejecting adequacy of $200 million loan "example" where defendants' overall real estate portfolio was $4.4 billion); *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411 at *11 (N.D. Ill. June 29, 2001) ("We cannot reasonably infer from two instances the existence of 'widespread problems.'"). The only defendant alleged to have had anything to do with any of these loans is defendant Van Solkema. His involvement is alleged to have been with the Vienna Beef loan, which he was "not thrilled with" but approved "even though it had problems" because it was being priced accordingly. Nothing about these alleged facts may indicate some generalized decision to abandon lending standards. The alleged facts indicate that the loan was subject to scrutiny and priced to reflect the relevant risk. The complaint does not allege that this loan ever became non-performing.

None of the allegations about the three other loans indicates that any was made without adequate underwriting. CWs 1 and 9 note that borrowers Bower and Bailey and General Growth failed after loans were made to them. The complaint contains no factual allegations at all regarding the underwriting

processes for either of those loans, or any facts at all indicating that these loans were determined to be low quality/high-risk loans at the time they were made.[3] Though CW 1 notes that Harlan had had prior bankruptcies, he provides no specifics at all regarding the underwriting process and determinations made at the time of the $2-3 million loan made to it concerning the quality of the collateral securing the loan. Instead the complaint asserts CW 1's unexplained characterization of the loan as being "high risk"--notwithstanding the fact that, according to the complaint, PVTB would be holding $10 million in Harlan's cash deposits. The complaint's "examples" do not give rise to any broader inference of a general policy of abandoning lending quality requirements, and do not indicate inadequate underwriting in these few instances.

The complaint contains no allegations at all directly supporting the existence of a deliberate strategy by the 10(b) defendants "to initiate as many loans as possible, regardless of the credit quality or long-term risk to the company." Nor does the complaint disclose a deliberately concealed strategy from a mere handful of loans in which the officer defendants had no involvement (other than the Vienna Beef loan, as to which only Van Solkema was involved). There is no

---

[3]General Growth's bankruptcy filing apparently reflects repayment of the loan.

"cogent and compelling" inference of such a hidden strategy here, or "strong inference" that the 10(b) defendants lied whenever they discussed lending standards. *Tellabs*, 551 U.S. at 324. To the contrary, the purported strategy is contradictory. The loans were not sold or syndicated. It would not be in the interests of bank executives to intentionally embark on a strategy that would result in their bank deliberately making loans they knew were likely to be written down "in the near future." *Cf. DiLeo*, 901 F.2d at 629.

Plaintiffs also assert that the 10(b) defendants were motivated to mislead the market about their plan so that PVTB could conduct offerings in order to raise money to "potentially off-set the huge write-downs the Company was eventually forced to take" on loans under the Plan. They knew the growth plan would result in losses so that they could conduct offerings to cover those losses. This motive fails to allege any personal, concrete benefit that any officer defendant could realize from such a deception.

### III.  Group Pleadings

The complaint lumps all of the officer and director defendants together for purposes of all the challenged statements. There are no allegations tying each of the officer defendants to the "making" of each such statement. There are various oral statements quoted in the complaint made by a single officer defendant

which the complaint nonetheless attempts to attribute to all. The Seventh Circuit has made clear, a defendant can be held liable with respect to a statement only if he is a maker of that statement (and acts with scienter in the making). ***Pugh***, 521 F.3d at 696-97, *citing **Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.***, 552 U.S. 148 (2008). It is alleged that all the defendants had access to unspecified information and knew of the alleged misrepresentations by virtue of their high-level positions. But lumping all defendants together constitutes group pleading, which fails to meet the heightened PSLRA pleading requirements. ***Pugh***, 521 F.3d at 693-94. Vague allegations that defendants had "access to undisclosed information" have been rejected under the PSLRA. Courts have held that "[s]cienter . . . may not rest on the inference that defendants must have been aware of a misstatement based simply on their positions within the company." ***In re Bally Total Fitness Sec. Litig.***, 2006 WL 3714708 *8 (N.D. Ill. July 12, 2006). *See also **Abrams v. Baker Hughes Inc.***, 292 F.3d 424, 432 (5th Cir. 2002) (dismissing claims against the company's chairman and CFO because "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company"); ***Oran v. Stafford***, 226 F.3d 275, 290 (3d Cir. 2000) (quoting ***In re Advanta Corp. Sec. Litig.***, 180 F.3d 525, 539 (3d Cir. 1999)("[g]eneralized imputations of knowledge do not

suffice regardless of the defendants' position within the company"); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008), *denial of reconsideration aff'd sub. nom.*, *Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009). Likewise, allegations regarding unspecified reports, conversations, and meetings fall far short of the particularity requirements of the PSLRA and Rule 9(b) which require a plaintiff to "specifically identify the reports or statements containing this information." *See Higginbotham v. Baxter Int'l, Inc.*, 2005 WL 1272271 (N.D. Ill. May 15, 2005) ("*Higginbotham I*") (refusing to infer strong inference of scienter without "some details as to the contents of the reports [allegedly provided to defendants], as well as when and how reported"); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

Plaintiffs have not alleged any particularized facts giving rise to a strong inference that any of defendants made any false statements with scienter. Plaintiffs' failure to do so is not only fatal to their claims against these individuals, but also to their claims against PVTB. As the Seventh Circuit has explained:

> [T]he corporate scienter inquiry must focus on "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the

collective knowledge of all the corporation's officers and
employees acquired in the course of their employment."

*Pugh*, 521 F.3d at 697 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702, 708 (7th Cir. 2008)). Thus, to plead scienter against PVTB,
plaintiffs must either successfully plead that scienter is "held by the corporate
employee responsible for issuing the alleged misrepresentations or at least that a
senior officer or director of the corporation [has] the pertinent scienter."
*Higginbotham I*, 2005 WL 1272271 at *8. Having failed to do so with respect to
any officer defendant and having failed to identify anyone else who allegedly
made false statements with scienter, plaintiffs' allegations of scienter must fail.

### IV. Securities Act Claims

Sections 11 and 12(a)(2) of the Securities Act are provisions with
parallel elements. *Fait*, 655 F.3d at 109 (quoting *In re Morgan Stanley Tech.
Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). Section 11 governs
registration statements, and Section 12 governs prospectuses and oral
communications. 15 U.S.C. §§ 77k(a), 77l(a)(2). Whether the prospectus contains
a material misstatement or omission depends upon whether representations in the
prospectus, taken together and in context, would have misled a reasonable
investor. To be actionable, a statement must be false or misleading at the time it

was made; how things "turn out *ex post* do not matter to liability." ***Eckstein v. Balcor Film Investors***, 58 F.3d 1162, 1169 (7th Cir. 1995).

To separate the Securities Act claims from the Exchange Act claims, the complaint severs the two. As a result, specifics have been removed from the Securities Act allegations. No specific loans have been identified, no internal warnings or communications of any sort are alleged, and no "confidential witness" averments are included.

### A. The 2008 Offering

Plaintiffs do not allege that any of the statements contained in the registration statement or prospectus supplement for the 2008 offering were false or misleading. Instead, they allege that certain statements included in documents incorporated by reference in the offering materials were misleading, in three respects.

The complaint alleges that PVTB's incorporated 2007 10-K and April 28, 2008 8-K were misleading because they "failed to disclose the deteriorating credit quality problems in their legacy loan portfolio." PVTB did, however, disclose deterioration in its legacy loan portfolio in documents incorporated by reference into the 2008 offering documents. PVTB reported allowances for loan losses that, on a dollar basis and as a percentage of outstanding loans, continued to grow each

quarter, and also quarterly disclosed region-by-region increases in its non-performing loans. The disclosures accompanying these increases made clear that they were attributable to deterioration in the legacy loan portfolio, attributing growth in non-performing loans to "general weakening of the housing market, and the deterioration of many residential real estate development loans," and attributing 65% to residential development loans. These claims fail. *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (dismissing Section 11 claim where "the prospectus states exactly the 'fact' that [plaintiff] contends has been covered up"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) (dismissing Section 11 and 12 claims where "contradicted by the disclosure of risk made on the face of each prospectus"); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 313 (S.D.N.Y. 2001) (dismissing Section 11 claim "because the Prospectus disclosed the fact plaintiffs charge to have been omitted"), *aff'd*, 318 F.3d 170, 181-82 (2d Cir. 2003).

Also, the complaint alleges that the incorporated 2007-10-K and first quarter 2008 10-Q were each misleading because they "failed to maintain an allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's loan portfolio." Matters pertaining to the adequacy of reserves and loss allowances are in the nature of judgmental estimates. *See United States v.*

*Morris*, 80 F.3d 1151, 1163 (7th Cir. 1996) (holding that statements regarding the adequacy of loan loss reserves are matters of "opinion or belief" and that claims as to their falsity are therefore subject to the requirements of *Va. Bankshares*). Accordingly, statements by defendants regarding the adequacy of loan loss reserves can only be actionable under the Securities Act if it is alleged that defendants did not actually believe that loan loss reserves were adequate and defendants had no reasonable factual basis for that belief. *See Fait*, 655 F.3d at 111-13. *Cf. Morris*, 80 F.3d at 1164-65 (requiring a showing that "bank management did not truly believe in the adequacy of Germania's loss reserves and its statement to the contrary was not supported by the available facts."). The Securities Act claims contain no allegations indicating either that defendants did not actually believe that loan loss allowances were adequate at the time of the 2008 offering or that they lacked a reasonable basis for their beliefs at the time.

The complaint asserts that two of the incorporated documents, a January 28, 2008 8-K and an April 28, 2008 8-K were "false and misleading" because they did not go on to state that the increase in the loan portfolio was due to risky lending under the growth plan, resulting in a rapidly increasing number of bad loans. However, companies are under no obligation to characterize their operations in a negative manner.

## B.  The 2009 Offering

The complaint's allegations regarding the May 14, 2009 offering are insufficient.  The complaint alleges that two documents incorporated by reference in the 2009 offering materials were each false because they "did not provide any allowance for loan losses that was sufficient to absorb the credit losses inherent in the Company's Growth Plan loan portfolio."  These allegations are similar to those discussed with respect to the 2008 offering.  There are no allegations about how loan losses were estimated at the time.  Nor are there any allegations indicating that defendants did not actually believe that loan loss allowances were adequate at the time of the 2009 offering or that they lacked a reasonable basis for their beliefs at that time.

The complaint also alleges that each of these incorporated documents was "false" by failing to disclose "the high-risk loans originated under the Growth Plan."  These conclusory allegations are insufficient .  To the extent plaintiffs seek to suggest the existence of such policy sacrificing "quality" and making "high-risk loans" to achieve "quantity," no factual allegation in the Securities Act claim indicates the existence of any such deliberate policy.  Plaintiffs are required to allege "enough factual matter" as a basis for their claims to "nudge[ ] their claim

across the line from conceivable to plausible." ***Bell Atl. Corp. v. Twombly***,

550 U.S. 554, 570 (2007). They have not done so.

IT IS THEREFORE ORDERED that defendants' motions to dismiss [96, 98] are granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against lead plaintiffs dismissing lead plaintiffs' cause of action with prejudice.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: NOVEMBER 3 , 2011